# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| AT&T SERVICES, INC., and<br>AT&T MOBILITY LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>T-MOBILE US INC.,<br><br>*Defendant*. | Case No. 3:25-cv-03279-S |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

      A.    The Purpose of "Easy Switch"................................................................................3

      B.    Easy Switch Has Evolved Since November 20 .....................................................4

ARGUMENT ..........................................................................................................................9

I.     AT&T Cannot Show Any Likelihood Of Irreparable Harm..............................................9

      A.    T-Mobile Disabled The Original Version Of Easy Switch And Does Not
            Intend To Revert To It .........................................................................................10

      B.    AT&T's Claimed Harms From The Original Easy Switch Were
            Speculative And Not Irreparable .........................................................................12

II.    AT&T Is Also Not Likely To Succeed On The Merits Of Its Claims Regarding
      The Original Easy Switch .................................................................................................15

      A.    AT&T Is Not Likely To Succeed On Its Claims Under The CFAA And
            State-Law Analogues ..........................................................................................15

      B.    AT&T Is Not Likely To Succeed On Its Breach Of Contract Claim.....................20

      C.    AT&T Is Not Likely To Succeed On Its Tortious Interference Claim .................23

III.   The Balance Of Equities And The Public Interest Strongly Support T-Mobile ...............24

CONCLUSION.....................................................................................................................25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACI Payments, Inc. v. Conservice, LLC*,
　No. 1:21-cv-00084-RJS-CMR, 2022 WL 622214 (D. Utah Mar. 3, 2022) ............................18

*ACS Invs. Inc. v. McLaughlin*,
　943 S.W.2d 426 (Tex. 1997) ................................................................................................23

*Alscott, Inc. v. Sealer*,
　No. 3:22-cv-00844-L, 2022 WL 14915582 (N.D. Tex. Oct. 25, 2022) ..............................9, 10

*Am. Hosp. Ass'n v. Becerra*,
　738 F. Supp. 3d 780 (N.D. Tex. 2024) ...................................................................................9

*Anibowei v. Morgan*,
　70 F.4th 898 (5th Cir. 2023) ................................................................................................10

*Associated Mech. Tool Techs. v. Doosan Infracore Am., Inc.*,
　No. 4:15-cv-2755, 2015 WL 13660130 (S.D. Tex. Nov. 24, 2015) ......................................24

*Bates v. State Bar of Arizona*,
　433 U.S. 350 (1977) ........................................................................................................24, 25

*Bluefield Water Ass'n, Inc. v. City of Starkville*,
　577 F.3d 250 (5th Cir. 2009) ...............................................................................................25

*Budri v. FirstFleet Inc.*,
　No. 3:19-cv-0409-N-BH, 2019 WL 5587181 (N.D. Tex. Sept. 20, 2019) ............................15

*Carter v. Loc. 556, Transp. Workers Union of Am.*,
　156 F.4th 459 (5th Cir. 2025) ...............................................................................................9

*CDK Global, LLC v. Tekion Corp.*,
　No. 25-cv-01394-JSC, 2025 WL 1939951 (N.D. Cal. July 15, 2025) ...................................18

*Chegg, Inc. v. Doe*,
　No. 22-cv-07326-CRB, 2023 WL 4315540 (N.D. Cal. July 3, 2023) ....................................19

*Cigniti Techs. Inc. v. Govinsadamy*,
　No. 3:23-cv-2460-L, 2024 WL 4329021 (N.D. Tex. Aug. 7, 2024) .......................................15

*Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*,
　351 F.3d 642 (5th Cir. 2003) ...............................................................................................20

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) ................................................22

*Dresser-Rand Co. v. Jones*,
957 F. Supp. 2d 610 (E.D. Pa. 2013) ................................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ................................................25

*eBay, Inc. v. Bidder's Edge, Inc.*,
100 F. Supp. 2d 1058 (N.D. Cal. 2000) ................................................22

*Enargy Power Co. v. Wang*,
No. 13-cv-11348-DJC, 2013 WL 6234625 (D. Mass. Dec. 3, 2013) ................................................14

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................25

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................24, 25

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ................................................14, 17, 19

*Facebook, Inc. v. Power Ventures, Inc.*,
No. 08-cv-05780-JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................................14

*Fla. Atl. Univ. Bd. of Trustees v. Parsont*,
465 F. Supp. 3d 1279 (S.D. Fla. 2020) ................................................14

*Fram Corp. v. Boyd*,
230 F.2d 931 (5th Cir. 1956) ................................................10

*FTC v. Infinity Grp. Servs.*,
No. 09-cv-977-DOC (MLGx), 2009 WL 10670551 (C.D. Cal. Oct. 1, 2009) ................................................11

*FTC v. Intuit Inc.*,
No. 22-cv-01973-CRB, 2022 WL 1601403 (N.D. Cal. Apr. 22, 2022) ................................................11

*FTC v. Lakhany*,
No. 12-cv-00337-CJC (JPRx), 2012 WL 12860115 (C.D. Cal. May 2, 2012) ................................................11

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ................................................25

*Gibson v. Campbell*,
No. 09-cv-00983-WYD-KLM, 2010 WL 582383 (D. Colo. Feb. 17, 2010) ................................................11

*Good Sportsman Mktg. LLC v. Non Typical, Inc.*,
No. 6:07-cv-177, 2008 WL 11348379 (E.D. Tex. May 8, 2008) ............................................25

*Gouldd v. Accetta*,
No. 3:08-cv-0497-O, 2009 WL 10678304 (N.D. Tex. Feb. 24, 2009) ...............................9, 10

*Greer's Ranch Café v. Guzman*,
540 F. Supp. 3d 638 (N.D. Tex. 2021) ..............................................................................9, 15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) .........................................................................................15, 19

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ..................................................................................................13

*IPC Sys., Inc. v. Garrigan*,
No. 1:11-cv-3910-AT, 2012 WL 12872028 (N.D. Ga. May 21, 2012) ...................................19

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.*,
No. 3:16-CV-1651-L, 2016 WL 4944370 (N.D. Tex. Sept. 16, 2016) ....................................13

*Kendall Holdings, Ltd. v. Eden Cryogenics LLC*,
630 F. Supp. 2d 853 (S.D. Ohio 2008) ...................................................................................10

*Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*,
No. 14-cv-02737-BLF, 2015 WL 1289984 (N.D. Cal. Mar. 20, 2015) ..................................17

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
447 F. Supp. 3d 522 (N.D. Tex. 2020) ...............................................................................9, 11

*Meta Platforms, Inc. v. Ates*,
No. 22-cv-03918-TSH, 2023 WL 4035611 (N.D. Cal. May 1, 2023) ....................................14

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) ............................................................................17, 19

*Meta Platforms, Inc. v. Bright Data Ltd.*,
No. 23-cv-00077-EMC, 2024 WL 251406 (N.D. Cal. Jan. 23, 2024) ....................................21

*National Presto Industries Inc. v. Slate River Systems, Inc.*,
No. 4:25-cv-00462-O, 2025 WL 2684327 (N.D. Tex. May 7, 2025) ......................................12

*Ocusoft, Inc. v. Walgreen Co.*,
No. H-17-1037, 2017 WL 1838106 (S.D. Tex. May 8, 2017) .................................................13

*Ryanair DAC v. Booking Holdings Inc.*,
No. 20-cv-1191-WCB, 2024 WL 3732498 (D. Del. June 17, 2024) .......................................18

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) ..........................................................................9

*Southwest Airlines Co. v. BoardFirst, LLC*,
    No. 3:06-cv-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ..............14, 21

*Southwest Airlines Co. v. Kiwi.com, Inc.*,
    No. 3:21-cv-00098-E, 2021 WL 4476799 (N.D. Tex. Sept. 30, 2021) ..................21

*State Analysis, Inc. v. Am. Fin. Servs. Assoc.*,
    621 F. Supp. 2d 309 (E.D. Va. 2009) .............................................................18

*Stewart Glass & Mirror, Inc. v. USA Glas, Inc.*,
    940 F. Supp. 1026 (E.D. Tex. 1996)...............................................................24

*Tex. Marine & Brokerage, Inc. v. Bennington Marine, LLC*,
    No. 1:12-cv-397, 2012 WL 12888827 (E.D. Tex. Oct. 17, 2012)........................13

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) ...................................................................15, 19

*Wehner v. Linvatech Corp.*,
    No. 06-cv-1709-JMR/FLN, 2008 WL 495525 (D. Minn. Feb. 20, 2008).............11

*WickFire, LLC v. Woodruff*,
    989 F.3d 343 (5th Cir. 2021) ........................................................................23

**Docketed Case**

*Southwest Airlines Co. v. BoardFirst, LLC*,
    No. 3:06-cv-891 (N.D. Tex. July 28, 2006)......................................................14

**Statutes**

18 U.S.C. § 1030.....................................................................................15, 16, 18, 19

Ga Code Ann. § 16-9-93 ...............................................................................19

Tex. Pen. Code § 33.02 .................................................................................19

**Other Authorities**

*Access*, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/access?src=search-dict-box#h2 (last visited Dec. 8,
    2025) ...........................................................................................................20

*Use*, Merriam-Webster, https://www.merriam-webster.com/dictionary/using (last
    visited Dec. 8, 2025)....................................................................................20

## INTRODUCTION

Wireless providers like T-Mobile, AT&T, and others vigorously compete for customers. They compete on dimensions like network coverage, speed, quality, plan features, and, of course, price and value. This competition benefits consumers, and consumers benefit most when they can easily compare and choose among the available options.

To that end, on November 20, 2025, T-Mobile released a beta version of "Easy Switch," a new feature in its T-Life mobile application. Easy Switch is designed to allow non-T-Mobile customers to easily share information with T-Mobile about their existing wireless plans. T-Mobile then uses that information to generate recommended T-Mobile offers and to help the customer compare those competing offers against their current plan. The Easy Switch feature is inherently pro-competitive and pro-consumer, providing customers with the information they need to select a wireless plan that best suits their needs.

Instead of competing with T-Mobile on the merits of its plan offerings and wireless network, AT&T technologically blocked its customers from using the original version of the Easy Switch feature. It filed this lawsuit on the eve of Thanksgiving, and then moved over the holiday weekend for extraordinary and expedited relief, seeking a temporary restraining order to stop T-Mobile from offering the original Easy Switch tool.

AT&T claims "this case is not about competition for customers" (Mot. 1), but that is exactly what it's about. AT&T asks this Court to help it limit how AT&T customers can choose to voluntarily share their own account information to comparison shop with competing wireless providers. The Court should decline that invitation. AT&T cannot satisfy any of the required elements for temporary injunctive relief, and its motion should be denied.

AT&T's motion is defective in multiple ways. The most glaring and obvious of those is

1

that the version of Easy Switch it challenges *is no longer available to AT&T customers*, and it has not been available to AT&T customers since well before AT&T filed its motion. AT&T even admits as much. Among the pages of mischaracterizations and arguments about the original, now-disabled version of Easy Switch, AT&T concedes that "T-Mobile removed its [supposed] scraping function for AT&T customers" on November 26, 2025, *four days before AT&T filed for a TRO*. Mot. 2. Since then—including and through today—Easy Switch has only allowed AT&T customers to upload a copy of their wireless bill or manually enter their wireless plan information. AT&T does not allege that this current version of Easy Switch is unlawful or harms it—let alone irreparably so. Indeed, AT&T affirmatively agrees that it is common and appropriate for customers to bring their wireless bill to a competing carrier to comparison shop. Compl. ¶22; Dkt. 8, Ex. B ("Kia Decl.") ¶15 (Appx030). Finally, as T-Mobile's counsel informed AT&T's counsel on December 5, 2025, T-Mobile does not intend to revert to the original version of Easy Switch that AT&T challenges, given AT&T's dogged efforts to technologically block its customers from taking advantage of the feature and thereby impede their ability to compare the companies' offerings.

These facts resolve the motion. The conduct AT&T challenges is not occurring and AT&T has not objected to the operation of Easy Switch in its current form. Courts routinely deny emergency and preliminary relief when, as here, the challenged conduct is not ongoing and there is nothing to enjoin.

Accordingly, the Court can (and should) deny AT&T's motion without even reaching the other required elements for a temporary restraining order. In any case, though, each of those elements also favors T-Mobile. AT&T is unlikely to succeed on the merits of any of its claims. T-Mobile's Easy Switch feature was entirely lawful. AT&T's motion grossly mischaracterizes the

functionality of that feature in an effort to mask its true motivation—to make it more difficult for AT&T customers to see that T-Mobile may offer better service terms. And it follows, of course, that neither the balance of equities nor the public interest supports restricting T-Mobile from offering a pro-consumer, pro-competitive feature like Easy Switch. AT&T's motion should be denied.

## BACKGROUND

### A.       The Purpose of "Easy Switch"

T-Mobile[1] operates a mobile application called "T-Life." Ex. A ("Shah Decl.") ¶2 (DAppx003). On November 20, 2025, T-Mobile released a new optional feature in the T-Life app called "Easy Switch" as a "beta" version. *Id*. ¶3 (DAppx003). Easy Switch is designed to allow consumers who are not T-Mobile customers to use the T-Life app to compare their existing AT&T or Verizon wireless plans against competing T-Mobile plans that may better suit their needs. *Id*. ¶4 (DAppx003).

Using information that prospective customers provide to T-Mobile, Easy Switch gives those prospective customers a personalized recommendation containing T-Mobile offerings. *Id*. ¶5 (DAppx003). To generate the most relevant and best value recommendations, T-Mobile needs accurate and complete information about a prospective customer's current wireless account—including the type of plan the customer has, the monthly cost, how many lines the customer has, and the different devices covered by the plan. *Id*. If the customer finds a T-Mobile offering to be

---

[1] AT&T's Complaint names as the defendant T-Mobile US, Inc., and AT&T alleges that entity does business under the name T-Mobile USA, Inc. *See* Compl. 1 n.1. In fact, T-Mobile USA, Inc. is a wholly owned operating subsidiary of T-Mobile US, Inc. *See* T-Mobile US, Inc., Annual Report (Form 10-K) at 190 (Jan. 31, 2025). T-Mobile USA, Inc. distributes the T-Life mobile app that includes the Easy Switch feature, and T-Mobile USA, Inc. is therefore likely the entity AT&T should have named as the defendant in this case.

better, the customer can select that offering and quickly complete the switching process within the T-Life app, without ever having to go to a physical store. *Id.* ¶6 (DAppx003).

AT&T agrees that comparison shopping like this is appropriate, observing that "competitors may seek to provide AT&T customers with offers to switch" by "allow[ing] AT&T users to upload a copy of their AT&T bill in order to receive a competitive offer." Kia Decl. ¶15 (Appx030); *see also* Compl. ¶22 ("AT&T customers can share information about their service plans and compare AT&T plans with those of their competitors."). Indeed, consumers have long brought hard copies of their wireless bills into the stores of competing providers to compare wireless options. Shah Decl. ¶7 (DAppx003-004). Easy Switch is designed to streamline and digitize that established process by allowing customers to easily compare personalized wireless offers from a convenient app on their phones. *Id.*

### B.    Easy Switch Has Evolved Since November 20

T-Mobile released the original version of Easy Switch in "beta" on November 20, 2025. (AT&T pejoratively—and inaccurately—coins that version the "SME scraping tool.") Shah Decl. ¶8 (DAppx004). As shown below, prospective customers could find the feature on a screen in the T-Life app that announced: "Switching pays off—your way to save starts here." *Id.* ¶9 (DAppx004). From there, the customer could then choose the Easy Switch experience by clicking a button with an invitation to "Share your current account details to get matched with your best T-Mobile plan." *Id.* The next screen allowed the customer to select the customer's current carrier and explained, "You'll need to log into your current carrier account and get your details to build the best T-Mobile match." *Id.*

  

*Id.* ¶10 (DAppx004).

As shown in the screenshots below, a customer who selected "AT&T" would then see a screen that again described the information the customer would share with T-Mobile by using the Easy Switch tool: "This tool will pull your phone numbers, billing address, account, plan, and device details." *Id*. ¶11 (DAppx005). Clicking the "Agree and continue" button at the bottom of that screen then opened a "WebView" within the T-Life app. *Id*. ¶13 (DAppx005). A WebView is a web browser window—like Safari on iPhone and Chrome on Android—that opens within an app. *Id*. ¶14 (DAppx005). WebViews are commonplace in apps because they allow app users to access external content conveniently and in its native format. *Id*.[2]

---

[2] Just like a standard web browser window, a WebView can navigate to URLs and display webpage content, all without leaving the app. Shah Decl. ¶14 (DAppx005). Both iOS and Android provide app developers WebView tools for use in apps on those mobile operating systems. *Id.*



*Id.* ¶¶12, 16, 19 (DAppx005-007).

The WebView browser then allowed the customer to access their own AT&T account. *Id.* ¶15 (DAppx006). As shown on the middle screenshot above, the WebView first displayed a standard AT&T login page. *Id.* The customer could then log into their AT&T account, just like they would in any other context, by manually entering their AT&T username and password, clicking "Sign in" and completing two-factor authentication. *Id.* T-Mobile never accessed or stored the customer's AT&T login credentials. *Id.* ¶17 (DAppx006).

By logging in, the customer requested the customer's *own* account, plan, and device information from AT&T's website, which was sent to the *customer's* phone. *Id.* ¶18 (DAppx006-007). This information—all of which is available to the customer through the AT&T account portal—then loaded on the customer's phone. *Id.* While the information loaded onto the customer's phone, the customer was shown a screen describing the information being sent to the customer, as shown on the rightmost screenshot above. *Id.* The screen serially displayed the following text:

"Finding your lines information;" "Finding your device information;" and "Finding your contact and account information." *Id.* Only then—once the information had arrived on the customer's phone—was it shared with T-Mobile to allow T-Mobile to generate a personalized plan recommendation for the customer. *Id.* At no point did T-Mobile access or request information from AT&T's servers. *Id.*[3]

Shortly after T-Mobile launched the original version of Easy Switch in beta, AT&T began interfering with the feature's use—attempting to stop its customers from using Easy Switch to share *their own* information with T-Mobile to help them make an informed decision about their wireless carrier and plan. *Id.* ¶24 (DAppx009). Those efforts ultimately succeeded. AT&T repeatedly blocked the original Easy Switch, and—as AT&T acknowledges—T-Mobile eventually disabled the original Easy Switch for AT&T customers on November 26, 2025. *Id.* ¶25 (DAppx009); Dkt. 8, Ex. A ("Abraham Decl.") ¶39 (Appx013-014). AT&T also admits that the original version of Easy Switch was used only *342* times in the six days it was available. Abraham Decl. ¶43 (Appx015).

T-Mobile released the current version of Easy Switch for AT&T customers on November 26, 2025. Shah Decl. ¶26 (DAppx009). In the current version, which remains live, T-Mobile gives AT&T customers two methods to provide T-Mobile with information about their plans. *Id.* ¶27 (DAppx009). AT&T customers can upload a copy of their AT&T wireless bill, or, alternatively, they can manually enter information about their existing plan into Easy Switch. *Id.* The screenshots

---

[3] Although irrelevant, AT&T is wrong that the original Easy Switch collected information that is not "available to a customer through their AT&T wireless bill or its account portal." Mot. 10. Every category of data AT&T identifies (*id.*) is available to the customer on the webpages of their AT&T account portal. Shah Decl. ¶23 (DAppx007). And it is exactly these kinds of "account, plan, and device details" that the customer agreed to share with T-Mobile when choosing to use the original version of Easy Switch. *Id.* ¶12 (DAppx005).

below illustrate the current Easy Switch.



*Id.* ¶28 (DAppx010).

AT&T's motion—filed four days after T-Mobile launched the current version of Easy Switch—does not challenge that version, and AT&T agrees that it is permissible. *See* Kia Decl. ¶15 (Appx030) ("[C]ompetitors may seek to provide AT&T customers with offers to switch" by "allow[ing] AT&T users to upload a copy of their AT&T bill in order to receive a competitive offer.").

AT&T filed its TRO motion on November 30. In that motion, AT&T seeks sweeping relief that is both fatally vague and goes far beyond the original version of Easy Switch that it challenged.[4] On December 5, 2025, T-Mobile's counsel informed AT&T's counsel that T-Mobile

---

[4] AT&T's proposed injunction (Dkt. 7-2) is itself riddled with flaws. To begin with, by its own terms it purports to enjoin indisputably lawful conduct—including "providing a means for others to access" or "attempting to access" AT&T computers. *See infra* p. 17. It also broadly covers "*any* automated means"—not just the challenged version of Easy Switch—that "access . . . AT&T's

does not intend to re-enable the original version of Easy Switch and requested that AT&T therefore withdraw its motion without prejudice. *See also* Shah Decl. ¶29 (DAppx010). AT&T declined to do so.

**ARGUMENT**

AT&T's unnecessary motion should be summarily denied for a simple reason: ***T-Mobile disabled the original version of Easy Switch that AT&T claims is unlawful, and T-Mobile does not intend to reenable it.*** AT&T thus cannot show that it is suffering or will suffer any irreparable harm. That begins and ends the inquiry because, without irreparable harm, the Court "need not reach the remaining three elements." *See Alscott, Inc. v. Sealer*, 2022 WL 14915582, at \*3 (N.D. Tex. Oct. 25, 2022) (Lindsay, J.); *Gouldd v. Accetta*, 2009 WL 10678304, at \*2 (N.D. Tex. Feb. 24, 2009) (O'Connor, J.) (same). But even if the Court does reach those elements, they likewise support denying AT&T's request for emergency relief, as set forth below.

**I.      AT&T Cannot Show Any Likelihood Of Irreparable Harm**

"An irreparable injury is a *sine qua non* for injunctive relief." *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 805 (N.D. Tex. 2024) (Pittman, J.). The "irreparable harm" factor is accordingly "perhaps the most important of the four elements" that courts must consider in assessing a motion for a temporary restraining order. *Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 534 (N.D. Tex. 2020) (Kacsmaryk, J.); *see also Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 644-45 (N.D. Tex. 2021) (O'Connor, J.) (TROs and

---

computer systems or websites without authorization." It is thus not "narrowly tailor[ed] . . . to remedy the specific action." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). Beyond that, the proposed injunction consists largely of vague commands lifted from the CFAA, the state-law analogues, and AT&T's Terms of Use ("TOU"). Such "injunctions simply telling a party to 'obey the law' are improper." *Carter v. Loc. 556, Transp. Workers Union of Am.*, 156 F.4th 459, 500 (5th Cir. 2025).

9

preliminary injunctions are governed by the "same" principles). It requires a showing that there is a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023).

### A.    T-Mobile Disabled The Original Version Of Easy Switch And Does Not Intend To Revert To It

AT&T's motion attacks the original version of Easy Switch. AT&T does not challenge or claim to be harmed by the current version of Easy Switch. Compl. ¶22 ("Consistent with AT&T's belief in the importance of transparency and choice, AT&T customers can *share information about their service plans* and compare AT&T plans with those of their competitors." (emphasis added)); Kia Decl. ¶15 (Appx030) ("[C]ompetitors may seek to provide AT&T customers with offers to switch" by "allow[ing] AT&T users to upload a copy of their AT&T bill in order to receive a competitive offer"); *see also* Mot. 19-22. And T-Mobile does not intend to reenable the original version of Easy Switch. Shah Decl. ¶29 (DAppx010). Accordingly, there is no possibility of "imminent" future harm. *Anibowei*, 70 F.4th at 902.

A wealth of authority confirms that temporary or preliminary relief is not warranted when the defendant is not currently engaged in the challenged conduct. *See, e.g.*, *Fram Corp. v. Boyd*, 230 F.2d 931, 934 (5th Cir. 1956) ("past acts and practices furnish no basis for injunctive relief when, as here, they have been effectively discontinued"); *Alscott*, 2022 WL 14915582, at *3-4 (no irreparable harm where defendant "ceased all allegedly violating activities and the plaintiff d[id] not rebut this assertion with evidence of continuing losses"); *Gouldd*, 2009 WL 10678304, at *2 (denying preliminary injunction because "Defendants have represented that they are no longer using the material that is the basis for this lawsuit"); *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 868-69 (S.D. Ohio 2008) (finding "no substantial danger of irreparable

harm to [p]laintiff that would justify the extraordinary remedy of issuing a temporary restraining order" in part because defendants had already halted the alleged conduct); *FTC v. Intuit Inc.*, 2022 WL 1601403, at *1 (N.D. Cal. Apr. 22, 2022) (denying TRO and preliminary injunction where defendant had "removed several of the . . . [challenged] advertisements"); *FTC v. Lakhany*, 2012 WL 12860115, at *1 (C.D. Cal. May 2, 2012) (denying TRO where the plaintiff failed to show that the defendant was "engaging in the wrongful conduct at issue in this action").[5]

In its motion, AT&T argued that it faced a risk of supposedly irreparable harm because AT&T believed T-Mobile would continue to attempt to make the original Easy Switch available to AT&T customers.[6] But AT&T's speculation does not satisfy the high legal bar for immediate, emergency relief now. *See, e.g.*, *Intuit*, 2022 WL 1601403, at *1 (denying TRO and preliminary injunction in part because defendant ceased the challenged conduct, but noting plaintiff may "return to this Court" to request relief if conduct resumed); *Infinity Grp.*, 2009 WL 10670551, at *4 (denying a preliminary injunction "without prejudice to the FTC again seeking preliminary

---

[5] *See also FTC v. Infinity Grp. Servs.*, 2009 WL 10670551, at *4 (C.D. Cal. Oct. 1, 2009) (defendant's "cessation" of challenged conduct "militates against the imposition of a preliminary injunction"); *Mayo Found.*, 447 F. Supp. 3d at 534 (alleged "*past* injuries" cannot support a forward-looking injunction); *Gibson v. Campbell*, 2010 WL 582383, at *2 (D. Colo. Feb. 17, 2010) ("Conduct that has already occurred and is not ongoing cannot be remedied by the Court by the issuance of a preliminary injunction."); *Wehner v. Linvatec Corp.*, 2008 WL 495525, at *3 (D. Minn. Feb. 20, 2008) ("Because Defendant's current conduct is not causing the Plaintiff harm, injunctive relief is not proper.").

[6] AT&T points to a prior press release, T-Mobile's response to its cease-and-desist letter, and T-Mobile's previous efforts to maintain the availability of the original Easy Switch to the benefit of consumers to suggest that AT&T needs an emergency injunction now. Mot. 4-7, 20-21. Make no mistake, T-Mobile steadfastly believes that the original Easy Switch was both good for consumers and entirely lawful. Given AT&T's repeated actions to block its customers from using the original version of Easy Switch, however, T-Mobile does not intend to reenable it. Shah Decl. ¶29 (DAppx010). T-Mobile's commitment to defending its past conduct and advocating the rights of consumers does not entitle AT&T to an injunction. Should T-Mobile in the future launch a different version of Easy Switch or some other tool that AT&T finds objectionable, AT&T would of course be free to seek injunctive relief at that time.

injunctive relief during the pendency of this action if new evidence comes to light demonstrating that Defendants have reentered the debt negotiation business and are offering similar services to those complained of").[7] By the date of the hearing on AT&T's motion, the original Easy Switch will have been inactive for 20 days—more than three times longer than it was active. On these facts, AT&T cannot show *any* likelihood of immediate, irreparable harm. Its motion for "emergency," prospective injunctive relief should be denied on that basis alone.

### B.    AT&T's Claimed Harms From The Original Easy Switch Were Speculative And Not Irreparable

AT&T's motion also fails to establish irreparable harm for additional and independent reasons. First, AT&T's claims of damage to its goodwill and reputation are speculative and legally insufficient. Second, AT&T's factually unsupported assertion that T-Mobile's supposed access to its computer systems is itself an irreparable harm does not support immediate injunctive relief.

For example, AT&T's declarants hypothesize that the so-called "security measures" AT&T put into place to prevent customers from accessing their accounts using Easy Switch "pose a *risk* of 'false positives,'" because "AT&T cannot eliminate the risk" that those measures might block "legitimate AT&T customers or approved marketing partners." Abraham Decl. ¶40 (Appx014). Piling speculation on speculation, AT&T then suggests any such "false positives" might somehow make "[c]ustomers . . . *less likely* to believe in AT&T's promise of reliable wireless services if they cannot reliably access AT&T's own websites." Kia. Decl. ¶13 (Appx029). AT&T points to no evidence of any actual "false positives"—let alone any customer subjected to

---

[7] AT&T cites *National Presto Industries Inc. v. Slate River Systems, Inc.* (Mot. 24), but unlike here, the plaintiff in that case *did* face a concrete risk of irreparable injury—potential transfer of funds the plaintiff had paid to a defendant that was then nearing insolvency. 2025 WL 2684327, at *2-3 (N.D. Tex. May 7, 2025) (O'Connor, J.). No such risk of impending harm exists here because T-Mobile does not intend to reenable the original Easy Switch. *See supra* pp. 10-11 (listing cases).

one claiming to now doubt the reliability of AT&T's wireless service. AT&T also claims that, despite AT&T customers having used Easy Switch to access their accounts only "*342* times"—out of 119 million total AT&T customers—"high unanticipated traffic" from customers using Easy Switch could "force AT&T to invest in additional server infrastructure, or risk slower response times and a poor user experience for AT&T customers." Abraham Decl. ¶43 (Appx015) (emphasis added). It again identifies no evidence that Easy Switch actually impaired its website or is even capable of doing so. And AT&T guesses that, "[i]n the event of" a theoretical T-Mobile data breach—which it provides no reason to believe would in fact occur—involving information that AT&T customers shared with T-Mobile through Easy Switch, "AT&T's goodwill and customer relationships would be further damaged because AT&T was the original collector of the data." Kia Decl. ¶15 (Appx030).

But such "[s]peculative injury is not sufficient." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). That is especially so when the claimed harm is to business reputation or goodwill, which "in most cases . . . do not constitute irreparable harm since they are compensable through monetary damages." *Tex. Marine & Brokerage, Inc. v. Bennington Marine, LLC*, 2012 WL 12888827, at *5 (E.D. Tex. Oct. 17, 2012); *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, 2016 WL 4944370, at *13-16 (N.D. Tex. Sept. 16, 2016) (Lindsay, J.) (denying relief where plaintiff's proffered support "regarding the possibility of permanent loss of customers to a competitor or the loss of goodwill" was "purely speculative" and "conclusory"); *Ocusoft, Inc. v. Walgreen Co.*, 2017 WL 1838106, at *4 (S.D. Tex. May 8, 2017) (similar). And AT&T does not even try to demonstrate that its claimed reputational and goodwill harms could not be remedied by money damages if they were to materialize.

Likewise, AT&T is wrong that it can establish irreparable injury merely by claiming the

original Easy Switch "interfered with AT&T's control of its own computer systems and data." Mot. 19. As discussed below, T-Mobile *did not access* AT&T's computer systems—much less interfere with them. *Infra* pp. 16-17. And the cases AT&T cites are distinguishable because, in each of them, the defendant engaged in some *additional* conduct beyond mere access that was especially harmful or truly irreparable.[8] And even then, courts typically waited until the end of the case—after adequate discovery and a determination of liability—to grant a permanent injunction; they did *not* grant preliminary relief, much less on an expedited basis. *See* Order, *Southwest Airlines Co. v. BoardFirst, LLC*, No. 3:06-cv-891 (N.D. Tex. July 28, 2006), Dkt. 19 (Boyle, J.) (denying preliminary injunction); *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *12 (N.D. Cal. July 20, 2010) (denying plaintiff's motion for judgment on the pleadings); *Power Ventures*, 844 F.3d at 1064 (observing that the court later granted a permanent injunction). Granting preliminary relief on this theory would be especially inappropriate here, where the challenged version of Easy Switch was active for only six days and was purportedly used fewer than 350 times. Abraham Decl. ¶43 (Appx015).

---

[8] In *Enargy Power Co. v. Wang*, the defendant "destroy[ed] the original files from the [plaintiff's] secure server" and prevented plaintiff from accessing "files on its own server." 2013 WL 6234625, at *1, 6 (D. Mass. Dec. 3, 2013). In *Meta Platforms, Inc. v. Ates*, the defendant "posted the scraped data" on clone sites which "promoted 'stalking people.'" 2023 WL 4035611, at *2-3 (N.D. Cal. May 1, 2023). In *Facebook, Inc. v. Power Ventures, Inc.*, the defendant sent messages to users *within the Facebook system* and sent tens of thousands of external emails impersonating "The Facebook Team." 844 F.3d 1058, 1063 (9th Cir. 2016); *see also Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1286 (S.D. Fla. 2020) (obtaining and using students' login credentials to send "mass-marketing emails"). And in *Southwest Airlines Co. v. BoardFirst, LLC*, Southwest's "legitimate interest in maximizing selling opportunities from its own website" was harmed when the defendant checked Southwest customers into their flights to obtain prioritized boarding, depriving Southwest the opportunity to "sell additional airline tickets or to cross-sell hotel and rental car reservations." 2007 WL 4823761, at *18 (N.D. Tex. Sept. 12, 2007) (Boyle, J.).

## II.    AT&T Is Also Not Likely To Succeed On The Merits Of Its Claims Regarding The Original Easy Switch

Because AT&T cannot show any risk of irreparable harm, there is no reason to address AT&T's likelihood of success on its claims about the original version of Easy Switch on this "emergency" motion. *Supra* pp. 9-14; *see Greer's Ranch Café*, 540 F. Supp. 3d at 645 (court "cannot grant the TRO or preliminary injunction" if "a party fails to meet *any* of the four requirements" for relief). But even if the Court *were* to address the merits of AT&T's challenge to the original version of Easy Switch, AT&T cannot show that it is likely to succeed on the merits.

### A.    AT&T Is Not Likely To Succeed On Its Claims Under The CFAA And State-Law Analogues

The CFAA is, at its core, a criminal "anti-hacking statute," *Budri v. FirstFleet Inc.*, 2019 WL 5587181, at *9 n.10 (N.D. Tex. Sept. 20, 2019) (Ramirez, Mag. J.), that was "enacted to prevent intentional intrusion onto someone else's computer." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). Courts thus interpret its provisions to "maintain[] the CFAA's focus on hacking rather than turning it into a sweeping Internet-policing mandate." *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc). Those provisions "must be construed narrowly, even in civil actions, because the same sections that give rise to civil remedies also give rise to criminal penalties." *Cigniti Techs. Inc. v. Govinsadamy*, 2024 WL 4329021, at *13 (N.D. Tex. Aug. 7, 2024) (Horan, Mag. J.) (internal citations omitted).

A CFAA claim requires AT&T to prove that T-Mobile (1) intentionally "accesse[d]" a computer, (2) without authorization or in excess of authorized access, (3) and thereby "obtain[ed]" information (4) from a protected computer, and (5) caused a qualifying loss.[9] *See* 18 U.S.C. § 1030(a)(2), (a)(4), (c)(4)(A)(i)(I).

---

[9] A claim under Section 1030(a)(4) of the CFAA requires proof of the same basic elements, Mot. 11, but also requires proof that the defendant acted knowingly and with intent to defraud. 18 U.S.C.

AT&T cannot show that the original version of Easy Switch likely violated this anti-hacking statute because T-Mobile never "accesse[d]" AT&T's servers to request or "obtain[]" customer information from them. 18 U.S.C. § 1030(a)(2), (a)(4). The original version of Easy Switch allowed an AT&T customer, *not* T-Mobile, to log into their own AT&T account. The customer, *not* T-Mobile, then asked AT&T's servers to transmit the customer's own account, plan, and device information to the customer's phone. Only then—once the information had arrived on the customer's phone—was that information shared with T-Mobile.



Shah Decl. ¶20 (DAppx008); *see also id.* ¶¶15-20 (DAppx006-008). A customer's voluntary decision to share their own plan information with T-Mobile ***from their own phone*** is not in any respect equivalent or analogous to hacking AT&T's computer systems.

***"Access."*** AT&T's CFAA claims fail out of the gate because T-Mobile did not "access[]" AT&T's computer servers at all. 18 U.S.C. § 1030(a)(2), (a)(4). AT&T devotes just five lines to the "access" element, asserting without support that T-Mobile collected data from AT&T's

---

§ 1030(a)(4). Because AT&T cannot meet the threshold CFAA elements as discussed below, its Section 1030(a)(4) claim also fails.

computer servers. Mot. 8. That is wrong. Only the AT&T customer ever accessed AT&T's servers. T-Mobile did not.

Rather, T-Mobile only "access[ed] and process[ed] the data that [AT&T] has sent to the individual users—incidentally, information that [AT&T] has never argued users are not free to share as they see fit." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022). Using the now-disabled version of Easy Switch, an AT&T *customer* would log into their own account to ask AT&T to send the customer's own information to the customer's phone. T-Mobile did not "proactively 'access[]' or 'communicat[e] with' [AT&T's] servers" at all. *Id.* (finding no CFAA violation where an internet browser extension only collected information that had been "transmit[ted] to the user").

T-Mobile's lack of any direct access to AT&T's computers is dispositive. "Reading the CFAA in its context as an anti-hacking statute, 'access' means something more than persuading someone to procure information you desire." *Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, 2015 WL 1289984, at *4 (N.D. Cal. Mar. 20, 2015). Rather, the statute is violated only where the defendant "[it]self physically engaged in the hacking." *Id.* at *5; *see also BrandTotal*, 605 F. Supp. 3d at 1268 (relying on an "authorized intermediary to obtain data from a computer the principal is not authorized to access does not violate the statute"); *Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 615 (E.D. Pa. 2013) (similar). AT&T cannot impute liability to T-Mobile based on a customer's authorized access of AT&T servers.

By contrast, the cases that AT&T cites (Mot. 9-10) all involved situations where an allegedly unauthorized defendant directly interacted with and accessed the plaintiff's computer servers and did not merely receive an authorized user's content from that authorized user. *See Power Ventures*, 844 F.3d at 1063 (defendant used users' Facebook credentials to access

Facebook's servers, send automated and unauthorized messages to other users "within the Facebook System," post events and photos "on the user's Facebook profile," and email users' "friends" by impersonating "The Facebook Team"); *ACI Payments, Inc. v. Conservice, LLC*, 2022 WL 622214, at *1-2 (D. Utah Mar. 3, 2022) (defendant's website directly initiated transactions and processed payments on plaintiff's website); *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 314 (E.D. Va. 2009) (defendant directly accessed plaintiff's database); *CDK Global, LLC v. Tekion Corp.*, 2025 WL 1939951, at *2 (N.D. Cal. July 15, 2025) (defendant installed unauthorized software, created their own user login accounts, and directly accessed plaintiff's servers to conduct "mass data exports" of proprietary information not available to the user); *Ryanair DAC v. Booking Holdings Inc.*, 2024 WL 3732498, at *1-2, *17-18 (D. Del. June 17, 2024) (defendants and affiliated vendors directly accessed and obtained information from Ryanair's website without user input and created Ryanair accounts to purchase and sell Ryanair tickets without authorization).

*"Obtain" Information.* For similar reasons, T-Mobile did not "obtain[]" information from AT&T's computer servers. 18 U.S.C. § 1030(a)(2). The CFAA does not prohibit obtaining information in general. Rather, a defendant violates the statute only if it "accesses" and "thereby obtains information from" a "covered computer." *Id.*; *see also id.* § 1030(a)(4) (barring "obtain[ing] anything of value" "by means of" fraudulent access). AT&T asserts (Mot. 10), without explanation or support, that T-Mobile "obtains" "vast amounts of" information from AT&T's servers. But AT&T again wholly ignores that it was the *customer*, not T-Mobile, that requested and obtained their own plan information from AT&T via the original Easy Switch. *Supra* pp. 4-7, 16-17. At most, T-Mobile "obtain[ed]" information only from the customer's phone after

18

that transmission occurred—conduct that does not violate the CFAA. *See BrandTotal*, 605 F. Supp. 3d at 1260.

**"*Without Authorization.*"** AT&T is also wrong that T-Mobile accessed or obtained information from AT&T's servers "without authorization" or by "exceed[ing] authorized access." 18 U.S.C. § 1030(a)(2), (a)(4). AT&T's argument (Mot. 9) that it did not authorize T-Mobile to access its servers is entirely beside the point because, as discussed, T-Mobile did not access AT&T's servers at all. AT&T ignores who was doing the "accessing": the customer (who is authorized to access their account information), not T-Mobile. *Supra* pp. 4-7, 16-17.

Nor can AT&T rely on its terms of use to satisfy the "without authorization" prong. Mot. 9. It is well-established that a purported "violation of the terms of use of a website . . . cannot establish liability under the CFAA." *hiQ Labs*, 31 F.4th at 1196 (citing *Power Ventures*, 844 F.3d at 1067); *Chegg, Inc. v. Doe*, 2023 WL 4315540, at *2-3 (N.D. Cal. July 3, 2023) (finding that plaintiff was not likely to succeed on CFAA claim in part because "the fact that [defendant] has clearly flouted [plaintiff's] terms of use . . . has no bearing on whether it has violated the CFAA"); *see also Nosal*, 676 F.3d at 861-62. Further, as discussed, *infra* pp. 20-23, Easy Switch does not even violate AT&T's terms of use.

**State-Law Analogue Claims.** For the same reasons as its CFAA claims fail, so too do AT&T's state-law claims under the California Computer Data Access and Fraud Act, the Georgia Computer Systems Protections Act, and the Texas Harmful Access by Computer Act. Like the CFAA, the three state laws all include as an element that an individual "access" or "use" a computer without authorization or without consent. *See BrandTotal*, 605 F. Supp. 3d at 1260; Tex. Pen. Code § 33.02; Ga. Code Ann. § 16-9-93(a); *see also IPC Sys., Inc. v. Garrigan*, 2012 WL 12872028, at *10 (N.D. Ga. May 21, 2012) (the "use[]" requirement in Georgia statute is satisfied

by "unauthorized access to a computer"). Because T-Mobile did not "access" or "use" AT&T's computer networks, *supra* pp. 16-17, it necessarily did not violate these parallel state laws.

### B.    AT&T Is Not Likely To Succeed On Its Breach Of Contract Claim

For similar reasons, AT&T also cannot show a likelihood of success on its breach of contract claim. AT&T fails to show that T-Mobile was bound by AT&T's Terms of Use ("TOU") or that the original Easy Switch violated the TOU. AT&T thus cannot establish any breach of contract.

***No Contract Was Formed Between T-Mobile and AT&T.*** AT&T claims that T-Mobile "assent[ed]" to the AT&T TOU solely by "us[ing] the website." Mot. 15-16. But the premise of this argument is wrong because T-Mobile did not "use" AT&T's website at all. AT&T's TOU purport to bind only those entering or visiting its website: The TOU tells website visitors that "[b]y *accessing* or *using* our Site in any way you are agreeing to comply with these Terms of Use." Dkt. 8, Ex. B-1 § 1 (Appx032) (emphasis added). "[W]ords and phrases in a contract" must generally "be given their plain meanings." *Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 650-51 (5th Cir. 2003). The plain meaning of "accessing" in this context is "to open or load (a computer file, an Internet site, etc.)."[10] And to "use" is "to put into action or service."[11]

As explained above, T-Mobile neither "accesse[d]" nor "use[d]" the AT&T website through Easy Switch. Instead, AT&T *customers* accessed and used the website. *Supra* pp. 16-17. That alone distinguishes this case from both the *BoardFirst* and *Kiwi* cases on which AT&T relies (cited at Mot. 16-17), where the defendants used Southwest Airlines' website directly by,

---

[10]  *Access*, Merriam-Webster, https://www.merriam-webster.com/dictionary/access?src=search-dict-box#h2 (last visited Dec. 8, 2025).

[11]  *Use*, Merriam-Webster, https://www.merriam-webster.com/dictionary/using (last visited Dec. 8, 2025).

respectively, having their own employees log in to check passengers in, enter passengers' flight information, and click boxes on the website, *BoardFirst*, 2007 WL 4823761, at *4, 13, and "purchas[ing] over 20,000 flights on the Southwest Digital Platforms." *Southwest Airlines Co. v. Kiwi.com, Inc.*, 2021 WL 4476799, at *3 (N.D. Tex. Sept. 30, 2021) (Brown, J.). Unlike in those cases, T-Mobile never assented to AT&T's TOU.

   ***The Original Easy Switch Did Not Violate AT&T's TOU.*** AT&T claims T-Mobile violated three provisions of its TOU. But none of those provisions prohibited T-Mobile from using the original Easy Switch.

   AT&T first points to Section 14(15) of the TOU, which prohibits "prepar[ing], compil[ing], us[ing], download[ing] or otherwise cop[ying] any user information and/or usage information . . . or transmit[ting], provid[ing], or otherwise distribut[ing] . . . such information to a third party." Mot. 4 (quoting Dkt. 8, Ex. B-1 § 14 (Appx035)). But this provision applies only to visitors to the AT&T website. It appears in Section 14 of the TOU, entitled "Acceptable *Use*," which lists actions that website visitors "will not take . . . with respect to [AT&T's] Site" or "manner[s]" in which users may not "use [AT&T's] Site." Dkt. 8, Ex. B-1 § 14. "[T]he overarching purpose of the section (as informed by the Preamble . . . ) is to prevent" users of AT&T's website—that is, visitors—"from abusing their access" to the website. *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406, at *15 (N.D. Cal. Jan. 23, 2024).

   The *Bright Data* court found that a similar provision in Meta's terms of service applied only to "action[s] taken by account holders (users) while they are logged in" because the terms repeatedly referred to "use," "users," and activities "on" Facebook and Instagram. 2024 WL 251406, at *12-17. The same is true here. Because T-Mobile did not "use" AT&T's website in connection with the original Easy Switch, the TOU's restrictions on how the website can be "used"

21

do not apply to T-Mobile.

The other two TOU provisions on which AT&T relies are similarly inapplicable. AT&T cites Section 14(13), which bars "use[] of any robot, spider, or other such programmatic of automatic device . . . to obtain information from the Site," and Section 14(22), which prohibits "systematically collect[ing] and us[ing] any Content including the use of data mining, or similar data gathering and extraction methods." Dkt. 8, Ex. B-1 § 14(13), (22) (Appx035). These provisions also appear in the TOU's list of Acceptable Uses—which, again, apply only when visiting the AT&T website.

In any event, the original Easy Switch did not actually violate either provision. "A software robot is" a tool "capable of executing ***thousands of instructions per minute***, far in excess of what a human can accomplish." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1060-61 (N.D. Cal. 2000) (emphasis added) (crediting testimony to that effect). Robots, "bots," and other "data mining" tools are "computer programs that can operate without input from a human user once they are activated" and access large volumes of information recursively. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 911-12 (4th Cir. 2025); Shah Decl. ¶22 (DAppx008) (describing bots, spiders, and data mining tools).

The version of Easy Switch that AT&T challenges bore no resemblance to any of those technologies. Shah Decl. ¶22 (DAppx008) (explaining that the disabled version of Easy Switch is not a bot, spider, or data mining technique). It simply allowed an individual AT&T customer to log in to the AT&T website through the standard log-in screen and seamlessly request a handful of pages about *the customer's own account*. *Id.* ¶¶15-20 (DAppx006-008). AT&T's attempt to liken that narrow, customer-directed action to a "robot" or other "automatic device" capable of generating thousands or more automated, recurring instructions every minute fails. The original

Easy Switch was not the kind of "automatic" or "systematic" data collection device prohibited by the TOU.[12]

### C.    AT&T Is Not Likely To Succeed On Its Tortious Interference Claim

AT&T's tortious interference with contract claim is equally without merit. AT&T concedes in its complaint and its declarations that its customers are free to access and share their own plan and account information as they see fit. Compl. ¶22; Kia Decl. ¶15 (Appx030). Despite that commonsense concession, AT&T also appears to argue—remarkably—that AT&T customers who chose to use the original version of Easy Switch to share their own information with T-Mobile somehow violated AT&T's TOU. AT&T makes no attempt to reconcile those contradictory positions, nor could it. To reiterate: Rules against "robots" or similar "automatic devices" do not restrict a customer-directed tool like Easy Switch. *See supra* pp. 22-23. Because AT&T customers' use of Easy Switch did not breach the TOU, there can be no interference. *See ACS Invs. Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (there is no "actionable interference" when the party "[m]erely induc[es] a contract obligor to do what it has a right to do."); *WickFire, LLC v. Woodruff*, 989 F.3d 343, 354 (5th Cir. 2021) ("a breach must result from the defendant's conduct").

In any event, AT&T's tortious interference claim fails for the independent reason that T-Mobile has an absolute right to compete with AT&T for customers. Any supposed interference with AT&T's contracts with its customers in the process was necessarily privileged conduct. "Under the defense of legal justification or excuse, one is privileged to interfere with another's

---

[12] AT&T suggests that similar provisions in T-Mobile's Terms and Conditions would prohibit tools like Easy Switch if offered by AT&T or other competitors. That is wrong for the reasons provided in the text. Unlike AT&T, T-Mobile does not fear vigorous competition, and T-Mobile would not block AT&T if it were to make available the same secure and consumer-friendly functionality that T-Mobile enabled with the original Easy Switch. *See* Shah Decl. ¶21 (DAppx008).

contract . . . if it is done in a bona fide exercise of its rights." *Stewart Glass & Mirror, Inc. v. USA Glas, Inc.*, 940 F. Supp. 1026, 1038 (E.D. Tex. 1996) (internal quotation omitted). "[A] competitor advancing its interests by offering more favorable terms to the breaching party has a legal right to do so and its actions are therefore privileged." *Associated Mech. Tool Techs. v. Doosan Infracore Am., Inc.*, 2015 WL 13660130, at *8 (S.D. Tex. Nov. 24, 2015). That is exactly and only what Easy Switch did. It empowered AT&T customers to share their own plan information with T-Mobile so that T-Mobile could offer them more competitive wireless pricing, which AT&T itself acknowledged its customers are free to do. *See supra* p. 2. Any purported incidental inducement of AT&T customers to supposedly breach the AT&T TOU was the byproduct of legitimate, lawful competition, and therefore cannot support a tortious interference claim.

## III.    The Balance Of Equities And The Public Interest Strongly Support T-Mobile

Finally, the equities tip sharply in T-Mobile's favor, and injunctive relief would not be in the public interest. *First*, the balance of equities tips in T-Mobile's favor because enjoining the original version of Easy Switch would curtail consumers' access to better, more competitive pricing and services. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 377 (1977) (noting that sharing of price information facilitates competitive pricing). Such a restriction would impede T-Mobile's ability to offer, and consumers' ability to access, competitive offerings. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (plaintiff harmed by competitor's restraint on consumers' ability to "learn about [plaintiff's] lower . . . prices"). While AT&T may prefer to make it more difficult for AT&T customers to compare the details of their existing plans with competitive offerings from T-Mobile, that preference neither supports nor justifies injunctive relief restricting T-Mobile's ability to offer consumers a lawful tool for using their own information in a way that promotes market transparency and consumer choice.

*Second*, for the same reasons, imposing injunctive relief would "disserve the public

24

interest." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009). There is a strong public policy interest in promoting "competition between market participants." *Good Sportsman Mktg. LLC v. Non Typical, Inc.*, 2008 WL 11348379, at *8 (E.D. Tex. May 8, 2008) (denying preliminary injunction in part because it would harm the public interest). Enjoining the original version of Easy Switch would hinder competition by denying consumers a tool to easily compare competitors' prices and services. Restraints on the ability to effectively "communicate lower prices on other platforms . . . prevent [consumers] from making informed choices" and ultimately harm consumers and competition. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1055 (N.D. Cal. 2021), *aff'd in relevant part*, 67 F.4th at 1000-01; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473-75 (1992) (increased "cost of information" creates potential for anticompetitive exploitation of consumers). By contrast, where pricing information is readily available to consumers, "prices often are dramatically lower." *Bates*, 433 U.S. at 377. Empowering consumers to more easily make decisions based on price is a procompetitive benefit in the public interest. *See FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 860-61 (S.D. Tex. 2025) (denying a preliminary injunction in part because of the targeted action's procompetitive benefits and noting that "public equities may include beneficial economic effects and procompetitive advantages").

## CONCLUSION

The Court should deny AT&T's motion.

Dated: December 8, 2025

Respectfully submitted,

By: */s/ Hallie B. Levin*
Hallie B. Levin (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Hallie.Levin@wilmerhale.com

Ari Holtzblatt (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6947
Ari.Holtzblatt@wilmerhale.com

Andrés Correa
Jared Eisenberg
LYNN PINKER HURST &
SCHWEGMANN LLP
2100 Ross Avenue, Ste. 2700
Dallas, TX 75201
Telephone: (214) 981-3800
Acorrea@lynnllp.com
Jeisenberg@lynnllp.com

*Counsel for Defendant T-Mobile US, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 8, 2025, a true and correct copy of Defendant's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction was properly served on counsel of record via electronic filing in accordance with the U.S. District Court, Northern District of Texas Procedures for Electronic Filing.

/s/ <u>*Hallie B. Levin*</u>
Hallie B. Levin
