**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| AT&T SERVICES, INC., and<br>AT&T MOBILITY LLC,<br><br>                      Plaintiffs,<br><br>     v.<br><br>T-MOBILE US INC.,<br><br>                     Defendant. | Case No. 3:25-cv-03279-S<br><br>**JURY TRIAL DEMANDED** |

**AT&T'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

TIMOTHY S. DURST (TX #00786924)
tdurst@omm.com
SID MODY (TX #24072791)
smody@omm.com
**O'MELVENY & MYERS LLP**
2801 North Harwood Street, Suite 1600
Dallas, TX 75201
Telephone:    +1 972 360 1900

RANDALL W. EDWARDS (*pro hac vice* pending)
redwards@omm.com
MARK LIANG (*pro hac vice* pending)
mliang@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Telephone:    +1 415 984 8700

REEMA SHAH (*pro hac vice* pending)
rshah@omm.com
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas 17th FL
New York, NY 10019-6022
Telephone:    +1 212 326 2000

*Attorneys for Plaintiffs AT&T SERVICES, INC. and
AT&T MOBILITY LLC*

# TABLE OF CONTENTS

**Page**

I.  Injunctive Relief is Warranted Despite T-Mobile's Litigation-Driven
About-Face.................................................................................................... 2

II. T-Mobile's SME Scraping Tool Is Unlawful ........................................................ 5

    A  T-Mobile Fundamentally Mischaracterizes the SME Scraping Tool ........ 5

    B  AT&T is Likely to Succeed on the Merits ................................................ 6

    C  AT&T Has and Will Suffer Irreparable Harm Without an
Injunction ................................................................................................ 9

    D  An Injunction Is in the Public Interest and Will Cause No Harm to
T-Mobile ................................................................................................ 10

**TABLE OF AUTHORITIES**

Page(s)

## Cases

*Alscott, Inc. v. Sealer,*
  2022 WL 14915582 (N.D. Tex. Oct. 25, 2022) ............................................................... 4

*American Airlines, Inc. v. Red Ventures LLC.,*
  2022 WL 2790643 (N.D. Tex. July 15, 2022) ................................................................. 9

*Beyhaqi v. Noem,*
  779 F. Supp. 3d 919 (S.D. Tex. 2025) .......................................................................... 10

*Black & Decker (US), Inc. v. Smith,*
  568 F. Supp. 2d 929 (W.D. Tenn. 2008) ........................................................................ 9

*Cisco Sys., Inc. v. Huawei Techs. Co.,*
  266 F. Supp. 2d 551 (E.D. Tex. 2003) ........................................................................ 3, 5

*CommonSpirit Health v. Emerge Clinical Sols., LLC,*
  2022 WL 17903800 (N.D. Tex. Dec. 23, 2022) ........................................................... 10

*Doe v. Duncanville Indep. Sch. Dist.,*
  994 F.2d 160 (5th Cir. 1993) ...................................................................................... 1, 2

*Facebook, Inc. v. Power Ventures, Inc.,*
  252 F. Supp. 3d 765 (N.D. Cal. 2017) ........................................................................... 9

*Fram Corp. v. Boyd,*
  230 F.2d 931 (5th Cir. 1956) ......................................................................................... 4

*FTC v. Intuit Inc.,*
  2022 WL 1601403 (N.D. Cal. Apr. 22, 2022) ................................................................ 4

*FTC v. Lakhany,*
  2012 WL 12860115 (C.D. Cal. May 2, 2012) ................................................................ 5

*Gilead Scis., Inc. v. Meritain Health, Inc.,*
  2025 WL 1745669 (D. Md. June 24, 2025) .................................................................... 5

*Gouldd v. Accetta,*
  2009 WL 10678304 (N.D. Tex. Feb. 24, 2009) .............................................................. 4

*Greenley v. Kochava, Inc.,*
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......................................................................... 8

*hiQ Labs, Inc. v. LinkedIn Corp.,*
  31 F.4th 1180 (9th Cir. 2022) ........................................................................................ 7

*Kendall Holdings, Ltd. v. Eden Cryogenics LLC,*
  630 F. Supp. 2d 853 (S.D. Ohio 2008) .......................................................................... 5

*Meta Platforms, Inc. v. Bright Data Ltd.,*
  2024 WL 251406 (N.D. Cal. Jan. 23, 2024) ................................................................... 8

*Netflix, Inc. v. Babin,*
  641 F. Supp. 3d 319 (E.D. Tex. 2022) ........................................................................... 3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sossamon v. Lone Star State of Tex.*,
  560 F.3d 316 (5th Cir. 2009) ............................................................................. 2

*Speech First, Inc. v. McCall*,
  138 F.4th 219 (5th Cir. 2025) ......................................................................... 3, 4

*State of La. v. EPA*,
  712 F. Supp. 3d 820 (W.D. La. 2024) ................................................................ 4

*Times Herald Printing Co. v. A.H. Belo Corp.*,
  820 S.W.2d 206 (Tex. App. (Houston (14th Dist.)) 1991) ................................. 9

*Union Carbide Corp. v. UGI Corp.*,
  731 F.2d 1186 (5th Cir. 1984) ......................................................................... 10

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) ............................................................................. 7

*Wenner v. Tex. Lottery Comm'n*,
  123 F.3d 321 (5th Cir. 1997) ........................................................................... 10

Trust us, T-Mobile says to the Court, there is no need for an injunction because we "do not intend" to reactivate the "original version" of our data scraping bot. But in the last two weeks, T-Mobile has rejected AT&T's cease-and-desist letter, disguised its bots to mislead AT&T's systems, twice re-engineered its app to evade AT&T's security measures, and then—but only after AT&T filed this lawsuit—shifted to a new design rather than defend a bot that cannot withstand judicial scrutiny.

Evasive behavior such as this is precisely why courts are skeptical of defendants who "voluntarily cease" a challenged practice when facing an injunction. The Fifth Circuit's "crucial test" is not whether the wrong has stopped, but "whether it can be said with assurance that there is no reasonable expectation that the wrong will be repeated." *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993).  Here, the answer is clear: there is no assurance.

To avoid expense and out of respect for the Court's resources, AT&T has tried no less than seven times to obtain a simple assurance that T-Mobile will not access AT&T's computer systems again without permission.[1] Just yesterday, AT&T proposed a stipulation that requested only one commitment from T-Mobile:

> [D]uring the pendency of this litigation, T-Mobile agrees that it will not revert to the original version of the Easy Switch application, or any substantially similar version of the Easy Switch application that accesses AT&T's computer systems, without permission of the Court.

Tellingly, T-Mobile rejected the proposed stipulation, again refusing to give any assurance that the wrong would not repeat. Instead, T-Mobile relies on its carefully worded statements in its brief that it does not "intend" to redeploy the "original version" of its data scraping tool.

---

[1] AT&T's attempts to obtain assurances from T-Mobile are reflected in the Appendices filed with AT&T's briefing. The November 24 to December 11 exchanges are set out chronologically in a summary at Ex. A-8 (RAppx043-46). The emails and letters themselves are at: Ex. C-8 (Appx108-110); Ex. A-1 (RAppx005-8); Ex. A-5 (RAppx025-29); Ex. A-6 (RAppx030-37).

On the merits, T-Mobile's core defense—that AT&T customers (not T-Mobile) accessed the data—is gutted by its own admissions. T-Mobile's declaration and accompanying screenshots show T-Mobile's "tool" gathering AT&T information, not AT&T customers. Federal and state law, as well as AT&T's terms of use, require AT&T's consent before T-Mobile may access AT&T's websites. (T-Mobile knows this and requires the same on its own websites.) Here, there is no dispute: AT&T did not consent to T-Mobile's access.

The intrusion by T-Mobile's scraping tool **without AT&T's consent** is exactly the type of unauthorized invasion prohibited by CFAA, state statutes, and AT&T's terms of use. T-Mobile's empty statement of current intent, coupled with its pre-lawsuit evasion and deception, leave open the prospect that T-Mobile may again turn abruptly and restart its invasive data scraping. Absent an injunction, AT&T is left to guess at T-Mobile's next move, watch and wait for T-Mobile's next unlawful attempt, and bear the risk of further unauthorized incursions and the costs of heading them off. An injunction, on the other hand, preserves the status quo without harm to T-Mobile by merely holding it to what it says it "intends" to do anyway.

## I.    Injunctive Relief is Warranted Despite T-Mobile's Litigation-Driven About-Face

Contrary to T-Mobile's assertion, a defendant cannot inoculate itself from an injunction simply by pausing its challenged conduct after a dispute arises. The Fifth Circuit has long held that an injunction request is not mooted when a defendant "voluntarily ceased his allegedly illegal conduct" unless "it can be said with assurance that there is no reasonable expectation that the wrong will be repeated." *Duncanville*, 994 F.2d at 166. Where, as here, a "self-interested private part[y]" like T-Mobile attempts to evade judicial review by voluntarily stopping its conduct, it is T-Mobile—not AT&T—that carries the "heavy burden" to show that "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009).

The Fifth Circuit considers three factors in making this assessment: (1) whether the party makes a "controlling statement of future intention"; (2) "the suspicious timing of the change"; and (3) the party's "continued defense of the challenged policies." *Speech First, Inc. v. McCall*, 138 F.4th 219, 223 (5th Cir. 2025). T-Mobile fails on all three counts.

First, T-Mobile refuses to provide any binding commitment that it will not resume scraping. T-Mobile rejected AT&T's pre-lawsuit cease and desist letter and rebuffed AT&T's pre-TRO follow ups. Then, on December 5, nine days after being sued, T-Mobile told AT&T it did not "intend" to reenable the original SME. On that call and then again in writing on December 8, AT&T proposed a binding stipulation or order that T-Mobile would not reenable scraping. T-Mobile refused and filed its opposition, telling the Court it "does not intend" to reenable "the original version," while inviting further litigation if it later launches "a different version." Resp. 11 n.6. AT&T reached out again on December 9 and again (for the seventh time) on December 11 to seek assurances, but T-Mobile refused. Litigation-driven statements of "intent" come nowhere close to the unequivocal, forward-looking renunciation the Fifth Circuit requires. *See Speech First*, 138 F.4th at 223 (university did not meet its burden where it represented it would not revert to old policies but offered no sworn, controlling commitment); *Cisco Sys., Inc. v. Huawei Techs. Co.*, 266 F. Supp. 2d 551 (E.D. Tex. 2003) (enjoining defendant's use of copyrighted materials despite its statements that it would not use them).

Second, the timing and context of T-Mobile's about-face are suspect: T-Mobile configured SME to masquerade as a consumer browser, twice reengineered the tool to evade AT&T's blocks, and continued scraping until after AT&T filed this lawsuit. Courts routinely treat such post-suit changes as "litigation posturing" rather than genuine abandonment. *See Netflix, Inc. v. Babin*, 641 F. Supp. 3d 319, 330-33 (E.D. Tex. 2022) (granting PI despite DA's

post-suit dismissal of charges and policy change because he could refile); *State of La. v. EPA*, 712 F. Supp. 3d 820, 845-48 (W.D. La. 2024) (post-suit closure of investigations did not moot case where agencies still threatened enforcement and closure was deemed "litigation posturing").

Third, T-Mobile continues to defend its misconduct, insisting that the original SME was "inherently pro-competitive and pro-consumer" and "entirely lawful." Resp. 1-2. These statements confirm that T-Mobile paused scraping only because it got caught in the act—not because it had a genuine change of heart. *See Speech First*, 138 F.4th at 224 (a factor in plaintiff's favor was that university continued to "vigorously defend[] [its] policy").

T-Mobile's Response cites authorities to support its position, but they are distinguishable, mostly unreported cases. Its only Fifth Circuit case, from 1956, *Fram Corp. v. Boyd*, denied a PI because "no evidence in the record…cast[s] any doubt upon appellee's good faith abandonment of the [infringing] practices." 230 F.2d 931, 934 (5th Cir. 1956). Here, T-Mobile's surreptitious conduct and litigation-driven tactics appear anything but good faith. In *FTC v. Intuit Inc.*, a case about misleading advertising for tax-preparation services ahead of tax day, the court denied a PI because: (1) tax day had already passed; (2) Intuit had removed the deceptive ads even before tax day; and (3) the FTC was pursuing a parallel proceeding to respond to Intuit's future violations. 2022 WL 1601403, at *1 (N.D. Cal. Apr. 22, 2022). Here, there is no built-in end date to the security risks and T-Mobile kept SME scraping in place until after it was sued. *Alscott, Inc. v. Sealer* concluded that a plaintiff in an unfair competition case alleging only one disputed client contact and ordinary lost commissions had not shown irreparable harm, a far cry from AT&T's exposure to renewed, mass data scraping, with attendant security and customer-trust harms. 2022 WL 14915582, at *3 (N.D. Tex. Oct. 25, 2022). *Gouldd v. Accetta* denied a PI because defendants represented they were no longer using the challenged material and the plaintiff had no

basis to dispute those assurances, whereas here AT&T does. 2009 WL 10678304, at *2 (N.D. Tex. Feb. 24, 2009). *Kendall Holdings, Ltd. v. Eden Cryogenics LLC* denied a TRO in part because the plaintiff delayed seeking relief and defendants stopped using the challenged catalog as soon as they received a cease-and-desist request, unlike T-Mobile. 630 F. Supp. 2d 853, 868-69 (S.D. Ohio 2008). And *FTC v. Lakhany* denied a TRO where a downstream law firm—no longer working with an already-enjoined fraud scheme—was unlikely to take up the wrongful conduct and an asset-freezing injunction would cripple its practice. 2012 WL 12860115, at *1 (C.D. Cal. May 2, 2012). Here, T-Mobile has shown it can readily reenable its scraping, and AT&T seeks only a narrow injunction stopping that illicit conduct.

In sum, T-Mobile's "intent" not to reenable the "original" SME provides cold comfort to AT&T and the Court. Given its history of surreptitious scraping, repeated workarounds of AT&T's defenses, litigation-driven change, refusal to provide binding assurances that it will not scrape again, and stubborn clinging to thin legality arguments, there is every reason to be concerned that T-Mobile will deploy the same or functionally similar scraping tool once the immediate pressure of this motion passes. Under similar circumstances, courts regularly hold that injunctive relief is necessary. *E.g.*, *Cisco*, 266 F. Supp. at 551; *Gilead Scis., Inc. v. Meritain Health, Inc.*, 2025 WL 1745669, at *29-31 (D. Md. June 24, 2025).

## II.     T-Mobile's SME Scraping Tool Is Unlawful

### A      T-Mobile Fundamentally Mischaracterizes the SME Scraping Tool

Despite claiming that it does not intend to redeploy the original version of SME, T-Mobile spends most of its opposition defending it. T-Mobile's defenses are without merit because they rely entirely on the false premise that AT&T customers—not T-Mobile—are to blame for harvesting over 100 fields of customer data in a matter of seconds. Resp. 4-5, 16-18. T-Mobile presents a made-for-litigation flowchart attributing every step in its scraping process to

the "customer." *Id.* 16. But the screenshots T-Mobile provides from SME reveal the truth: T-Mobile asks customers to allow "***this tool*** to gather information" and admits "***[t]his tool*** will pull your phone numbers, billing address, account, plan, and device details." *Id.* 6; Shah Decl. ¶ 12 (DAppx005). "***This tool***" is the SME scraping tool designed and controlled by T-Mobile.

AT&T's investigation of suspicious network traffic, patterns, and messages from T-Mobile's scraping tool confirms it is an automated "tool" for harvesting data from AT&T's servers without authorization. Abraham Decl. ¶¶ 20-25 (Appx009-10). A more accurate flowchart based on facts, not T-Mobile's fiction, looks like this:



After the customer logs in, ***T-Mobile's SME scraping tool completely controls the entire process***. It navigates to various password-protected AT&T sites to harvest customer data from AT&T's servers, and then issues automated instructions to download, copy, and send the data it obtains to T-Mobile. Abraham Decl. ¶¶ 17, 20-21 (Appx007, 009). AT&T customers only log-in; they do not interact with AT&T's site, download any data, or send any data to T-Mobile. *Id.* Nor do customers decide which AT&T websites or data are being scraped. *Id.* This entire process is automated, controlled, and performed by T-Mobile from start to finish—not the customer.

**B**    **AT&T is Likely to Succeed on the Merits**

CFAA and State Counterparts: T-Mobile's "the customer did it" defense is demonstrably false; it was T-Mobile that used the scraping tool to (1) "access" AT&T's servers, (2) to "obtain information," and (3) "without authorization." Resp. 15–19. The premise is false, as proven by T-Mobile's own admissions and AT&T's investigation. Once AT&T customers log into their accounts through the T-Life App, the SME scraping tool takes over navigation of AT&T's websites and issues network requests to access and obtain over 100 fields of customer data in seconds from AT&T websites. Abraham Decl. ¶¶ 23-24 (Appx009-10). T-Mobile does not contend it has "authorization" from AT&T, nor could it credibly given AT&T's November 24, 2025 cease-and-desist letter. And because it is T-Mobile's scraping tool, not AT&T customers, harvesting data from AT&T's servers, the "access" and "obtaining information" elements also are met (and T-Mobile's reliance on *BrandTotal* is wholly misplaced, Resp. 17-19). Thus, T-Mobile has no legitimate defense to the CFAA violation count.

Further, T-Mobile's characterization of CFAA as an "anti-hacking statute" does not help T-Mobile and is wrong. Resp. 15. First, T-Mobile's repeated attempts to circumvent AT&T's security measures ***are*** "hacking." Courts define "hacking" under CFAA to mean "the circumvention of technological access barriers," which is precisely what T-Mobile did here. *U.S. v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012). Moreover, T-Mobile's cases merely refer to "hacking" in dicta; none hold that "hacking" is a requirement of CFAA and that term is not in the statute. The cases instead hold that CFAA liability turns on whether access is to a "public" versus "private" computer system, not hacking versus non-hacking. *E.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022).[2]

---

[2] In addressing its state law violations, T-Mobile also errs by relying on the false premise that "T-Mobile did not 'access' or 'use' AT&T's computer networks." Resp. 20. Further, the state

Breach of Contract: T-Mobile claims it was not bound to the TOU because only AT&T's customers, not T-Mobile, "used" AT&T's website. As explained in Section II.A above, that is false. The SME scraping tool visited and downloaded customer data from multiple AT&T's websites every time it launched from T-Mobile's app, and thereby "used" those websites. *See* Abraham Decl. ¶¶ 23-24 (Appx009-10). Unlike in *Meta Platforms, Inc. v. Bright Data Ltd.*, where non-account holders had no opportunity to assent to Meta's website terms, AT&T's TOU expressly binds <u>anyone</u> who accesses and uses its sites, not just AT&T account holders. *See* 2024 WL 251406, at *12 (N.D. Cal. Jan. 23, 2024); Ex. B-1, TOU §§ 1, 14 (Appx035). Similarly, because T-Mobile is the party who "used" AT&T's websites through scraping, there is no merit to T-Mobile's argument that it did not violate prohibitions against "uses" of the websites, including "uses, downloads or otherwise copies any information" to transmit "to any third party." Nor can T-Mobile contend that its scraping tool is not a "robot" that engages in "data mining, or similar data gathering or extraction methods." Resp. 22. Even under T-Mobile's own definition, its SME scraping tool clearly qualifies because after customer log-in, it takes control and issues automated instructions to AT&T's servers to rapidly extract over 100 data fields.

Tortious Interference with Contract: T-Mobile's first argument against tortious interference makes no sense: the fact that AT&T customers may share their account information (in other non-scraping ways) does not, as T-Mobile argues, imply that customers are also permitted to grant access to a third party to scrape AT&T's servers. Resp. 23. Granting such access, even if induced unknowingly, breaches the TOU. *See* Ex. B-1, TOU § 14(15). T-Mobile's second argument, relying on competitor's privilege, is equally misplaced because

---

laws also do not require hacking. *E.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023) (ruling that California statute does not require "hack[ing] a computer system").

that privilege applies where a competitor induces the breaching party to take a better contract in place of the plaintiff's contract. *E.g.*, *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 215 (Tex. App. (Houston (14th Dist.) 1991). But here, the contract at issue here is the TOU—not AT&T's contract with its customers for wireless services, as T-Mobile argues. Resp. 24. T-Mobile did not induce AT&T customers to breach the TOU by offering more favorable website terms of use. *See* Ex. C-4, T-Mobile TOU. Rather, T-Mobile induced AT&T customers to breach the TOU by granting T-Mobile's SME scraping tool access to their protected websites.

**C    AT&T Has and Will Suffer Irreparable Harm Without an Injunction**

T-Mobile's three arguments to escape the irreparable harm caused by its original SME scraping are without merit. First, T-Mobile re-argues that its scraping tool never "accessed" AT&T's networks, which is false for the reasons detailed in Section II.A.

Second, T-Mobile contends that "access" is not enough for irreparable harm under CFAA or state counterparts because "additional conduct" beyond access is required. Resp. 13-14. But T-Mobile's purported "additional conduct" requirement finds no support in any case law and, in fact, was squarely rejected by this District in *American Airlines, Inc. v. Red Ventures LLC*. There, Judge Pittman held that a plaintiff need only show the defendant accessed protected information without authorization under CFAA, while rejecting defendant's contention that a CFAA claim also requires showing that "data was impaired, that its integrity was compromised, or that any data was rendered unavailable." 2022 WL 2790643, at *4-5 (N.D. Tex. July 15, 2022). At base, CFAA is an anti-trespass statute enacted to prevent unauthorized access itself, regardless of what the defendant subsequently did with the illicit access. *Black & Decker (US), Inc. v. Smith*, 568 F. Supp. 2d 929, 935 (W.D. Tenn. 2008). Courts consistently hold unauthorized access to protected websites or computers is, by itself, an irreparable harm. *E.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017) ("Numerous

courts have found that unauthorized access of computers and the acquisition of data in violation of CFAA constitute irreparable harm.") (collecting cases).

Third, T-Mobile extracting and retaining protected data also irreparably harms AT&T's goodwill with its customers because there is no adequate remedy against a defendant who extracts and continues to possess wrongfully obtained information. *E.g.*, *Commonspirit Health v. Emerge Clinical Sols., LLC*, 2022 WL 17903800, at *2 (N.D. Tex. Dec. 23, 2022) ("[U]nless enjoined, Defendant will continue to hold the [private information]…creating a risk of detriment to the privacy and data security of the private information…such a data breach has no adequate remedy at law."). Contrary to T-Mobile's assertion, the harm to AT&T's goodwill stems not from AT&T's potential loss of customers (Resp. 13), but rather from wrongful exfiltration of customer ***data*** and T-Mobile's improper use of that data.

### D    An Injunction Is in the Public Interest and Will Cause No Harm to T-Mobile

After protesting 15 times in its Response that it "does not intend" to relaunch the original SME scraping tool, T-Mobile reveals its true position with a full-throated defense that unauthorized data scraping is in the public interest and equitable. But it is axiomatic that unfair competition accomplished through unlawful means is not in the public interest. *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1192 (5th Cir. 1984). And given that the new, non-scraping SME has been in place since November 26, an injunction would preserve the status quo, serving the essential purpose of a TRO. *Beyhaqi v. Noem*, 779 F. Supp. 3d 919, 922 (S.D. Tex. 2025) ("The purpose of a TRO is to preserve the status quo and prevent irreparable harm."); *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) ("Preliminary injunctions commonly favor the status quo."). Here, an injunction would cause no harm to T-Mobile if we take it at its word and instead imply hold T-Mobile to its professed "intent" to not scrape again.

Dated:  December 12, 2025                    O'MELVENY & MYERS LLP


                                            By:     /s/ Timothy S. Durst

                                            TIMOTHY S. DURST (TX #00786924)
                                            tdurst@omm.com
                                            SID MODY (TX #24072791)
                                            smody@omm.com
                                            **O'MELVENY & MYERS LLP**
                                            2801 North Harwood Street, Suite 1600
                                            Dallas, TX 75201
                                            Telephone:     +1 972 360 1900

                                            RANDALL W. EDWARDS (*pro hac vice*
                                            pending)
                                            redwards@omm.com
                                            MARK LIANG (*pro hac vice* pending)
                                            mliang@omm.com
                                            **O'MELVENY & MYERS LLP**
                                            Two Embarcadero Center, 28th Floor
                                            San Francisco, California 94111-3823
                                            Telephone:     +1 415 984 8700

                                            REEMA SHAH (*pro hac vice* pending)
                                            rshah@omm.com
                                            **O'MELVENY & MYERS LLP**
                                            1301 Avenue of the Americas 17th FL
                                            New York, NY 10019-6022
                                            Telephone:     +1 212 326 2000

                                            *Attorneys for Plaintiffs AT&T SERVICES,*
                                            *INC. and AT&T MOBILITY LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, a copy of the foregoing motion was served electronically via the CM/ECF system.

*/s/ Timothy S. Durst*