**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| AT&T SERVICES, INC., and AT&T MOBILITY LLC | § § § § § | |
| Plaintiffs, | § § | C.A. No. 3:25-cv-03279-S |
| v. | § § § | **JURY TRIAL DEMANDED** |
| T-MOBILE US INC., | § § § | |
| Defendant. | § § | |

<u>**SECOND AMENDED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**</u>

Plaintiffs AT&T Services, Inc. and AT&T Mobility LLC (collectively, "AT&T") file this Second Amended Complaint and Request for Injunctive Relief against Defendant T-Mobile US Inc. ("T-Mobile")[1] and request relief as set out below:

<u>**SUMMARY**</u>

1.      Consumers can't trust T-Mobile. It tricks them with bogus marketing claims, and its pattern of deception is deep and longstanding. In 2013, T-Mobile reportedly boasted in an internal manifesto that it would be unwilling to play by the rules.[2] True to form, T-Mobile has spent more than a decade refusing to play by truth-in-advertising rules, all to the detriment of consumers who rely on wireless carriers to tell them the truth when deciding where to spend their hard-earned money.

---

[1] Defendant T-Mobile US, Inc. appears to be doing business as "T-Mobile USA, Inc."  AT&T's complaint refers to defendant as T-Mobile US, Inc. based on its public SEC filings.
[2] https://www.businessinsider.com/t-mobile-ceo-john-legere-un-carrier-manifesto-2016-10

2.      T-Mobile's deceptive advertising takes many forms.  Sometimes T-Mobile inflates savings claims by bundling optional third-party services customers never asked for; sometimes it makes apples-to-oranges comparisons between premium AT&T plans and bare-bones T-Mobile plans; and sometimes it simply misrepresents the features of AT&T's offerings or exaggerates T-Mobile's own network capabilities.  These are just some of the latest examples in T-Mobile's longstanding pattern and practice of deception.

3.      T-Mobile's false and misleading advertisements are not isolated incidents but rather the product of a deliberate corporate marketing strategy designed to lure customers from AT&T through deception.  On information and belief, T-Mobile's marketing leadership has adopted and implemented a policy of disseminating materially false and misleading claims about the relative costs, features, and quality of AT&T's and T-Mobile's services to induce AT&T customers to switch to T-Mobile.  The deceptive tactics T-Mobile has employed to date include, but are not limited to, inflating purported savings by bundling optional third-party services, making apples-to-oranges plan comparisons, misrepresenting switching times, and making unsubstantiated network claims.  T-Mobile executes this strategy through a continuous stream of advertisements employing these and other deceptive tactics.

4.      Although the Court preliminarily shut down T-Mobile's data scraping bot, T-Mobile's nationwide false and misleading advertising aimed at driving customers from AT&T to T-Mobile continues unabated, such as:

- Bogus "savings" from optional add-ons and bundle perks.

- False and misleading promises that customers can save hundreds and even thousands of dollars if they switch away from AT&T and to T-Mobile.

- Apples-to-oranges comparisons between premium AT&T plans and no-frills T-Mobile plans.

- Misrepresentations that "switching" to T-Mobile takes just 15 minutes, when the process typically takes hours or even days.

- Phantom network coverage and capacity superiority.

5.      T-Mobile knows full well that its comparative advertising against AT&T is wrong—it already has been told so by the Southern District of New York. On March 30, 2026, Judge Kaplan in S.D.N.Y. granted Verizon a preliminary injunction against T-Mobile, enjoining T-Mobile from publishing certain advertisements premised on similar types of deceptive apples-to-oranges comparisons and illusionary savings promises.[3] Notwithstanding that injunction, T-Mobile has continued to publish other advertisements directed at AT&T customers employing similar deceptive tactics—demonstrating its willingness to act in deliberate bad faith.

6.      T-Mobile's false and misleading statements, including those presented by Easy Switch, harm AT&T and its customers by inducing switching decisions based on false and misleading price and feature information, resulting in customers being exposed to unexpected charges by T-Mobile and loss of benefits, and creating confusion about the services customers receive.  They also harm AT&T by misleading consumers and the market about AT&T's pricing and plan features, damaging AT&T's reputation and eroding the goodwill it has built with its customers.

7.      The advertisements described below are representative examples of T-Mobile's deceptive advertising practices and are not intended to be an exhaustive list.  T-Mobile's pattern

---

[3] *See Cello P'ship d/b/a Verizon Wireless v. T-Mobile USA, Inc.*, No. 26-cv-0972 (LAK) (S.D.N.Y. Mar. 30, 2026).

and practice of deception is ongoing, and T-Mobile continues to create, modify, and disseminate new advertisements employing the same or similar deceptive tactics. T-Mobile routinely launches new advertisements that employ the same categories of misrepresentations—including but not limited to inflated savings claims, apples-to-oranges comparisons, misleading switching-speed promises, and unsubstantiated network superiority claims—while making superficial changes to the colors, images, fonts, and scripts. Each such advertisement arises from and furthers the same common scheme. AT&T reserves the right to present evidence at trial of additional advertisements employing materially false or misleading claims arising from this same pattern and practice.

## THE PARTIES

8.      Plaintiff AT&T Mobility LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. AT&T Mobility LLC is an indirectly owned subsidiary of AT&T Inc. AT&T Mobility provides wireless services to AT&T's customers.

9.      Plaintiff AT&T Services, Inc., is a Delaware corporation with its principal place of business in Dallas, Texas. AT&T Services, Inc. is a wholly owned subsidiary of AT&T Inc. AT&T Services owns many of the systems that were being intruded and scraped by T-Mobile's actions.

10.      Defendant T-Mobile US Inc. is a Delaware corporation with its principal place of business in Bellevue, Washington. T-Mobile is registered to do business in the State of Texas and can be served with process through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

11.      This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 over the federal CFAA and Lanham Act causes of action alleged in this Complaint, as the

CFAA claim arises under 18 U.S. Code § 1030, and the Lanham Act claim arises under 15 U.S.C. § 1125.

12. This Court has supplemental jurisdiction over the state law causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Plaintiffs' federal law claims that they form part of the same case or controversy and arise out of the same case or controversy as Plaintiffs' federal claim.

13. T-Mobile is subject to this Court's personal jurisdiction, consistent with the principles of due process and the Texas Long Arm Statute.

14. T-Mobile consented to this Court's personal jurisdiction because it actively litigated AT&T's Motion for Temporary Restraining Order and Preliminary Injunction in front of this Court without any objection to personal jurisdiction and even stipulated to this Court's entry of its Preliminary Injunction Order (ECF No. 35).

15. T-Mobile has sufficient minimum contacts and has engaged in continuous and systematic activities in the forum as a result of business conducted within this District and State of Texas.



16.     Through the physical storefronts and corporate office, T-Mobile purposefully avails itself of the privileges of conducting business in Texas.

17.     T-Mobile maintains a substantial and continuous presence in Texas and this District, which extends well beyond its physical retail locations.  In addition to operating brick-and-mortar stores, T-Mobile owns and operates nationwide telecommunications networks that reach customers throughout Texas, including within this District.

18.     Easy Switch and the T-Life App at issue are part of the same suite of offerings that T-Mobile actively markets, delivers, and supports in this District and Texas.  Furthermore, T-Mobile's false and misleading advertising campaigns meant to induce customers to switch  from AT&T to T-Mobile, including by using the T-Life App and Easy Switch, is targeted at Texas residents.  T-Mobile has purposefully availed itself of the laws and jurisdiction of Texas because, among other things, it provided or made available, or will provide or make available, Easy Switch

and T-Life App (including beta and full versions) to residents (including all current AT&T customers) of this District and Texas, as well as support services, including troubleshooting, activation, and technical support regarding Easy Switch and the T-Life App. And within the T-Life app, T-Mobile publishes its false and misleading advertisements to all Texas users. T-Mobile's false and misleading advertisements are also prominently published on its website. T-Mobile further prominently advertises Easy Switch and the T-Life App on its website—through which users can access and manage their accounts, including AT&T consumers. T-Mobile also targets Texas residents by publishing its false and misleading claims in television commercial advertisements that air in Texas. These tools, applications, advertisements and websites are not passive; they are purposefully directed at residents of this District and Texas, and are structured to facilitate commercial transactions here, including encouraging the residents to switch their wireless services from AT&T to T-Mobile. T-Mobile's in-state retail presence further underscores its intent to cultivate and serve a customer based in this District and Texas. By soliciting potential customers and providing on-site service within this District for Easy Switch and the T-Life App that are at issue in this case, T-Mobile has established sufficient minimum contacts to subject it to personal jurisdiction in this Court.

19.    Moreover, the claims in this case arise directly out of, or at a minimum relate closely to, T-Mobile's forum-directed activities. T-Mobile has targeted AT&T's systems, which are located in large part in the Northern District in Texas. T-Mobile also is intentionally targeting residents of this District and Texas—including AT&T's customers—with its false and misleading advertising, including by inducing them to access their accounts and interact with the very feature that is a subject of the dispute. T-Mobile also supports and services these customers through its

brick-and-mortar operations within this District and Texas.  Sufficient nexus exists between T-Mobile's contacts with the forum and the claims alleged in this complaint.

20.    T-Mobile's business activities in this District and Texas are neither isolated nor incidental—it does significant business here.  It maintains a Texas registered agent, pays Texas franchise taxes, and maintains an extensive physical presence, including large-scale infrastructure facilities, hundreds of retail stores, and a corporate office in Frisco.  T-Mobile also maintains extensive customer relationships locally, collects revenue from subscribers in this District, and continuously transmits signals, data, and communications over infrastructure that it controls and manages in this District and Texas.  It also engages in advertising, customer service operations, and ongoing contractual relationships with residents of this District and Texas, including employing hundreds if not thousands of Texans.  By purposefully directing its commercial activities toward this forum and deriving substantial benefits from doing so, T-Mobile has established the requisite minimum contacts for the exercise of personal jurisdiction.  Further, by advertising to potential customers here, utilizing its local network to deliver service to residents here, attacking AT&T's computer systems with automated tools to gain unauthorized access to AT&T's systems here, and directing harm to AT&T here, T-Mobile created a substantial connection with this District, making the exercise of personal jurisdiction both foreseeable and reasonable.[4]

---

[4] *See* https://www.t-mobile.com/coverage/coverage-map (showing that T-Mobile provides 5G service in Texas) (last visited November 26, 2025); *see also* https://www.t-mobile.com/news/ network/t-mobile-bringing-more-to-texas;  https://www.t-mobile.com/news/press/new-stores-in- dallas-fort-worth; *see also* https://careers.t-mobile.com/?location_name=Dallas&location_type=1 (showing T-Mobile's job openings near Dallas) (last visited November 26, 2025); https://careers. t-mobile.com/jobs?filter%5Bstate%5D%5B0%5D=Texas (showing T-Mobile's job openings in Texas) (last visited November 26, 2025).

21.     Plaintiffs maintain a place of business within this District.  For example, AT&T Services, Inc. has its headquarters within this District at 208 S. Akard Street, Dallas, TX 75202.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because of the same reasons that personal jurisdiction is proper as discussed above and because the claims asserted in this action arose in this District and a substantial part of the activities, conduct and damages have occurred in this District.

## FACTUAL BACKGROUND

**I.     AT&T's Comprehensive Measures to Protect Customer Data and Privacy**

23.     AT&T is an American telecommunications company that provides wireless service to over 119 million customers.  Critical to AT&T's success is the trust of its customers.  As part of AT&T's ongoing efforts to build and maintain that trust, AT&T invests continually in the best technology and practices to protect customer data, comply with all applicable privacy regulations, and prevent unauthorized access, misuse, and other threats to AT&T's systems.

24.     AT&T believes that customers should be empowered with transparent information about pricing and services.  To that end, AT&T provides customers with ready but protected access to detailed data about their user accounts, contracts, wireless plans, billing and billing history, promotions, and subscriptions.  One way customers can access their AT&T account data is through password-protected accounts on the non-public portions of AT&T's websites.  For example, customers can access their AT&T account after providing their username and password at https://signin.att.com/.

25.     Consistent with AT&T's belief in the importance of transparency and choice, AT&T customers can share information about their service plans and compare their AT&T plans with those of their competitors.  By way of example, customers can download their bills and, using those bills, compare pricing and services, including on AT&T's competitor websites.

9

26.     AT&T also prioritizes the security of customer data and takes comprehensive measures to ensure that its data is handled responsibly. These practices are multi-layered and proactive, especially when it comes to protecting customer data and internet-facing systems. Both AT&T's Terms of Use ("TOU") governing its websites, both the public and non-public portions, and additional computer security measures seek to prevent unauthorized access to AT&T's systems. The TOU applies to the AT&T plaintiff entities in this complaint as both are "subsidiaries and affiliates of AT&T Inc."

27.     AT&T also implements a range of advanced, continuous security measures to (1) detect and block unauthorized access to AT&T's systems, (2) absorb and mitigate actions that threaten the operation and integrity of publicly accessible applications, and (3) shield against common web exploits and efforts to harvest and abuse private information stored within AT&T's systems.

28.     AT&T's TOU is publicly available on each page of AT&T's website.  It applies to everyone accessing AT&T's websites and includes many provisions designed to safeguard customer private information, as well as to maintain the integrity of AT&T's computer systems. Every visitor, including T-Mobile, agrees to the TOU when it accesses and uses the website. AT&T's TOU at § 1 ("by accessing or using our site in any way you are agreeing to comply with these Terms of Use").[5]  For example, AT&T's TOU prohibit, among other things, "unauthorized access to or use of data or systems, including . . . unauthorized monitoring of data or traffic." *Id.* § 15.

29.     T-Mobile is well aware of the TOU's requirements.  It is a sophisticated competitor that, on information and belief, closely monitors AT&T.  And there can be no doubt of its

---

[5] https://www.att.com/legal/terms.attWebsiteTermsOfUse.html?

awareness because on November 24, 2025, AT&T directed T-Mobile to the specific language in the TOU discussed above.

30.     Nor can T-Mobile be surprised by or reasonably dispute the applicability and importance of those provisions.  T-Mobile's own website likewise prohibits activities that "bypass or circumvent measures we may use to prevent, interfere, or limit access to the Site or any T-Mobile network, and "use the Site to intercept, collect or store personal information about other users"[6]—the very same conduct it employed against AT&T.  T-Mobile's unauthorized access to AT&T's computer systems, being password-protected websites, indisputably violates AT&T's TOU.

## II.     T-Mobile Launches Its "Switching Made Easy" Campaign, With Plans to and Illegally Scrape AT&T Customer Data and to Make False and Misleading Promises of Savings If Customers Would Switch

31.     Rather than compete with AT&T on a level playing field, T-Mobile embarked on a brazen effort to bypass AT&T's security measures and illegally access its data and systems.  That effort took the form of T-Mobile's Switching Made Easy campaign, which it launched last year to great fanfare.  T-Mobile's CEO, Srini Gopalan, and President of Marketing, Strategy and Products, Mike Katz, unveiled the campaign on November 20, 2025, at the Formula 1 Las Vegas Grand Prix. With three "Pit Lane" locations across the Las Vegas Grand Prix to entice potential customers to switch, access to "Club Magenta" for customers who actually switched, and multiple merchandise and membership experiences, T-Mobile spared no expense.  But under the razzle-dazzle, T-Mobile was pulling a fast one.

32.     T-Mobile sought to lure customers with fabricated price and feature comparisons and claims customers could switch from their current carrier to T-Mobile at the "speed of an F1

---

[6] https://www.t-mobile.com/responsibility/consumer-info/policies/terms-of-use?

race car." It was a two-pronged scheme: (i) collect AT&T customer data, and (ii) present those customers with distorted comparisons to make them believe T-Mobile was offering a lower price option for equivalent services. The T-Life app and Easy Switch were central to the first prong of the scheme.

33. T-Mobile launched its "T-Life" app in early 2024, and by November 26, 2025, it had been installed over 90 million times. The app can be installed on any wireless device regardless of whether the device currently uses T-Mobile or another carrier, such as AT&T, for telecommunications services.

34. At the heart of T-Mobile's Switching Made Easy campaign was the "Easy Switch" tool, which was presented as a new feature in the T-Life app.[7]

35. The first iteration of Easy Switch was an audacious effort to break into AT&T's protected systems. Specifically, with the beta version of Easy Switch, T-Mobile asked AT&T customers to provide T-Mobile with their AT&T login and password:

> "With Easy Switch (beta)[8], **any wireless customer can open T-Life**, **log in to their current AT&T** and Verizon wireless provider—and based on their number of lines, devices and plan—it will identify and recommend the best plans for that customer"[9]

Unbeknownst to the customer, Easy Switch was a Trojan horse, giving T-Mobile the keys to confidential data. Once the customer had logged in, T-Mobile would then access the customer's AT&T account and launch an automated data-scraping bot against AT&T's computer systems that extracted much more than "number of lines, devices, and plan." In truth, T-Mobile scraped over

---

[7] https://www.t-mobile.com/news/un-carrier/switchingmadeeasy?
[8] Notably, T-Mobile refers to its Easy Switch tool interchangeably as Easy Switch and Switch Made Easy.
[9] https://www.t-mobile.com/news/un-carrier/switchingmadeeasy?

100 fields of that customer's personal account information, contracts, phones and phone plans, and billing and billing history, among others sensitive and private information. Significantly, this included information relating to other individuals on the customer's account (such as family members) and AT&T products or services beyond just wireless services. T-Mobile's illegal bot did not accurately identify itself to AT&T; rather it disguised itself to appear as a generic web browser, hoping to trick AT&T's computer systems into thinking that the connection was from a legitimate customer—rather than T-Mobile engaging in prohibited and illegal intrusion into its systems and data extraction.

36. T-Mobile purported to use that data to develop an offer for a competing service from T-Mobile. T-Mobile also stated that it would use the information gathered from AT&T's computer systems to address "what [AT&T] customers like you need":



37. T-Mobile was not authorized by AT&T to access its systems and scrape this data, and AT&T informed T-Mobile of that expressly.

38.    At the time of the filing of the original complaint, T-Mobile's Easy Switch was in beta mode, and T-Mobile had announced plans to make the comparisons widely available on December 1, 2025, which meant the tool would be widely employed then.

**III.    T-Mobile Circumvents AT&T's Security Measures and Flouts AT&T's Cease-and-Desist Letter**

39.    As soon as T-Mobile released the beta version of Easy Switch, AT&T began detecting unauthorized intrusions into its systems and illegal scraping of AT&T customer account data.  AT&T's investigation showed that Easy Switch accessed and copied confidential data from password-protected AT&T websites hosted on AT&T's servers in Dallas, Texas, Alpharetta, Georgia, and Fairfield, California.  Easy Switch then sent back to T-Mobile over 100 data fields about AT&T's customers, including full legal name, billing and physical addresses, billing and billing history, phones and devices, trade-in values, installment plans and payoffs, available upgrades and upgrade pathways, and charges and disputes, among many other fields.

40.    AT&T's investigation further showed that T-Mobile intentionally designed its Easy Switch tool to hide its unauthorized access to AT&T's systems.  When Easy Switch sent AT&T customer data scraped from AT&T's servers back to T-Mobile's servers, the response data included fields identifying the data as associated with T-Mobile's T-Life app name, i.e., "Origin-Application-Id=TLIFE."  But when Easy Switch accessed AT&T's systems and issued requests to scrape AT&T's customer data, Easy Switch and T-Mobile's automated bot intentionally omitted any identifying information associating it with T-Life or T-Mobile—a blatant attempt to avoid detection of its unauthorized intrusion.

41.    Upon discovering T-Mobile's intrusions, AT&T immediately began to develop and implement new security measures to detect and block T-Mobile's unauthorized access to AT&T's systems, including by detecting patterns or behaviors associated with Easy Switch.  AT&T

14

designed these measures to prevent unauthorized access, while still permitting legitimate customers to view their account information.

42.    On November 24, 2025, four days after the launch of Easy Switch, AT&T sent a cease-and-desist letter demanding that T-Mobile stop its unauthorized access to AT&T's systems. AT&T's letter made clear that T-Mobile's use of Easy Switch to access AT&T's systems was unauthorized, not permitted by AT&T, and also a breach of AT&T's TOU.  AT&T further explained that T-Mobile's use of Easy Switch to gain unauthorized access to AT&T's systems violated federal and state laws.

43.    AT&T's actions to protect against unauthorized access are fully consistent with its vigilant data-security practices to protect customer data and its business information.  It regularly protects its systems from bots or other bad actors and does not allow scraping of non-public information.

44.    Despite AT&T's explicit warnings, T-Mobile persisted. On November 25, less than a day after AT&T implemented its additional security blocking measures to prevent T-Mobile's illegal scraping, AT&T detected that T-Mobile had modified T-Life and disguised the identity of its requests to circumvent AT&T's new security blocking measures. T-Mobile intentionally reengineered T-Life to evade AT&T's security measures even after it was put on notice by AT&T's cease-and-desist letter. On the evening of November 25, AT&T developed and implemented yet additional security measures to prevent T-Mobile's unauthorized access to its systems. Despite twice blocking through security measures T-Mobile's data-scraping app, on November 26, T-Mobile once again modified and disguised T-Life to attempt to circumvent the security measures that AT&T had implemented to prevent unauthorized access to its systems.

AT&T was forced once again to develop and implement security measures to prevent T-Mobile's unauthorized intrusion and data scraping.

## IV.   The Court Orders T-Mobile to Stop Illegally Scraping Data

45.   On November 26, 2025, AT&T brought this suit to halt T-Mobile's unauthorized intrusions into AT&T's system.  AT&T moved for a temporary restraining order and preliminary injunction against T-Mobile shortly thereafter.  On December 18, 2025, the Court granted AT&T a temporary restraining order.  The Court converted the TRO into a preliminary injunction on December 23, 2025.  On information and belief, and based on T-Mobile's course of conduct to date, AT&T shares the Court's concern "that [T-Mobile] can use something very similar that does the same thing but might be tweaked a little bit differently in the future."  (Hearing Tr. 89: 19-23). Absent an injunction permanently preventing it from doing so, T-Mobile is likely to continue to try to circumvent AT&T's security measures, at substantial harm to AT&T and its customers.

## V.   T-Mobile Presses On With Its False and Misleading Ad Campaign

46.   Its data-scraping scheme thwarted by the Court's order, T-Mobile appears to have doubled down on all that's left: a nationwide false, misleading, and ongoing advertising campaign directed at enticing customers to switch from AT&T to T-Mobile.

47.   As part of this campaign, T-Mobile has flooded the marketplace with numerous false and misleading marketing statements across numerous platforms, including television and online commercials, social media, advertisements on T-Mobile's websites, and within the T-Life app itself.  Each deceptive statement is designed to steer consumers from AT&T to T-Mobile based on bogus promises of savings, false and misleading plan comparisons, exaggerated claims about switching speeds, and false and misleading claims about T-Mobile's plans and capabilities.  The following are illustrative of T-Mobile's deceptive advertising practices.

16

### a. T-Mobile Misleads Customers with Exaggerated Claims and Deceptive Promises of Savings

48.     In television and online commercials, T-Mobile promises customers hundreds and even thousands of dollars of savings if they switch from AT&T to T-Mobile.  What T-Mobile omits, however, is that its purported "savings" are not based on one-to-one plan comparisons; instead, the figures are artificially inflated by including the value of third-party subscriptions, comparing selective snapshots of customer bills without disclosing the underlying data, or both.

*$1,000 Savings Commercial[10]*

49.     For example, T-Mobile advertises that customers can "save over $1,000/year" compared to AT&T.  But that inflated figure does not reflect a comparison between the price of an AT&T wireless plan and the price of a comparable T-Mobile wireless plan.  Instead, that fake savings is the sum of various add-ons that are not part of the wireless plan, such as Netflix, AppleTV, Hulu, and a whole-cloth $10 monthly value per line for "T-Satellite."  The comparison presented to the prospective customer is thus between AT&T's wireless plan and the purported value of T-Mobile's suite of extras, making the advertised savings apples-to-oranges.

50.     T-Mobile has been widely making these savings exaggerations, relying on the likelihood that reasonable consumers will be none the wiser.  In a commercial featuring comedian Druski (T-Mobile's "Chief Switching Officer"), a voiceover asserts that consumers can "save over

---

[10] This advertisement was enjoined in *Cello P'ship d/b/a Verizon Wireless v. T-Mobile USA, Inc.* There, the court explained: "T-Mobile's 'Save Over $1,000' campaign necessarily implies that customers can save over $1,000 per year on a comparable plan by switching from Verizon's Unlimited Ultimate Plan to T-Mobile's Better Value Plan. That is the substance of T-Mobile's top-line claim and disclaimers in its advertisements, and conveying that message is T-Mobile's intent in airing the campaign.  That message is false.  Instead of putting comparable plans side-by-side, T-Mobile engages in an apples-to-oranges comparison at every step of the way."  No. 26-cv-0972 (LAK) (S.D.N.Y. Mar. 30, 2026).

17

$1,000 a year versus Verizon and AT&T." The voiceover then reads "save on streaming, satellite, and more benefits that they leave out."



51.    Only in the nearly illegible fine print at the bottom of the graphic does T-Mobile disclose that the advertised "savings" require the addition of optional third-party services. Even smaller—almost imperceptible—text reveals that the savings are based on the cost of three lines, not an individual line for an individual customer. There is little chance that a consumer will be able to read and consider the small text—and a very good chance that they will believe that switching wireless plans would deliver the primary savings for their wireless service, rather than for the combination of unrelated, third-party streaming services and other extraneous benefits that some customers may not even want. (AT&T and T-Mobile are wireless carriers, after all, not streaming platforms.)

52.    T-Mobile repeated its "$1,000" savings claim in another commercial—and took it even further, suggesting that consumers also would gain better coverage if they switch to T-Mobile. The ad features a rural Kentucky family who say coverage with "other carriers" is "hit or miss," but switching to T-Mobile solved "a lot" of their coverage problems. And before viewers can even begin to question who these "other carriers" are, the ad displays the same $1,000 graphic

18

as above, explicitly calling out AT&T and adding false and exaggerated network coverage claims to T-Mobile's suite of deceptive marketing.

*$750 Savings Claim*

53.    T-Mobile uses the same deceptive formula in numerous advertisements.  For example, in television commercial trading on the United States' 250th birthday, T-Mobile opens with: "250 reasons to choose T-Mobile, switch and you can save 750 bucks on the Experience Beyond plan in the first year, thanks to our benefits. Guaranteed."  Then—blink and you'll miss it—T-Mobile displays a message stating that the "savings" comprises "$100 back and built-in benefits worth $650."  Camouflaged at the bottom of the screen in tiny white text T-Mobile discloses that the claimed savings is derived from value of additional third-party services and extraneous benefits, including "one year of AAA Classic and DashPass on us."



*$3,700 Savings Claim*

54.    In another commercial, T-Mobile represents that consumers can achieve even greater savings by switching to T-Mobile, declaring: "T-Mobile families saved over $3,700 vs the other big guys in the past 5 years."  A voiceover bellows the exaggerated savings claim while the commercial flashes barely visible fine print at the bottom of the screen qualifying that the claimed savings were calculated using third-party "Billing Snapshots" "among accounts with 3+ voice

lines." There is little chance that a consumer could read or appreciate that the advertised savings figure is not necessarily based on a direct, apples-to-apples comparison of equivalent wireless plans and features, but instead on a narrow and selectively framed dataset. The advertisement further deceives customers because they will not notice or navigate to harrisx.com/T-Mobile-bills—the third-party website underpinning T-Mobile's promise—to confirm the accuracy of the T-Mobile's savings claim.

### *Additional Comparator Savings Commercials*

55.     But wait, there's more. T-Mobile's misleading savings promises do not stop there. In yet another commercial, T-Mobile claims that "T-Mobile customers had the lowest wireless bills vs. Verizon and AT&T over the past 5 years." A similar advertisement directed at its competitors announces: "T-Mobile families can save up to $700 a year vs the other big guys." These advertisements are just some of the recent illustrations of T-Mobile's pattern of deceptive conduct: promise customers bold savings if they switch from AT&T to T-Mobile, while simultaneously making it extremely unlikely customers can read or understand the "savings" formula.

56.     In both advertisements, for example, T-Mobile conceals in fine print that the promised savings is premised on selectively chosen data—snapshots of bills from accounts holding three or more voice lines. Like T-Mobile's other purported savings commercials, customers viewing these and similar advertisements are unlikely to read and comprehend the fleeting, small text providing this information. Nor are customers likely to undertake the analysis necessary to assess whether T-Mobile's promises are based on comparable wireless plans.

57.     Indeed, in another television commercial aimed at enticing customers to switch to T-Mobile, T-Mobile implies customers will enjoy savings based on nothing more than an

20

unsupported assertion that "AT&T just raised your rates!" This is misleading.  All wireless carriers raise rates over time, including T-Mobile.  T-Mobile's commercial harms AT&T by leaving out this important context, and instead seeking to capitalize on new business by causing artificial fear and frustration in the minds of AT&T customers.



***Percentage Savings Commercials***

58.    Yet another example of this pattern, T-Mobile deceives customers by misleadingly advertising that AT&T customers can save, for example, up to 20% by switching carriers.  Just like the supposed $700, $750, $1,000, and $3,700 savings claims, the supposed 20% savings relies on bundled optional add-ons and faulty plan comparisons.  As the fine print seen below admits, the savings come from "built-in benefits."  But again, consumers would likely not understand that what T-Mobile frames as "benefits" are optional, potentially unwanted third-party services.





59.    T-Mobile knows what it is doing is wrong because T-Mobile itself challenged the very same type of advertising from Spectrum Mobile in front of the National Advertising Division ("NAD"), a self-regulatory body for national advertisers administered by the Better Business Bureau.  There, T-Mobile argued that Spectrum's advertised savings claims were inaccurate and misleading because Spectrum claimed customers could save "up to 40%" by switching to Spectrum, but failed to disclose that estimate baked in other bundled options—in that case, a Spectrum Internet subscription.  Now, T-Mobile resorts to the same ruse: baking optional benefits into its savings claims.

60.    Additionally, T-Mobile previously ran a campaign, which is still available on its websites, claiming first responders and emergency groups would receive "40% more" 5G capacity than AT&T and other carriers—a statement with no factual basis.  T-Mobile cannot substantiate this claim, as the information needed to do so is confidential and simply unavailable.  AT&T made

22

this same argument in a challenge brought before the National Advertising Division—T-Mobile simply ignored that proceeding and refused to respond.  These misleading ads harm not only customers, but AT&T as well.  Police and fire departments who serve our communities—like all other consumers—deserve candor, not hollow marketing ploys.

61.    The above-described advertisements are illustrative of the types of misleading tactics and claims that T-Mobile has employed—and continues to employ—to lure customers away from AT&T.  Like a game of whack-a-mole, T-Mobile keeps taking down ads and popping up with new variants employing the same deceptive formulas.  Cosmetic changes to colors, images, fonts, scripts, and celebrity spokesperson do not cure the underlying deception.  T-Mobile's misleading savings claims, which are not based on comparable plans, harm consumers and AT&T.

**b.  T-Mobile's Easy Switch Generates Savings Estimates Premised on False and Misleading Price Comparisons**

62.    The Easy Switch campaign is part of T-Mobile's ongoing pattern of false and misleading advertising in its effort to entice customers to switch carriers.  Because it can no longer scrape data, T-Mobile's Easy Switch now prompts users to supply information about their AT&T wireless service plans, either by uploading PDF copies of their bills or manually entering plan details into the tool.  T-Mobile then exploits that user-supplied information to generate comparisons and offers that are inaccurate and deceptive in two structural ways.

*Inflated Baseline Prices:*
*Calculated Based on Comparisons to Other T-Mobile Prices and Not to AT&T*

63.    First, the supposed "savings" T-Mobile shows the customer are not always based on a comparison between what the customer is currently paying to AT&T and what they would be paying at T-Mobile for a similar plan.  Instead, T-Mobile presents "savings" reflecting the difference between T-Mobile's discounted rate and T-Mobile's significantly higher rack rate.  For example, as shown below, one Easy Switch comparison purports to provide yearly "savings" of

23

$420, but this estimate is based on discounts, promotions, and other perks relative to the standard price of the T-Mobile plan being offered, not any AT&T plan. These intentionally misleading tactics belie what any reasonable consumer would naturally expect of a tool whose very name claims to provide an "easy" way to "switch" carriers: A comparison between AT&T and T-Mobile, not a comparison between T-Mobile and itself.



64.    As shown above, the tool obscures what it is doing. It does not display the breakdown of the purported "savings" in the first instance. Rather, the user has to click through to discover that what Easy Switch represents to customers as their supposed savings from switching to T-Mobile are really only discounts and value add-ons from T-Mobile's off-the-shelf pricing, not a reduction from the customer's current AT&T payment.

*Inaccurate and Inapt Comparisons to AT&T Offerings*

65.    Second, even where Easy Switch does compare AT&T and T-Mobile plans, it presents apples-to-oranges comparisons—comparing a higher tier AT&T plan to a lower tier

T-Mobile plan.  The below example shows a recommendation to switch from an unlimited AT&T plan (Unlimited Premium PL) to a no-frills limited-data T-Mobile plan (Essentials):



66.     At least sometimes, Easy Switch also creates a false comparison by including industry-standard costs in AT&T's column but not T-Mobile's.  In the example below, the AT&T user's higher-tier plan costs $106.47 per month.  The Easy Switch-generated comparison incorrectly calculates and inflates this amount to $123.53 by including equipment, standard fees, and surcharges—universal in the industry—without also adding them into T-Mobile's estimated cost.





67.    Easy Switch even purports to offer free same-day phone delivery for anyone who switches using Easy Switch.  This too is untrue for some consumers—same-day delivery is not automatically available for all who are switching.

Switch online today and get FREE same-day delivery. Or call a mobile expert at 1-844-537-5456 for support.

c.  **Easy Switch Fails To Read AT&T Bills Accurately**

68.    Easy Switch sometimes deceives prospective customers at an even more basic level: failing to truthfully describe the customers' AT&T plan prices, features, and other attributes. For example, Easy Switch misinterprets AT&T accounts with multiple lines and mix-and-match plans by erroneously treating all lines as if they were on the same AT&T plan.  That inaccurate treatment causes Easy Switch to present customers who have multiple lines on different AT&T plans with inaccurate statements about their AT&T charges and plan configurations.  Easy Switch also misrepresents plan features when comparing customers' existing AT&T plans to the T-Mobile plans being offered.  As one example, Easy Switch informed a user that international texting is not included in the user's current AT&T plan, as illustrated in the screenshot below:



69.    T-Mobile's statement is false.  International texting is included in that user's AT&T Unlimited & More (SM) Premium plan, as shown below:



70.     These false representations are likely being made to most or all AT&T customers who submit their bills, because Easy Switch is not able to pull out any plan attributes from an uploaded bill—AT&T customers' bills do not list plan attributes because customers find such information elsewhere in their accounts.

71.     T-Mobile's false and misleading claims harm all consumers, perpetuating confusion about pricing and features, and harm AT&T's reputation and goodwill with its customers, by falsely and misleadingly portraying AT&T as a higher-cost service provider. T-Mobile must be held accountable.

**d.  T-Mobile Promises Misleading and Unrealistic Switching Speeds**

72.     T-Mobile's deception goes further—in star-studded advertisements, on its website, and within the T-Life app, T-Mobile repeatedly represents that new customers can switch to T-Mobile in just 15 minutes.  This is false.  A customer might be able to comparison shop and pick a new plan in 15 minutes, but switching *services* to a new wireless carrier such that the customer

can actually make and receive calls on that carrier's network generally requires much longer—hours, even days—to complete.  T-Mobile knows this, and that is why when T-Mobile includes disclaiming information on its webpages that fully switching takes longer than 15 minutes, it does so in hidden fine print:  "Check out in 15 minutes or less per line.  Device activation, data & number transfer will take additional time."  But reasonable consumers are likely to understand that "switching" means using their devices with their new carrier—not waiting around for activation and transfer to be completed at some future time.

73.    T-Mobile admits this on its website.  T-Mobile's official support page cautions its "switching" customers that transferring their wireless numbers alone will "typically complete in 10 minutes to 3 hours."[11]  Because a consumer cannot use their phone on T-Mobile's network until their service is established and their number is transferred, T-Mobile's website makes clear that it is impossible for *any* consumer to "switch to T-Mobile in just 15 minutes."  Yet T-Mobile promises customers just that.

74.    In commercials starring Billy Bob Thornton, for example, the actor declares, "You can switch to T-Mobile from your phone in just 15 minutes."[12]



---

[11] https://www.t-mobile.com/support/account/transfer-your-phone-number
[12] https://www.ispot.tv/ad/BvHP/t-mobile-network-hero-little-dodgy-featuring-billy-bob-thornton

75.     In another commercial, T-Mobile "Chief Switching Officer" Druski likewise states without qualification that customers can "switch to T-Mobile in just 15 minutes" while the onscreen text directs consumers to the T-Life app.[13]  A voiceover then repeats that switching takes just 15 minutes.  There is no disclaimer or fine print disclosing that the mechanics of switching (i.e., actually using a phone on T-Mobile's wireless network) will take longer than 15 minutes.



76.     After clicking the "start your switch" icon on Easy Switch in the T-Life app, T-Mobile states that "it'll take as little as 15 minutes to complete."  And as illustrated below, there are no disclaimers, qualifiers, or linked terms on this page:

---

[13] https://www.ispot.tv/ad/BmWF/t-mobile-holiday-reindeer-iphone-17-featuring-jeff-bridges-zoe-saldaa-druski

30



77.    And on T-Mobile's 15 Minute Switch website, T-Mobile represents that prospective customers are "just 15 minutes to better."[14]  But it is only by clicking on the tiny "get full terms" link that consumers can learn that both the 15 minutes per line and the activation and transfer process will take much longer.

---

[14] https://www.t-mobile.com/switch/15-minute-switch

31



## **COUNT I**

### **Computer Fraud and Abuse Act – 18 U.S.C. §§ 1030 *et seq***

78.    AT&T realleges and incorporates the allegations of paragraphs 1–77 of this Complaint.

79.    AT&T's servers and computer systems are computers that are used in or affecting interstate or foreign commerce or communication, and they are thus protected computers under 18 U.S.C. § 1030(e)(2)(B).

80.    T-Mobile has violated 18 U.S.C. § 1030(a)(2) because it knowingly and intentionally accessed AT&T's servers without authorization or in excess of authorization, obtaining password-protected customer account information from non-public AT&T websites hosted on AT&T's protected computers.  The customer account data that T-Mobile has obtained is vast, spanning over 100 different data fields, and including such information as full legal name, billing and physical address, billing and billing history, phones and devices, trade-in values, installment plans and payoffs, available upgrades and upgrade pathways, and charges and disputes, to name just a few categories of data.

81.    T-Mobile's access to AT&T's servers has been without authorization or in excess of authorization, because it was in violation of AT&T's TOU, which prohibits automated scraping, commercial exploitation of data accessed through AT&T's websites, and circumvention of AT&T's security measures.    T-Mobile had constructive knowledge of AT&T's TOU (as a sophisticated commercial entity that maintains its own terms of use containing similar prohibitions), which has been in place since January 2020, and is publicly available online at https://www.att.com/legal/terms.attWebsiteTermsOfUse.html.    In addition, T-Mobile received actual notice and knowledge by no later than November 24, 2025, through the cease-and-desist letter sent by AT&T on that date, demanding that T-Mobile stop its unauthorized access to AT&T's systems.    T-Mobile's continued access to and use of AT&T's websites after T-Mobile's constructive and actual knowledge of the TOU confirm T-Mobile's agreement to the TOU.

82.    T-Mobile's own conduct further demonstrates T-Mobile's knowledge that its conduct described above was unauthorized or exceeded authorized access.    T-Mobile's T-Life App attempted to conceal its identity from AT&T's servers, while performing its unauthorized and illegal scraping, and T-Mobile deliberately circumvented multiple technical security measures that AT&T employed, including both measures in place since before T-Mobile's beta-testing of Easy Switch began, as well as the additional security measures in place since November 24, 2025, to prevent its automated scraping.

83.    T-Mobile also has violated 18 U.S.C. § 1030(a)(4) because it knowingly, and with intent to defraud, accessed AT&T's servers without authorization or in excess of authorization, and by means of such conduct has furthered the intended fraud and obtained something of value. T-Mobile's intended fraud included sending commands and requests to AT&T's servers that omit information that could identify those commands and requests as originating from Easy Switch,

T-Mobile, or an automated bot, and instead falsely indicate that they originate from authenticated logged-in customers, in order to access and obtain password-protected customer account data from AT&T.

84.    T-Mobile's conduct has caused a loss to AT&T as defined by 18 U.S.C. § 1030(e)(11), during a one-year period in excess of $5,000, including AT&T's substantial expenditure of resources to investigate and remediate T-Mobile's conduct.

85.    AT&T has suffered immediate irreparable and incalculable harm resulting from T-Mobile's conduct, and—as demonstrated by its disregard of AT&T's November 24, 2025 letter and security measures—T-Mobile's misconduct and resulting harm will continue unless T-Mobile is enjoined from further unauthorized access and use of AT&T's protected computers.

86.    AT&T also seeks compensatory damages in an amount to be proven at trial and injunctive relief under 18 U.S.C. § 1030(g).

## COUNT II

**Texas Computer Crimes – Tex. Civ. Practice and Remedies Code 143.001**

87.    AT&T realleges and incorporates the allegations of paragraphs 1–86 of this Complaint.

88.    T-Mobile knowingly and intentionally accessed AT&T's servers—including those located in Texas—without AT&T's effective consent, in violation of Texas Penal Code § 33.02. T-Mobile's access to AT&T's systems was without effective consent because: it was in violation of AT&T's TOU, which prohibits automated scraping, commercial exploitation of data accessed through AT&T's websites; it disregarded AT&T's November 24, 2025 cease and desist letter that expressly rejected any authorization for T-Mobile misconduct based on Easy Switch; and it repeatedly circumvented AT&T's security measures, including those in place since before

34

T-Mobile began beta-testing Easy Switch and those that were implemented on November 24, 2025, and then again on November 25, 2025.

89.    As a sophisticated commercial entity that maintains its own terms of use containing similar prohibitions to those at issue here, T-Mobile has had constructive knowledge that its access to AT&T's servers lacked effective consent.  Moreover, T-Mobile has had actual knowledge that it lacked effective consent, at least by November 24, 2025, when it received AT&T's cease-and-desist letter rejecting any authorization by AT&T and demanding that it cease its unauthorized access and scraping of AT&T's password-protected webpages.

90.    Through Easy Switch and automated bots, T-Mobile obtained access to AT&T's private customer data and confidential business information, as a result of which, AT&T lost control over its computer servers and customer data.  Thus, T-Mobile accessed AT&T's servers with the intent and effect of causing harm to AT&T.

91.    AT&T has been and will continue to be damaged as the result of T-Mobile's violation of the Texas Penal Code.

92.    Pursuant to § 143.001 of the Texas Civil Practice and Remedies Code, T-Mobile's knowing and intentional violation of Texas Penal Code § 33.02 makes T-Mobile liable for the harmful access of AT&T's servers.

93.    As a direct and proximate result of T-Mobile's conduct, AT&T is entitled to damages in an amount to be proven at trial pursuant to Texas Civil Practice and Remedies Code § 143.002 and otherwise according to law.  AT&T is further entitled to its attorneys' fees and full costs pursuant to Texas Civil Practice and Remedies Code § 143.002 and otherwise according to law.

94.     AT&T has suffered irreparable and incalculable harm resulting from T-Mobile's conduct, and this harm will continue unless T-Mobile is enjoined from further unauthorized access and use of AT&T's protected computers.

## COUNT III

**Violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA") – Cal. Penal Code § 502 *et seq.***

95.     AT&T hereby realleges and incorporates the allegations of paragraphs 1–94 of this Complaint.

96.     AT&T also owns servers located in California that have been targeted by T-Mobile's scraping activities, and AT&T is able to bring a cause of action under Cal. Penal Code § 502.  This cause of action is in addition to and in the alternative to a Texas cause of action, with respect to the affected California-based servers.

97.     Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

98.     T-Mobile violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing password-protected websites hosted on AT&T's servers and scraping AT&T's customer data and business information from those secure websites and servers. T-Mobile accessed, copied, took, analyzed, and used data from AT&T's servers in and from the State of California.  On information and belief, at least some of AT&T's servers used to host secure websites and the private customer data that has been scraped by T-Mobile's Easy Switch tool and bots are located in California.

36

99.     T-Mobile also violated Cal. Penal Code § 502(c)(3) by knowingly and without permission using AT&T's computer services, as defined by § 502(b)(4).  T-Mobile used AT&T's servers to access and copy the data it scraped from those servers.

100.    As a sophisticated commercial entity that maintains its own terms of use containing similar prohibitions to AT&T's terms, T-Mobile has had constructive knowledge that it lacked authorization to access AT&T's servers in the manner alleged.  Moreover, T-Mobile has had actual knowledge that its access is unauthorized, at least by November 24, 2025, when it received AT&T's cease-and-desist letter rejecting any authorization by AT&T and demanding that it cease its unauthorized access and scraping of AT&T's password-protected webpages.

101.    As a direct and proximate result of T-Mobile's conduct, AT&T has suffered damages, including but not limited to AT&T's substantial expenditure of resources to investigate and remediate T-Mobile's conduct.

102.    AT&T has suffered immediate irreparable and incalculable harm resulting from T-Mobile's conduct, and—as demonstrated by its disregard of AT&T's November 24, 2025 letter and security measures—T-Mobile's misconduct and resulting harm will continue unless T-Mobile is enjoined from further unauthorized access and use of AT&T's protected computers.

103.    AT&T is entitled to compensatory damages, and/or disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

104.    AT&T is also entitled to recover its reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## COUNT IV

**Violation of the Georgia Computer Systems Protections Act – O.C.G.A. § 16-9-93**

105.    AT&T realleges and incorporates the allegations of paragraphs 1–104 of this Complaint.

106.    AT&T maintains corporate offices and retail locations within Georgia, and AT&T owns and operates additional servers located in Alpharetta, Georgia, that, on information and belief, have been targeted by T-Mobile's scraping activities.

107.    O.C.G.A. § 16-9-93(g) provides: "Any person whose property or person is injured by reason of a violation of any provision of this article may sue therefor and recover for any damages sustained and the costs of suit."

108.    T-Mobile violated O.C.G.A. § 16-9-93(a), by using AT&T's computer systems with knowledge that such use was without authority, to scrape AT&T's password-protected customer data.  On information and belief, T-Mobile accessed, copied, took, analyzed, and used data from AT&T's servers in and from the State of Georgia.

109.    As a sophisticated commercial entity that maintains its own terms of use containing similar prohibitions to AT&T's terms, T-Mobile has had constructive knowledge that it lacked authorization to access AT&T's computer systems in the manner alleged.  Moreover, T-Mobile has had actual knowledge that its access is unauthorized, at least by November 24, 2025, when it received AT&T's cease-and-desist letter rejecting any authorization by AT&T and demanding that it cease its unauthorized access and scraping of AT&T's password-protected webpages.

110.    As a direct and proximate result of T-Mobile's conduct, AT&T has suffered damages, including but not limited to AT&T's substantial expenditure of resources to investigate and remediate T-Mobile's conduct.

111.     AT&T is entitled to compensatory and punitive damages, and such other and further relief as the Court deems just and proper.

## COUNT V

### Breach of Contract

112.     AT&T realleges and incorporates the allegations of paragraphs 1–111 of this Complaint.

113.     Access and use of AT&T's websites, including both public and non-public websites, is governed by and subject to AT&T's Terms of Use (TOU).

114.     AT&T's TOU applies to websites operated by the subsidiaries and affiliates of AT&T Inc., including both AT&T Mobility LLC and AT&T Services, Inc.

115.     AT&T's TOU constitutes a valid and enforceable contract between AT&T and anyone who accesses or uses AT&T's websites.  This includes T-Mobile, who has used its T-Life app to access password-protected portions of AT&T websites hosted on AT&T's servers.

116.     At all relevant times, T-Mobile has had constructive or actual knowledge of AT&T's TOU.

117.     T-Mobile is a sophisticated commercial entity that operates its own websites subject to its own terms of use, which includes restrictions against data scraping of password-protected information and circumvention of security measures similar to those at issue here.  As such, T-Mobile knew or should have known that AT&T's websites would likewise be governed by terms of use prohibiting similar misconduct.  AT&T's TOU was, at all relevant times, readily and publicly available to T-Mobile by means of a clear hyperlink posted on AT&T's websites.

118.     T-Mobile has also had actual notice and knowledge of AT&T's TOU by no later than November 24, 2025, when it received AT&T's cease-and-desist letter expressly informing

39

T-Mobile that its unauthorized access and scraping of AT&T's password-protected webpages is in violation of AT&T's TOU, and demanding that it cease this conduct.

119.    Through its continued access of AT&T's websites, with actual and constructive knowledge of the TOU, T-Mobile has agreed to AT&T's TOU.  The TOU has language that clearly encompasses a prohibition on unauthorized access and harvesting of data from password-protected websites, including specifically provisions that prohibit (1) use of any robot, spider, or other such programmatic or automatic device to monitor, copy or obtain information from AT&T's websites; (2) use, downloading or otherwise copying user or usage information, or transmitting, providing or otherwise distributing it to a third party; (3) exploiting for any AT&T's websites or their content for commercial purposes; or (4) collecting and using any content available through AT&T's websites, including the use of any data mining, or similar data gathering or extraction methods. *See* TOU §§ 14–15.

120.    AT&T has performed all obligations required of it under the TOU.

121.    T-Mobile has breached AT&T's TOU by using its Easy Switch tool and unidentified automated bots to harvest private customer account information and AT&T business information from AT&T's password-protected websites.

122.    Despite having actual and constructive knowledge that its conduct violates AT&T's TOU, T-Mobile has continued to willfully, repeatedly, and materially breach the TOU.

123.    As a direct and proximate result of T-Mobile's breaches, AT&T has suffered damages, including but not limited to AT&T's substantial expenditure of resources to investigate and remediate T-Mobile's conduct.

124.    AT&T has suffered immediate irreparable and incalculable harm resulting from T-Mobile's conduct, and—as demonstrated by its disregard of AT&T's November 24, 2025 letter

and its security measures—T-Mobile's misconduct and resulting harm will continue unless T-Mobile is enjoined from further unauthorized access and use of AT&T's protected computers.

125.    AT&T is entitled to compensatory damages, restitution as permitted, injunctive relief enforcing specific performance of the TOU, costs, and such other and further relief as the Court deems just and proper.

## COUNT VI

### Tortious Interference With Contract

126.    AT&T realleges and incorporates the allegations of paragraphs 1–125 of this Complaint.

127.    AT&T's TOU is a valid and enforceable contract between AT&T and its customers, which governs access and use of AT&T's websites, including the password-protected websites through which AT&T customers can view their account data.  AT&T customers who register for an account on AT&T's password-protected customer portal are informed of, and must affirmatively agree to, AT&T's TOU, as part of the registration process.

128.    At all relevant times, T-Mobile has known of the existence and applicability of AT&T's TOU to the access and use of AT&T's password-protected webpages by AT&T's customers.  T-Mobile is a sophisticated commercial entity that operates its own websites subject to its own terms of use, which includes restrictions against data scraping of password-protected information and circumvention of security measures similar to those at issue here.  As such, T-Mobile knew or should have known that AT&T's websites would likewise be governed by terms of use prohibiting similar misconduct.  AT&T's TOU was, at all relevant times, readily and publicly available to T-Mobile by means of a clear hyperlink posted on AT&T's websites.

129.    Moreover, T-Mobile itself had actual notice and knowledge of AT&T's TOU by no later than November 24, 2025, when it received AT&T's cease-and-desist letter expressly

41

informing T-Mobile that its unauthorized access and scraping of AT&T's password-protected webpages is in violation of AT&T's TOU, and demanding that it cease this unauthorized conduct.

130.    With knowledge of AT&T's contractual relationships with its customers, T-Mobile has intentionally encouraged and induced AT&T customers to breach AT&T's TOU by duping them.  By offering Easy Switch without disclosing to AT&T customers that T-Mobile will be unlawfully using disguised bots that are prohibited by the TOU to scrape AT&T's computer systems, T-Mobile has deceptively implied to customers that use of Easy Switch is consistent with the TOU.  In addition, by telling AT&T's customers that T-Mobile will not "collect or store" their login credentials and that T-Mobile is merely collecting information to match them with a plan, T-Mobile has misled AT&T's customers about the actual extent of T-Mobile's data harvesting, through which T-Mobile is scraping over a hundred categories of personal account information that, on information and belief, T-Mobile is retaining in its own company's records, regardless of whether the customer becomes a T-Mobile customer.  In this manner, T-Mobile has induced and caused AT&T customers to log into AT&T's password-protected webpages to use T-Mobile's Easy Switch tool, which enable T-Mobile's automated bots to scrape data from AT&T's password-protected webpages, in violation of AT&T's TOU.

131.    As a direct and proximate result of T-Mobile's interference with AT&T's contractual relations that protect AT&T's systems and data from scraping by bots, AT&T has suffered damages, including but not limited to AT&T's substantial expenditure of resources to investigate and remediate T-Mobile's conduct.

132.    AT&T has suffered immediate irreparable and incalculable harm resulting from T-Mobile's conduct, and—as demonstrated by its disregard of AT&T's November 24, 2025 letter

42

and its security measures—T-Mobile's misconduct and resulting harm will continue unless T-Mobile is enjoined from further unauthorized access and use of AT&T's protected computers.

133.    AT&T is entitled to compensatory and punitive damages, restitution as permitted, injunctive relief enforcing specific performance of the TOU, costs, and such other and further relief as the Court deems just and proper.

## COUNT VII

### Misappropriation

134.    AT&T hereby realleges and incorporates the allegations of paragraphs 1–133 of this Complaint.

135.    AT&T places a high value on the trust of its customers, continually investing in the best technology and practices to protect customer data, comply with all applicable privacy regulations, and prevent unauthorized access, misuse, and other threats to its systems.

136.    At the same time, AT&T believes that customers should be empowered with transparent information about pricing and services.  To that end, AT&T has developed systems and websites to provide its customers with detailed data about their user accounts, contracts, wireless plans, billing and billing history, promotions, and subscriptions.  Customers are able to access their AT&T account data through password-protected accounts on the non-public portions of AT&T's websites.

137.    AT&T has invested substantial time, effort, and money in developing both its customer relationships, as well as the websites and computer systems it has put in place to support its customers.  In particular, AT&T has developed hosting infrastructure, security systems, and specialized software, to gather, curate, and make available personal account data to its customers, in real time, through its password-protected webpages.  This account data is time-sensitive, non-public, commercially valuable data gathered and stored by AT&T at considerable expense.

Without authorization, T-Mobile has accessed AT&T's password-protected systems to scrape AT&T's time-sensitive customer data. T-Mobile has publicly stated that it did this to gather competitive intelligence about AT&T's customer base. Thus, T-Mobile seeks to gain a competitive advantage over AT&T, by free-riding on AT&T's efforts, misappropriating both AT&T's password-protected customer data and the systems AT&T has developed to provide that data to its customers.

138. As a direct and proximate result of T-Mobile's misappropriation of AT&T's systems and data, AT&T has suffered harms, including but not limited to AT&T's substantial expenditure of resources to investigate and remediate T-Mobile's conduct, and damage to AT&T's reputation and goodwill with its customers.

139. AT&T is entitled to compensatory and punitive damages, restitution as permitted, injunctive relief enforcing specific performance of the TOU, costs, and such other and further relief as the Court deems just and proper.

## COUNT VIII

**False and Misleading Advertising in Violation of Section 43(a) of the Lanham Act**
**15 U.S.C. § 1125(a)**

140. AT&T hereby realleges and incorporates the allegations of paragraphs 1–139 of this Complaint.

141. AT&T and T-Mobile are direct competitors that each offer wireless telecommunications services in interstate commerce to customers throughout the United States.

142. T-Mobile has violated Section 43(a) of the Lanham Act by making false and misleading statements about the costs and features associated with AT&T's and T-Mobile's services through the T-Life app and other means of communicating with consumers. T-Mobile presents AT&T customers with offers for T-Mobile's competing services that include inaccurate

and deceptive purported plan comparisons and projected savings. First, Easy Switch displays purported savings that appear to be actual monthly payment reductions, but instead, the estimated savings are calculated compared to T-Mobile's own pricing—and with promotions, discounts, and bundled optional add-ons artificially bolstering the differential. Second, even when Easy Switch generates plan comparisons to AT&T plans, it misleads customers by using different tiered plans for supposed apples-to-apples comparisons or includes certain types of common fees only when presenting the AT&T portion of the comparison, all in direct contravention of reasonable consumer expectations and exaggerating the purported savings.

143.    T-Mobile also has violated Section 43(a) of the Lanham Act by making literally false and misleading claims about the attributes and features associated with AT&T's customer plans. Once a customer uploads a PDF of their bill, the Easy Switch tool misinterprets the information and displays false information to AT&T customers about their plan, including in the ways described above. For example, Easy Switch mishandles AT&T accounts with multiple lines and mix-and-match plans, generating recommendations that treat each line as part of the same AT&T plan. Easy Switch also falsely misrepresents specific plan features, such as international texting, when comparing plans.

144.    In addition, T-Mobile has violated Section 43(a) of the Lanham Act by making false and misleading claims that by switching to T-Mobile, an AT&T customer can save up to a certain percentage of their bill, or that by switching an AT&T customer can save hundreds or even thousands of dollars per year. These claims are false and misleading because they bake in bundled optional third-party add-ons services including, for example, Netflix, DoorDash, AAA Classic, and a $10 per month value for T-Satellite. T-Mobile then tacks on the charges of these extra services to the price of AT&T's wireless plans, while at the same time failing to account for similar

45

benefits or promotions that an AT&T customer may receive.  Even where T-Mobile inadequately attempts to provide clarity on its claim by stating in tiny print that the estimated savings come from "built-in benefits," consumers would still be unlikely to understand that those "benefits" are optional third-party services.

145.    Further, T-Mobile has violated Section 43(a) of the Lanham Act by making false and misleading claims that its customers' bills are categorically lower than those of AT&T's customers and that AT&T customers who switch to T-Mobile will realize significant savings. Those claims are false and misleading because the figures on which they rely are derived from selectively chosen data—snapshots of bills from selected accounts. T-Mobile ensures that customers will not scrutinize the data supporting these claims by burying the source in fine print, and storing the data at a third-party website where customers are unlikely to navigate, let alone review.

146.    Still further, T-Mobile has violated Section 43(a) of the Lanham Act by making false and misleading claims that an AT&T customer can switch to T-Mobile in a mere 15 minutes within the T-Life app.  In reality, the "15 minute" claim pertains to the checkout process, not the entire switching process—which involves device activation and data and number transfer—that can take hours or even days.

147.    T-Mobile also violated Section 43(a) of the Lanham Act in its claims that T-Mobile offers better coverage than AT&T, when they have no way to substantiate such claims.

148.    The foregoing examples are illustrative of T-Mobile's ongoing pattern and practice of false and misleading advertising, which arises from T-Mobile's deliberate corporate marketing strategy as alleged above.  T-Mobile continues to disseminate new advertisements employing the same or similar deceptive tactics.  Each such advertisement constitutes a further violation of

Section 43(a) arising from the same common scheme.  AT&T reserves the right to present evidence at trial of additional advertisements arising from this pattern and practice.

149.    T-Mobile's false and misleading comparisons are material to consumers' purchasing decisions, as the comparisons are intended and likely to influence customers seeking to make a decision on their wireless service to view T-Mobile's services more favorably and AT&T's services less favorably.

150.    T-Mobile's conduct has the capacity to deceive a substantial segment of the intended audience—namely, current AT&T customers—into believing that they would save money by switching to T-Mobile, when, in many instances, T-Mobile's comparisons and other statements are inaccurate or misleading, and the purported savings are illusory.  It also would deceive them into thinking that switching can be completed in 15 minutes, when it cannot.

151.    As a direct and proximate result of T-Mobile's false and misleading advertising, AT&T is likely to suffer harms, including lost sales, AT&T's substantial expenditures on additional consumer outreach and marketing to counteract T-Mobile's false and misleading statements, loss of goodwill, and harm to AT&T's reputation, based on T-Mobile's false portrayal of AT&T as a higher-cost service provider, which has caused or may cause some AT&T customers to question whether AT&T's services are competitively priced.

152.    AT&T is entitled to compensatory damages, injunctive relief barring further violations of 15 U.S.C. § 1125(a), disgorgement of T-Mobile's profits and recovery of AT&T's costs under 15 U.S.C. § 1117, and such other and further relief as the Court deems just and proper.

## COUNT IX

### Unfair Competition

153.    AT&T hereby realleges and incorporates the allegations of paragraphs 1–152 of this Complaint.

154.    As detailed above, T-Mobile has made false and misleading statements about the costs and features of AT&T's and T-Mobile's services in advertising its competing services to AT&T customers, in violation of Section 43(a) of the Lanham Act in the many ways described above.

155.    By making these statements, T-Mobile also violated Texas Penal Code § 32.42, along with laws in each state it advertised, because T-Mobile knew or should have known that its statements were false and misleading, or acted in reckless or criminally-negligent disregard of the truth of such statements.

156.    T-Mobile's conduct has interfered with AT&T's ability to conduct its business, by falsely portraying AT&T as a higher-cost service provider and creating confusion in the marketplace regarding the true costs of the parties' services.  As a result, AT&T has had to devote additional resources to consumer outreach and marketing efforts to counteract T-Mobile's false and misleading statements.

157.    As a direct and proximate result of T-Mobile's conduct, AT&T has suffered, and will continue to suffer, harms, including lost sales, AT&T's substantial expenditures on additional consumer outreach and marketing to counteract T-Mobile's false and misleading statements, and loss of goodwill and harm to AT&T's reputation, arising from T-Mobile's false portrayal of AT&T as a higher-cost service provider, which has caused AT&T customers to question whether AT&T's services are competitively priced.

158.    AT&T is entitled to compensatory damages, injunctive relief barring further violations of 15 U.S.C. § 1125(a) and Texas Penal Code § 32.42, disgorgement of T-Mobile's profits and recovery of AT&T's costs, and such other and further relief as the Court deems just and proper.

## **REQUEST FOR RELIEF**

AT&T respectfully requests judgment in its favor and against T-Mobile as follows:

AT&T requests that the Court issue permanent injunctive relief, enjoining and restraining T-Mobile and its agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with T-Mobile, from:

a.      Accessing, attempting to access, or assisting, instructing, or providing a means for others to access or attempt to access AT&T's protected computer systems and password-protected websites using automated means without authorization;

b.      Using any customer accounts on AT&T's websites, or inducing AT&T customers to allow use of their accounts, for the purpose of allowing T-Mobile's applications or automated tools to access AT&T's protected computer systems and password-protected websites;

c.      Accessing, attempting to access, or assisting, instructing, or providing a means for others to access AT&T's protected computer systems and password-protected websites, in excess of AT&T's authorization;

d.      Violating or evading any technological measures, barriers, or restrictions AT&T puts on the use of automated tools for accessing or obtaining customer data from AT&T's protected computer systems and password-protected websites;

e.      Violating the terms of AT&T's TOU for its websites or any other application AT&T terms of use or service terms (including any future updates or amendments to those terms), and preventing further interference by T-Mobile with AT&T's contractual relationships, including with AT&T customers; and

f.　　　Disseminating false, misleading, or otherwise unlawful claims about the costs and features of AT&T's and T-Mobile's services and the timing of switching from AT&T to T-Mobile, including but not limited to: (i) savings claims that include the value of optional third-party services or bundled benefits without clear and conspicuous disclosure that such services are the basis for the claimed savings; (ii) plan comparisons between non-comparable service tiers; (iii) claims about switching speed that fail to clearly and conspicuously disclose the time required for activation and number transfer; (iv) unsubstantiated network coverage or capacity superiority claims; and (v) any other materially false or misleading claims about the relative costs, features, or quality of AT&T's and T-Mobile's wireless services that arise from the same pattern and practice of deception alleged herein.

AT&T further requests that the Court order the following additional nonmonetary relief:

a.　　　Inventory, accounting, and destruction by T-Mobile of all copies of AT&T's data, including customer data, unlawfully obtained by T-Mobile, whether in the custody or control of T-Mobile or its employees, agents, assigns, or the third-party service providers (including, without limitation, web hosts, cloud providers, proxy servers, privacy services, and domain registrars);

b.　　　Identification of each AT&T customer account ever accessed, used, or controlled through or by T-Mobile, or any of its employees, agents, and assigns, to engage in the complained-of conduct; and

c.　　　That T-Mobile certify and confirm, in writing and under oath, within thirty days of the issuance of any order of the Court providing a remedy to AT&T, that T-Mobile has complied fully and completely with all requirements of such order.

50

AT&T further requests that the court award to AT&T as permitted by law and equity and in such amounts to be proven at trial:

a.  Monetary damages, including but not limited to compensatory, statutory, and punitive damages;

b.  Disgorgement of T-Mobile's profits from its wrongful acts;

c.  AT&T's reasonable costs, including reasonable attorneys' fees; and

d.  Pre- and post-judgment interest.

AT&T further requests such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues and claims so triable.

Dated:  August 7, 2026                          O'MELVENY & MYERS LLP


By:      /s/ *Timothy S. Durst*

TIMOTHY S. DURST
tdurst@omm.com
SID MODY
smody@omm.com
**O'MELVENY & MYERS LLP**
2801 North Harwood Street, Suite 1600
Dallas, TX  75201
Telephone:    +1 972 360 1900

RANDALL W. EDWARDS (*pro hac vice*)
redwards@omm.com
MARK LIANG (*pro hac vice*)
mliang@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, California  94111-3823
Telephone:    +1 415 984 8700

REEMA SHAH (*pro hac vice*)
rshah@omm.com
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas 17th FL
New York, NY 10019-6022
Telephone:    +1 212 326 2000

*Attorneys for Plaintiffs AT&T SERVICES INC.*
*and AT&T MOBILITY LLC*