**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| AT&T SERVICES, INC. and<br>AT&T MOBILITY LLC,<br>Plaintiffs,<br><br>v.<br><br>T-MOBILE US, INC.,<br><br>Defendant. | Case No. 3:25-cv-03279-S |

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant T-Mobile US, Inc. ("Defendant" or "T-Mobile") files this Answer, Affirmative Defenses, and Counterclaims to Plaintiffs AT&T Services, Inc. and AT&T Mobility LLC's ("Plaintiffs" or "AT&T") Second Amended Complaint and Request for Injunctive Relief.

1. T-Mobile denies the allegations in paragraph 1 and footnotes 1 and 2, including that T-Mobile "appears to be doing business as T-Mobile USA, Inc." and respectfully refers the Court to T-Mobile's SEC filings and the document quoted in footnote 2 for an accurate recitation of their contents.

2. T-Mobile denies the allegations in paragraph 2.

3. T-Mobile denies the allegations in paragraph 3.

4. T-Mobile denies the allegation in paragraph 4 and respectfully refers the Court to the Temporary Restraining Order issued on December 18, 2025 (ECF No. 33) for an accurate recitation of its contents.

5. T-Mobile denies the allegations in paragraph 5 and footnote 3 and respectfully refers the Court to the Preliminary Injunction issued on March 30, 2026 in *Cellco Partnership v. T-Mobile USA Inc.*, No. 26-CV-0972 (LAK) (S.D.N.Y. Mar. 30, 2026) (ECF No. 48) for an accurate recitation of its contents.

6. T-Mobile denies the allegations in paragraph 6.

7. T-Mobile denies the allegations in paragraph 7.

8. T-Mobile admits that AT&T provides wireless service. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the other allegations in paragraph 6, and on that basis denies them.

9. T-Mobile denies that its actions "intruded" or "scraped" any AT&T "systems." T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the other allegations in paragraph 9 and on that basis denies them.

10. T-Mobile admits the allegations in paragraph 10.

11. Paragraph 11 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 9.

12. Paragraph 12 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 12.

13. Paragraph 13 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 13.

14. Paragraph 14 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile admits that it litigated AT&T's Motion for Temporary Restraining Order and Preliminary Injunction in front of this Court and stipulated to this Court's entry of its Preliminary Injunction Order (ECF No. 35).

15. Paragraph 15 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 15 and respectfully refers the Court to the referenced sections of its website for an accurate recitation of their contents.

16. Paragraph 16 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 16 except admits that it has physical storefronts and a corporate office in Texas.

17. Paragraph 17 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 17 except admits that it operates nationwide telecommunication networks that reach customers in Texas and in the Northern District of Texas.

18. Paragraph 18 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 18.

19. Paragraph 19 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 19.

20. Paragraph 20 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 20 and footnote 4 except admits that it maintains a Texas registered agent, pays Texas franchise taxes, and has some physical presence in Texas. T-Mobile also admits that it serves Texas customers and that some of its employees are located in Texas and respectfully refers the Court to the webpages cited in footnote 4 for an accurate recitation of their contents.

21. T-Mobile admits on information and belief the allegations in paragraph 21.

22. Paragraph 22 sets forth legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 22.

23. T-Mobile admits that AT&T is a telecommunications company that provides wireless service. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the other allegations in paragraph 23, and on that basis denies them.

24. T-Mobile admits that customers can view their account data through AT&T's website. T-Mobile denies the other allegations in paragraph 24.

25. T-Mobile admits that customers can download their bills from AT&T and believes that customers should be able to freely share their plan information with competitors to obtain the best wireless plan but denies that AT&T freely permits customers to do so. T-Mobile denies the other allegations in paragraph 25.

26. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 26, and on that basis denies them and respectfully refers the Court to AT&T's Terms of Use for an accurate recitation of their contents.

27. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 27, and on that basis denies them.

28. T-Mobile admits that AT&T's Terms of Use are available on its website. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegation that AT&T's Terms of Use are available on "each page" of the AT&T website, and on that basis denies it. T-Mobile denies the other allegations in paragraph 28, and, to the extent a response is required, footnote 5, and respectfully refers the Court to AT&T's Terms of Use for an accurate recitation of their contents.

29. T-Mobile denies the allegations in paragraph 29 and respectfully refers the Court to the letter dated November 24, 2025 from AT&T to T-Mobile for an accurate recitation of its contents.

30. T-Mobile denies the allegations in paragraph 30, and to the extent a response is required, footnote 6, and respectfully refers the Court to the referenced document for an accurate recitation of its contents.

31. T-Mobile denies the allegations in paragraph 31.

32. T-Mobile denies the allegations in paragraph 32.

33. T-Mobile denies the allegations in paragraph 33 except admits that it made its "T-Life" mobile app available in early 2024, that it has been installed over 90 million times, and that the T-Life app can be used by customers who use T-Mobile or another carrier.

34. T-Mobile denies the allegations in paragraph 34, and, to the extent a response is required, footnote 7. T-Mobile respectfully refers the Court to the referenced document for an accurate recitation of its contents.

35. T-Mobile denies the allegations in paragraph 35 and footnote 8, and, to the extent a response is required, footnote 9 and respectfully refers the Court to the referenced document for an accurate recitation of its contents.

36. T-Mobile denies the allegations in paragraph 36 except admits that it used the information provided by the customer through the Easy Switch tool to prepare competing offers for customers and respectfully refers the Court to the referenced document for an accurate recitation of its contents.

37. T-Mobile denies the allegations in paragraph 37.

38. T-Mobile denies the allegations in paragraph 38.

39. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 39, and on that basis denies them. T-Mobile denies the other allegations in paragraph 39.

40. T-Mobile denies the allegations in paragraph 40.

41. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 41, and on that basis denies them.

42. T-Mobile admits that AT&T sent it a letter dated November 24, 2025 and respectfully refers the Court to that letter for an accurate recitation of its contents. T-Mobile denies the other allegations in paragraph 42.

43. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 43, and on that basis denies them.

44. T-Mobile denies the allegations in paragraph 44.

45. T-Mobile denies the allegations in paragraph 45 except admits that AT&T filed its original Complaint on November 26, 2025 (ECF No. 1), AT&T moved for a temporary restraining order and a preliminary injunction on November 30, 2025 (ECF No. 7), the Court issued a Temporary Restraining Order on December 18, 2025 (ECF No. 33), and that, by a Joint Motion and Stipulation by the Parties, the Court entered a Preliminary Injunction Order on December 29, 2025 (ECF No. 35).

46. T-Mobile denies the allegations in paragraph 46.

47. T-Mobile denies the allegations in paragraph 47.

48. T-Mobile denies the allegations in paragraph 48.

49. T-Mobile denies the allegations in paragraph 49 and footnote 10 and respectfully refers the Court to the Preliminary Injunction issued on March 30, 2026 in *Cellco Partnership v. T-Mobile USA Inc.*, No. 26-CV-0972 (LAK) (S.D.N.Y. Mar. 30, 2026) (ECF No. 48) for an accurate recitation of its contents.

50. T-Mobile denies the allegations in paragraph 50 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

51. T-Mobile denies the allegations in paragraph 51 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

52. T-Mobile denies the allegations in paragraph 52 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

53. T-Mobile denies the allegations in paragraph 53 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

54. T-Mobile denies the allegations in paragraph 54 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

55. T-Mobile denies the allegations in paragraph 55 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

56. T-Mobile denies the allegations in paragraph 56 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

57. T-Mobile denies the allegations in paragraph 57 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

58. T-Mobile denies the allegations in paragraph 58 and respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

59. T-Mobile denies the allegations in paragraph 59.

60. T-Mobile denies the allegations in paragraph 60.

61. T-Mobile denies the allegations in paragraph 61.

62. T-Mobile denies the allegations in paragraph 62.

63. T-Mobile denies the allegations in paragraph 63.

64. T-Mobile denies the allegations in paragraph 64 and respectfully refers the Court to the referenced document for an accurate recitation of its contents.

65. T-Mobile denies the allegations in paragraph 65.

66. T-Mobile denies the allegations in paragraph 66.

67. T-Mobile denies the allegations in paragraph 67.

68. T-Mobile denies the allegations in paragraph 68.

69. T-Mobile denies the allegations in paragraph 69.

70. T-Mobile denies the allegations in paragraph 70.

71. T-Mobile denies the allegations in paragraph 71.

72. T-Mobile denies the allegations in paragraph 72 and respectfully refers the Court to T-Mobile's website for an accurate recitation of its contents.

73. T-Mobile denies the allegations in paragraph 73 and, to the extent a response is required, footnote 11. T-Mobile respectfully refers the Court to the referenced document for an accurate recitation of its contents.

74. T-Mobile denies the allegations in paragraph 74 and, to the extent a response is required, footnote 12. T-Mobile respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

75. T-Mobile denies the allegations in paragraph 75 and, to the extent a response is required, footnote 13. T-Mobile respectfully refers the Court to the referenced commercial for an accurate recitation of its contents.

76. T-Mobile denies the allegations in paragraph 76 and T-Mobile respectfully refers the Court to the referenced portion of the T-Life application for an accurate recitation of its contents.

77. T-Mobile denies the allegations in paragraph 77 and, to the extent a response is required, footnote 14. T-Mobile respectfully refers the Court to T-Mobile's website for an accurate recitation of its contents.

**COUNT I**

**Computer Fraud and Abuse Act - 18 U.S.C. §§ 1030 *et seq***

78. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 77.

79. Paragraph 79 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 79.

80. T-Mobile denies the allegations in paragraph 80.

81. T-Mobile denies the allegations in paragraph 81 and respectfully refers the Court to the referenced documents for an accurate recitation of their contents.

82. T-Mobile denies the allegations in paragraph 82.

83. T-Mobile denies the allegations in paragraph 83.

84. T-Mobile denies the allegations in paragraph 84.

85. T-Mobile denies the allegations in paragraph 85 and respectfully refers the Court to the referenced document for an accurate recitation of its contents.

86. Paragraph 86 contains a description of AT&T's legal claims and relief sought to which no response is required. To the extent a response is required, T-Mobile denies that AT&T is entitled to any relief.

**COUNT II**

**Texas Computer Crimes - Tex. Civ. Practice and Remedies Code 143.001**

87. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 86.

88. Paragraph 88 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 88.

89. T-Mobile denies the allegations in paragraph 89 and respectfully refers the Court to the referenced document for an accurate recitation of its contents.

90. T-Mobile denies the allegations in paragraph 90.

91. T-Mobile denies the allegations in paragraph 91.

92. T-Mobile denies the allegations in paragraph 92.

93. T-Mobile denies the allegations in paragraph 93.

94. T-Mobile denies the allegations in paragraph 94.

## COUNT III

### Violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA") - Cal. Penal Code § 502 *et seq.*

95. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 94.

96. T-Mobile lacks sufficient information or knowledge to form a belief as to the location of AT&T's servers, and on that basis denies the allegation. Paragraph 96 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 96.

97. T-Mobile respectfully refers the Court to the referenced statute for an accurate recitation of its contents.

98. T-Mobile denies the allegations in paragraph 98.

99. T-Mobile denies the allegations in paragraph 99.

100. T-Mobile denies the allegations in paragraph 100 and respectfully refers the Court to the referenced documents for an accurate recitation of their contents.

101. T-Mobile denies the allegations in paragraph 101.

102. T-Mobile denies the allegations in paragraph 102.

103. T-Mobile denies the allegations in paragraph 103.

104. T-Mobile denies the allegations in paragraph 104.

**COUNT IV**

**Violation of the Georgia Computer Systems Protections Act - O.C.G.A. § 16-9-93**

105. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 104.

106. T-Mobile denies having engaged in "scraping activities." T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the other allegations in paragraph 106, and on that basis denies them.

107. T-Mobile respectfully refers the Court to the referenced statute for an accurate recitation of its contents.

108. T-Mobile denies the allegations in paragraph 108.

109. T-Mobile denies the allegations in paragraph 109.

110. T-Mobile denies the allegations in paragraph 110.

111. T-Mobile denies the allegations in paragraph 111.

**COUNT V**

**Breach of Contract**

112. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 111.

113. Paragraph 113 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 113.

114. Paragraph 114 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 114.

115. Paragraph 115 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 115.

116. T-Mobile denies the allegations in paragraph 116.

117. T-Mobile denies the allegations in paragraph 117 except admits that AT&T's Terms of Use are publicly available.

118. T-Mobile admits that AT&T sent it a letter dated November 24, 2025 and respectfully refers the Court to that letter for an accurate recitation of its contents. T-Mobile denies the other allegations in paragraph 118.

119. T-Mobile denies the allegations in the first sentence of paragraph 119. The other allegations in paragraph 119 consist of characterizations of AT&T's Terms of Use, which T-Mobile denies, and T-Mobile respectfully refers the Court to AT&T's Terms of Use for an accurate recitation of their contents.

120. T-Mobile denies the allegations in paragraph 120.

121. T-Mobile denies the allegations in paragraph 121.

122. T-Mobile denies the allegations in paragraph 122.

123. T-Mobile denies the allegations in paragraph 123.

124. T-Mobile denies the allegations in paragraph 124.

125. T-Mobile denies the allegations in paragraph 125.

## COUNT VI

### Tortious Interference With Contract

126. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 125.

127. Paragraph 127 contains legal conclusions to which no response is required. To the extent a response is required, T-Mobile denies the allegations in paragraph 127.

128. T-Mobile denies the allegations in paragraph 128.

129. T-Mobile admits that AT&T sent it a letter dated November 24, 2025 and respectfully refers the Court to that letter for an accurate recitation of its contents. T-Mobile denies the other allegations in paragraph 129.

130. T-Mobile denies the allegations in paragraph 130.

131. T-Mobile denies the allegations in paragraph 131.

132. T-Mobile denies the allegations in paragraph 132.

133. T-Mobile denies the allegations in paragraph 133.

## COUNT VII

### Misappropriation

134. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 133.

135. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 135, and on that basis denies them.

136. T-Mobile admits that customers can view their account data through AT&T's website. T-Mobile denies the other allegations in paragraph 136.

137. T-Mobile lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in the first two sentences of paragraph 137, and on that basis denies them. T-Mobile denies the other allegations in paragraph 137.

138. T-Mobile denies the allegations in paragraph 138.

139. T-Mobile denies the allegations in paragraph 139.

## COUNT VIII

### False and Misleading Advertising in Violation of Section 43(a) of the Lanham Act 15 U.S.C. § 1125(a)

140. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 139.

141. T-Mobile denies the allegations in paragraph 141 except admits that AT&T and T-Mobile each offer wireless telecommunications services to customers in the United States and are competitors.

142. T-Mobile denies the allegations in paragraph 142.

143. T-Mobile denies the allegations in paragraph 143.

144. T-Mobile denies the allegations in paragraph 144.

145. T-Mobile denies the allegations in paragraph 145.

146. T-Mobile denies the allegations in paragraph 146.

147. T-Mobile denies the allegations in paragraph 147.

148. T-Mobile denies the allegations in paragraph 148.

149. T-Mobile denies the allegations in paragraph 149.

150. T-Mobile denies the allegations in paragraph 150.

151. T-Mobile denies the allegations in paragraph 151.

152. T-Mobile denies the allegations in Paragraph 152.

## COUNT IX

### Unfair Competition

153. T-Mobile incorporates its responses to the allegations in paragraphs 1 through 152.

154. T-Mobile denies the allegations in paragraph 154.

155. T-Mobile denies the allegations in paragraph 155.

156. T-Mobile denies the allegations in paragraph 156, except lacks sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in the second sentence of paragraph 156.

157. T-Mobile denies the allegations in paragraph 157.

158. T-Mobile denies the allegations in paragraph 158.

## REQUEST FOR RELIEF

T-Mobile states that no response is required to AT&T's requests for relief. To the extent a response is required, T-Mobile states that AT&T is not entitled to any relief.

## JURY DEMAND

T-Mobile states that no response is required to AT&T's demand for a jury trial.

## DEFENSES

159. T-Mobile asserts the following defenses in response to the Second Amended Complaint and reserves the right to assert other defenses or claims when and if they become appropriate and/or available in this action, including after discovery. The statement of any defenses in this Answer does not assume the burden of proof for any issue, fact, or element of a claim to which the applicable law places the burden of proof on a party other than T-Mobile.

## FIRST DEFENSE

160. To the extent that AT&T asserts that T-Mobile's conduct is prohibited under AT&T's Terms of Use, the Terms of Use are unenforceable and/or void as against public policy. To the extent that any claims rely on an alleged breach of AT&T's Terms of Use, AT&T has failed to state a claim.

## SECOND DEFENSE

161. With respect to AT&T's tortious interference with contract claim, T-Mobile's conduct is absolutely privileged, justified, or excused. T-Mobile has a right to compete with AT&T, and T-Mobile's conduct was in bona fide pursuit of its efforts to compete. T-Mobile developed Easy Switch in order to facilitate consumer choice and promote competition. Accordingly, T-Mobile's conduct cannot support a tortious interference with contract claim.

## THIRD DEFENSE

162. AT&T's claims against T-Mobile are barred, in whole or in part, because T-Mobile had legitimate justification for the conduct at issue. T-Mobile developed Easy Switch in order to

facilitate consumer choice and promote competition. T-Mobile therefore had a legitimate justification for its conduct, barring AT&T's claims.

**FOURTH DEFENSE**

163. AT&T's claims are barred, in whole or in part, because it has not incurred any damages.

**FIFTH DEFENSE**

164. AT&T's claims are barred, in whole or in part, because to the extent it has suffered any damages, it failed to mitigate those damages.

**SIXTH DEFENSE**

165. AT&T's claims are barred, in whole or in part, because relief to Plaintiffs would result in unjust enrichment to Plaintiffs.

**SEVENTH DEFENSE**

AT&T is not entitled to any equitable relief, including injunctive relief, based on the doctrine of unclean hands.

**EIGHTH DEFENSE**

166. AT&T is not entitled to any equitable relief, including injunctive relief, because the requested relief is contrary to the public interest.

**RESERVATION OF RIGHTS**

T-Mobile reserves the right to amend its responses above and to assert additional defenses, as established by the facts of the case obtained through discovery and/or continuing investigation.

**COUNTERCLAIMS**

167. Counterclaim Plaintiff T-Mobile US, Inc. ("Counterclaim Plaintiff" or "T-Mobile"), by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 8(d),

hereby alleges the following Counterclaims in the alternative against Counterclaim Defendants AT&T Services, Inc. and AT&T Mobility LLC (together, "AT&T") as follows:

**NATURE OF THE COUNTERCLAIMS**

168. T-Mobile brings these Counterclaims in the alternative. T-Mobile maintains that AT&T's Second Amended Complaint does not contain any viable claims, that T-Mobile has valid defenses to all of AT&T's claims, and that the advertising practices AT&T challenges—such as the use of qualifying, footnoted, or hyperlinked disclosures and the presentation of aggregated or bundled savings comparisons—are, as employed by T-Mobile, not false, misleading, or otherwise actionable under Section 43(a) of the Lanham Act or as unfair competition. However, if a fact-finder were to find that AT&T's Second Amended Complaint may contain any legally viable claims, then AT&T too should be held accountable, as it routinely engages in the same or materially similar advertising practices that its claims against T-Mobile challenge, *see, e.g.*, SAC ¶¶ 3, 7, 148. That T-Mobile brings these Counterclaims in the alternative under Federal Rule of Civil Procedure 8(d) is not in any way an admission or an endorsement of AT&T's theories or claims.

**THE PARTIES**

169. Counterclaim Plaintiff T-Mobile is a Delaware corporation with its principal place of business in Bellevue, Washington.

170. Based on the allegations of the Second Amended Complaint, Counterclaim Defendant AT&T Mobility LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. AT&T Mobility LLC is an indirectly owned subsidiary of AT&T Inc.

171. Based on the allegations of the Second Amended Complaint, Counterclaim Defendant AT&T Services, Inc., is a Delaware corporation with its principal place of business in Dallas, Texas. AT&T Services, Inc. is a wholly owned subsidiary of AT&T Inc.

## JURISDICTION AND VENUE

172. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 over T-Mobile's counterclaim under the Lanham Act, 15 U.S.C. § 1125. This Court has supplemental jurisdiction over T-Mobile's counterclaim for unfair competition pursuant to 28 U.S.C. § 1367(a), because that counterclaim is so related to T-Mobile's Lanham Act counterclaim that it forms part of the same case or controversy; indeed, AT&T has itself invoked this Court's jurisdiction over analogous state-law claims, including its own claim for unfair competition, in the Second Amended Complaint. AT&T has also submitted to venue and jurisdiction in this Court by bringing its claims set forth in its original Complaint, its First Amended Complaint, and its Second Amended Complaint. AT&T is also subject to this Court's personal jurisdiction, consistent with the principles of due process and the Texas Long Arm Statute.

173. As alleged in the Second Amended Complaint, AT&T Services has its headquarters within this District at 208 S. Akard Street, Dallas, TX 75202.

174. AT&T maintains a substantial and continuous presence in Texas and in this District, including through its physical retail locations and by operating telecommunications networks that reach customers throughout Texas and this District.

175. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because AT&T resides in this District, including through AT&T Services, Inc.'s principal place of business and headquarters in Dallas, Texas, and because a substantial part of the events giving rise to these Counterclaims occurred in this District. Venue is further proper because AT&T chose this forum by filing its claims here.

## FACTUAL BACKGROUND

176. T-Mobile is one of the nation's leading wireless carriers, serving over 140 million customers across the United States. T-Mobile has built its business by competing aggressively but

fairly on price, value, and network performance, and by innovating to reduce pain points for wireless customers, including through the Easy Switch tool at issue in this action, which makes it easier for consumers to compare competing wireless offerings and choose the provider that best serves their needs. T-Mobile is also committed to truthful advertising that gives consumers accurate information to help them make informed decisions.

177. AT&T's Second Amended Complaint accuses T-Mobile of deceiving consumers through an alleged "pattern and practice" of false and misleading advertising. *See* SAC ¶¶ 2, 3, 7, 61, 148. For instance, AT&T criticizes T-Mobile for advertising savings relative to T-Mobile's own standard rack rates in the context of "switching" offers; disclosing terms, conditions, and explanations in fine print and behind links presented alongside marketing claims; making assertions about connectivity allegedly without a factual basis; and declining to implement certain recommendations from the National Advertising Division ("NAD") *E.g.*, *id.* ¶¶ 48, 51-56, 59, 60, 63, 147. Yet even as it presses those accusations, AT&T is itself engaged in a "pattern and practice" of advertising that uses the very same tactics that AT&T claims are false and misleading when employed by its competitors. AT&T routinely uses what its Second Amended Complaint challenges as fine-print disclosures, *see* SAC ¶¶ 53-54, 56, 72, 145; self-referential savings claims, *id.* ¶ 142; and click-through terms and conditions, *id.* ¶¶ 64, 77. *See infra* ¶¶ 183-186, 188, 192, 195, 200-202, 207, 209. Accordingly, if those practices render any T-Mobile advertisement false and misleading, then AT&T's advertising is equally false and misleading. By AT&T's logic, its use of advertising tactics that it alleges are misleading when used by others demonstrates that AT&T "knows what it is doing is wrong," SAC ¶ 59. Through these conditional Counterclaims, T-Mobile seeks to hold AT&T accountable under the very same Section 43(a) and unfair competition standards that AT&T cynically invokes against T-Mobile in this case.

## I. AT&T's Own Advertising Employs the Same Types of Claims it Challenges Here

178. While pursuing this action and wrongly accusing T-Mobile of misleading consumers through allegedly deceptive advertising claims, AT&T has simultaneously engaged in its own widespread marketing that relies on claims with the same features AT&T faults T-Mobile for using. These claims appear across AT&T's website and in television commercials, digital advertising, and other promotional materials.

179. As described below, AT&T frequently presents its advertising claims in broad terms while relegating important qualifications, limitations, exclusions, and conditions to disclosures, hyperlinks, or separate webpages. *See infra* ¶¶ 188, 192, 195, 200-202, 207, 209. But where T-Mobile's advertising has used similar features, AT&T alleges that they amount to a pattern and practice of false and misleading advertising. *See, e.g.*, SAC ¶¶ 2, 3, 7, 55, 58, 62, 148. Many purported benefits that AT&T presents as exclusive to its customers are subject to significant restrictions that are not disclosed in the primary advertising message—or are not in fact exclusive at all. According to AT&T, this is also false and misleading advertising. *Id.* ¶¶ 65-71.

180. The following examples illustrate AT&T's routine use of the same types of advertising practices and claim structures that it now contends are unlawful when used by T-Mobile. Collectively, the following examples amount to what AT&T has called a "pattern and practice of deception," SAC ¶ 2. To the extent T-Mobile's advertising is determined to be deceptive, then AT&T "routinely launches new advertisements that employ the same categories of misrepresentations," *id.* ¶ 7.

## II. AT&T's Self-Referential Savings Claims and Comparative Benefits Claims

181. AT&T's comparative-savings advertising mirrors the practices the Second Amended Complaint challenges in T-Mobile's advertising. AT&T makes prominent headline savings claims based on calculations that are "compared to [AT&T's] own pricing" and

accompanied by disclosures comparable to T-Mobile's, which AT&T characterizes as inadequate. AT&T also touts what it calls unique customer benefits. When T-Mobile does this, AT&T insists that the benefits are based on inflated value and inaccurate comparisons to competing offers, thereby "artificially bolstering the differential." SAC ¶ 142; *see also id.* ¶ 48. Applying AT&T's standards, the same is true for AT&T's advertising.

***"Deals Worth Switching For"***

182. On AT&T's "switch and save" website, where consumers can compare carriers directly before deciding whether to switch, AT&T prominently advertises multiple "[d]eals worth switching for."[1]




183. Among those "deals," AT&T tells consumers that they can "[s]ave up to $360 per line when you switch to AT&T and bring your own smartphone" and that consumers can "[s]witch and save" and "[g]et up to $200 off per line."[2] But these purported savings are each tied to an

---

[1] *Switch to AT&T Wireless: Deals, Offers & More*, AT&T, https://www.att.com/wireless/switch-and-save/ (last visited Sept. 11, 2026).
[2] *Id.*

AT&T promotional incentive rather than any comparison of AT&T's underlying rates, plan prices, or overall cost of service with those of its competitors. According to AT&T's allegations against T-Mobile, touting those purported savings for switching to AT&T misleads consumers, because the advertised savings are "really only discounts…from [AT&T's] off-the-shelf pricing, not a reduction from the customer's current [T-Mobile] payment." SAC ¶ 64.

184. For example, the advertised "up to $360" savings is provided through bill credits distributed over a three-year period as part of AT&T's switching offer. The savings comparison is thus to AT&T's rack rate; although presented in the context of a "switching" offer, the claimed savings have no relationship to what subscribers would pay if they stuck with another carrier, like T-Mobile. According to AT&T's complaint, "present[ing] 'savings' reflecting the difference between [the carrier's] discounted rate and [its] significantly higher rack rate" is an "intentionally misleading tactic[]." SAC ¶ 63.

185. Similarly, when AT&T tells consumers that they can "switch and save" to "get up to $200 off per line," the advertised savings come from a "$5.56/mo. bill credit" spread over a three-year period for customers who take advantage of an AT&T promotion on calling or ordering online.[3] Again, this is "a comparison between [AT&T] and itself," not "[a] comparison between AT&T and T-Mobile," as, according to AT&T, "any reasonable consumer would naturally expect" of a webpage dedicated to switching carriers and saving. SAC ¶ 63.

186. AT&T therefore uses the exact marketing convention that it attacks: prominently touting a large savings number in the switching context even though "the estimated savings are calculated compared to [AT&T's] own pricing." SAC ¶ 142. According to AT&T, this advertising tactic violates the Lanham Act. *Id.*

---

[3] *Id.*

***Comparative Benefit Claims***

187. AT&T's "switch and save" website also touts purportedly exclusive AT&T features and benefits to attract customers from competing carriers.[4] Under the header "See how we stack up against the competition," AT&T presents a side-by-side comparison of its wireless plans against T-Mobile's and Verizon's, including a chart claiming to compare the availability of features across specific AT&T, T-Mobile, and Verizon rate plans.[5] The chart directly compares the AT&T Elite 2.0 and Premium 2.0 plans with T-Mobile's Experience Beyond plan and Verizon's Unlimited Ultimate plan, and it highlights a series of supposed AT&T advantages over both competing plans. In some instances, the purported exclusive feature is in fact available from T-Mobile. In other instances, AT&T's purported, exclusive benefits are just AT&T-branded features with little value, presented as unique competitive differentiators. Applying AT&T's own allegations to AT&T's conduct, this would create a materially misleading impression for potential switchers.

[4] *Switch to AT&T Wireless: Deals, Offers & More*, AT&T, https://www.att.com/wireless/switch-and-save/ (last visited Sept. 11, 2026).
[5] *Id*.

## See how we stack up against the competition

Enjoy your choice of the best deals, no matter what plan you choose. Plus get flexible payment options.

| | AT&T Elite 2.0℠ | AT&T Premium 2.0℠ | T-Mobile Experience Beyond | Verizon Unlimited Ultimate |
|---|---|---|---|---|
| AT&T Guarantee® Included with all our AT&T Fiber®, AT&T Internet Air®, and postpaid wireless plans. | GUARANTEE AT&T GUARANTEE | GUARANTEE AT&T GUARANTEE | ✗ | ✗ |
| **Unlimited talk, text, and high-speed data** With no usage limits. | ✓ | ✓ | ✓ | ✓ |
| AT&T Turbo Upgrade to enhanced wireless data performance for $7/mo. | Included at no extra cost | ✓ | ✗ | ✗ |
| AT&T Next Up Anytime Get a new phone anytime without worrying about the remaining balance of your installment plan.[1] | ✓ | ✓ | ✗ | ✗ |
| **Mix and match with other plans** Pick the perfect plan for everyone on your account. | ✓ | ✓ | ✗ | ✓ |
| **Canada, Mexico, and Latin America** Wireless included at no extra charge | Included plus 20GB/mo. international high-speed data. | ✓ | Unlimited text and 30GB/mo. of high-speed data in Canada and Mexico only. Plus 15GB/mo. of international high-speed data. | Talk, text, high-speed data in Canada and Mexico only |
| **Max. phone lines per account** Let friends and family pay for their own line with SplitPay | 10 lines | 10 lines | 12 lines | 8 lines |

[1]Req. purchase of eligible smartphone on AT&T Installment Plan℠ with extra $10/mo. Next Up Anytime feature, qualified credit and eligible svc. Upgrade eligible with qualified turn-in. Maximum 3 upgrades in a 12-month period. Limits & restrictions apply.

[2]Data speeds may temporarily slow if the network is busy, except on top plans.

188. First, the "switch and save" plan comparison chart presents the "AT&T Guarantee" as an exclusive, included feature.[6] But the website fails to inform a reasonable consumer what AT&T is supposedly "Guaranteeing." Is it price? Network quality? Customer satisfaction? The

[6] *Switch to AT&T Wireless: Deals, Offers & More*, AT&T, https://www.att.com/wireless/switch-and-save/ (last visited Sept. 11, 2026).

chart contains ***no*** information whatsoever about what the "Guarantee" actually is or about the significant limitations that render it nearly valueless for the typical subscriber. Only by following a hyperlink to a separate, AT&T Guarantee website—which the plan comparison chart does not explain contains critical details—does a potential switcher learn about the significant limitations on this purported "Guarantee." According to AT&T's operative complaint, "includ[ing] disclaiming information" on webpages only "in hidden fine print" or through a "'get full terms' link" constitutes deception. SAC ¶¶ 54, 72, 77. Here, the "disclaiming information" appears behind a link that is not labeled as containing "terms[]" and conditions. According to AT&T, that is necessarily misleading.

189. The separate AT&T Guarantee website states that AT&T promises to automatically credit customers' bills "[i]n the rare event of a network outage."[7] In fact, the Guarantee only applies if AT&T determines "in its sole discretion" that a qualifying wireless outage has occurred, defined as a single incident affecting at least eight towers for sixty or more minutes, and only if the customer was connected to an impacted tower when the outage began and lost service for at least sixty consecutive minutes as a result.[8] The Guarantee further excludes numerous categories of outages, including "events beyond the control of AT&T," which purportedly includes incidents such as "natural disasters, weather-related events, or outages caused by third parties."[9]

190. These problems are part of a broader "pattern and practice" of AT&T using what it would call misleading claims to market its "Guarantee" product. *See* SAC ¶¶ 2, 148. Notably, in September 2025, the NAD concluded that AT&T's advertising of the Guarantee was misleading

---

[7] *AT&T Guarantee: Reliable Connectivity & Service*, AT&T, https://www.att.com/why-att/guarantee/ (last visited Sept. 11, 2026) (under "What is the AT&T Guarantee?" dropdown). The limitation was previously even more significant, requiring a single incident affecting at least ***ten*** towers for at least sixty minutes.

[8] *Id.* (fine print at the bottom of the page).

[9] *Id.*

because the "first reference to the AT&T Guarantee … is not accompanied by a disclosure" explaining the material limitations of the offer.[10] Nevertheless, more than a year later, AT&T continues to advertise the Guarantee prominently as "America's best guarantee" without disclosing its numerous restrictions and eligibility requirements at the point where consumers first encounter the claim, as shown on the graphic in paragraph 187 above. In fact, the large banner at the top of the AT&T Guarantee website still makes one of the exact claims that the NAD found unsubstantiated and recommended discontinuing—that AT&T is the "first and only provider" to make such a guarantee.[11]




AT&T likewise continues to feature the Guarantee in its "switch and save" plan comparison chart in the same manner, without explaining what the Guarantee is, much less disclosing its restrictions. By AT&T's own logic, AT&T's use of advertising tactics that it claims are misleading when used by others demonstrates that AT&T "knows what it is doing is wrong," SAC ¶ 59.

---

[10] *AT&T Servs., Inc. (AT&T Internet & Mobile Services)*, NAD Case No. 7431, at 17 (BBB Nat'l Programs Nat'l Advert. Div. Sept. 3, 2025) (explaining that "[t]he very first instance a claim appears on a webpage is often the first time a consumer sees a claim, and the consumer may not scroll down further to see associated disclosures.").

[11] *AT&T Guarantee: Reliable Connectivity & Service*, AT&T, https://www.att.com/why-att/guarantee/ (last visited Sept. 11, 2026); AT&T Servs., NAD Case No. 7431, *supra* note 10, at 19.

191. Second, AT&T highlights its "Turbo" offering in the "switch and save" comparison chart, which AT&T describes as the ability to "[u]pgrade to enhanced wireless data performance for $7/mo" (or at "no extra cost" for AT&T Elite 2.0 subscribers). AT&T presents this as an exclusive advantage offered by AT&T and unavailable to customers on the comparable T-Mobile plan.[12]

192. To determine from these claims what AT&T Turbo is or how it works, consumers must navigate via a link to the AT&T Turbo webpage and click on yet another separate "see details" hyperlink to see a set of terms and conditions for this purportedly exclusive and supposedly valuable feature. It is only after the consumer navigates to a separate webpage and clicks through a hyperlink that the consumer is told that "AT&T Turbo doesn't provide extra data," that it "also doesn't apply to messaging or voice," that "coverage [is] not available everywhere," and that "after you exceed your hotspot allotment, your hotspot speeds are slowed."[13] AT&T further discloses that "[d]uring peak network congestion, AT&T Turbo benefits may not be noticeable."[14] According to AT&T, "burying [information] in fine print" and requiring users to follow a link to see disclosures is misleading, SAC ¶¶ 53-54, 72, 77, 145.

193. Although this is not apparent from the "switch and save" plan comparison chart, all AT&T Turbo provides is data prioritization relative to other ***AT&T*** customers. Including such a self-referential claim in the context of a graphic intended to induce consumers to "switch" from other carriers is, according to AT&T's reasoning, misleading. By AT&T's logic, a reasonable consumer reading the chart would believe that AT&T Turbo provides "enhanced wireless data

---

[12] *Switch to AT&T Wireless: Deals, Offers & More*, AT&T, https://www.att.com/wireless/switch-and-save/ (last visited Sept. 11, 2026).

[13] *AT&T Turbo for Enhanced Connectivity On the Go*, AT&T, https://www.att.com/plans/att-turbo (last visited Sept. 11, 2026) (main Turbo webpage); *What Is AT&T Turbo?*, AT&T, https://www.att.com/wireless/what-is-turbo/ (last visited Sept. 11, 2026) (linked in dropdown at the bottom of the main page under "What is AT&T Turbo?", containing disclosures).

[14] *Id*.

performance" in comparison to data speeds experienced by ***T-Mobile*** subscribers on the Experience Beyond plan. It is only by clicking through links and reviewing fine print that the consumer learns the truth about AT&T Turbo – that it not a comparison of AT&T and T-Mobile data performance at all.

194. Even if consumers understood that AT&T Turbo was a feature providing for higher relative data prioritization on the AT&T network, AT&T's "switch and save" chart still misleadingly suggests with a red "X" in the T-Mobile column that subscribers to T-Mobile's Experience Beyond plan lack access to the same kind of data prioritization. In fact, however, T-Mobile Experience Beyond customers already receive the highest available consumer data prioritization, without paying an additional monthly charge.

195. Third, the chart claims that AT&T's "Next Up Anytime" feature offers a "new phone anytime without worrying about the remaining balance of your installment plan." AT&T's chart misleadingly presents "Next Up Anytime" as an ***included*** feature of the two advertised AT&T rate plans. It is only in the fine print below that AT&T discloses that this feature is not included but instead requires payment of a $10 monthly fee in addition to requiring "purchase of an eligible smartphone on AT&T installment Plan."[15] According to AT&T, such a disclosure is unlikely to be read and understood by consumers. In addition, AT&T's "switch and save" chart assures consumers that "Next Up Anytime" will allow them to "[g]et a new phone anytime without worrying about the remaining balance of your installment plan," but it fails to disclose that "Next Up Anytime" will in fact cover, at most, $799.99 of any remaining installment plan balance—an amount much less than the cost of most new, premium smartphones. AT&T only discloses this

[15] *Switch to AT&T Wireless: Deals, Offers & More*, AT&T, https://www.att.com/wireless/switch-and-save/ (last visited Sept. 11, 2026).

and other critical limitations on a separate webpage.[16] Finally, AT&T's "switch and save" chart falsely implies with a red "X" that T-Mobile does not offer any early-upgrade feature; in fact, T-Mobile's Experience Beyond plan ***includes*** an early upgrade feature that is comparable in many ways—except that T-Mobile subscribers are not required to pay an extra $10 per month to get it.[17]

***"First to launch their best deals"***

196. Prior versions of the plan comparison chart on AT&T's "switch and save" website were no better. For example, the chart previously highlighted another purportedly exclusive AT&T advantage: that AT&T is the "[f]irst to launch their best deals for both new and existing customers."[18] The chart again presents that advantage as unavailable to T-Mobile customers.

---

[16] *See* AT&T, *Next Up Anytime*, https://www.att.com/plans/next-up-anytime (last visited Sept. 11, 2026).
[17] *See* T-Mobile, *Early Upgrade*, https://www.t-mobile.com/support/plans-features/early-upgrade (last visited Sept. 11, 2026).
[18] *Switch to AT&T Wireless: Deals, Offers & More*, AT&T, Internet Archive Wayback Machine (Nov. 7, 2025), https://web.archive.org/web/20251107130108/https:/www.att.com/wireless/switch-and-save/#compare-us.



## See how we stack up against the competition

When it comes to your choice of the best deals, wireless plans, and flexible payment options, we've got you covered.

| | AT&T | T-Mobile | Verizon |
|---|---|---|---|
| First to launch their best deals for both new and existing customers | ✓ | ✗ | ✗ |
| Best deals with your choice of unlimited plans<br>Data speeds may temporarily slow if the network is busy, except on top plans. | ✓<br>Choose any **entry, mid, or top** Unlimited Your Way® plan | ✗<br>No choice—top plan only | ✗<br>No choice—top plan only |
| Mix and match your family's plans | ✓ | ✗ | ✓ |
| With AT&T Next Up Anytime, upgrade anytime without worrying about the remaining balance of your installment plan.[1] | ✓ | ✗ | ✗ |
| Covered by the AT&T Guarantee with proactive bill credits for qualifying network outages.[2] | ✓ | ✗ | ✗ |

Competitor comparison based on publicly available date as of September 3, 2025

[1]Req's purchase of eligible smartphone on AT&T Installment Plan℠ with extra $10/mo. Next Up Anytime feature, qualified credit and elig. Svc. Upgrade elig. with qualified turn-in. Max 3 upgrades in a 12-month period. Limits & restr's apply.

[2]Credit for wireless downtime lasting 60 minutes or more caused by a single incident impacting 10 or more towers. Restrictions and exclusions apply. Learn more at att.com/guarantee

197. This purported advantage is meaningless and provides no discernable benefit to consumers. Nor does AT&T explain what it means to be the "first" to offer its "best deals" to new and existing customers, why that characteristic would matter to a consumer, or how it differentiates AT&T from its competitors. What other carrier would be the "first" to offer AT&T's "best deals" to AT&T's customers? Unsurprisingly, T-Mobile regularly extends promotional offers to its new and existing customers as well, notwithstanding the "X" in the T-Mobile column. AT&T's purported comparison both makes no sense and is misleading to consumers.

**AT&T Television Commercials and Other Materials Use Techniques AT&T Contends Are Misleading When Deployed By T-Mobile*AT&T Guarantee***

198. AT&T's television commercials advertising the AT&T Guarantee further evidence AT&T's pattern and practice of releasing advertising that is false and misleading under the standards AT&T seeks to apply to T-Mobile. AT&T's commercials fail to clearly communicate to consumers what the Guarantee is and how little it actually covers.

199. In numerous advertisements, AT&T presents the Guarantee as though it somehow guarantees service continuity in real time, thereby providing immediate value when cellular connectivity is poor. In reality, as described above, the AT&T Guarantee is replete with restrictions and limitations that render it of little meaningful value to subscribers. The "Guarantee" does nothing to ensure connectivity in real time or to restore connectivity when it goes out. The "Guarantee" is simply a bill credit program that applies only in narrow circumstances, subject to a host of restrictions, exclusions, and eligibility requirements that significantly limit when a consumer may actually receive the intended benefit. AT&T also retains apparently unlimited "discretion" to determine if the Guarantee applies to a particular outage. The broad messages conveyed by AT&T's TV advertising for the Guarantee materially overstate the practical benefit available to consumers.

200. In a recent AT&T Guarantee commercial, for instance, NBA player Blake Griffin receives a notification on his phone and says, "Oh wow, AT&T just credited my bill. I guess the service was out and I didn't even notice. It really is America's best guarantee[.]"[19] Prominent text appears on the screen at the end of the ad, and a matching voiceover reads, "When the connection matters it has to be AT&T…the company with America's best guarantee."[20] The only disclosures

[19] AT&T Wireless TV Spot, *Guarantee: The Gift*, Featuring Blake Griffin, Arturo Castro, iSpot.tv, https://www.ispot.tv/ad/gKQG/at-and-t-inc-bill-credit-featuring-blake-griffin (last visited Sept. 11, 2026).
[20] *Id*.

detailing the limited circumstances under which the Guarantee applies, and disclosing the substantial restrictions on eligibility, appear in what AT&T would call tiny text at the bottom of the screen at the very beginning of the ad. The advertisement implies that the Guarantee will provide subscribers with instant bill credits whenever they experience any service disruption, even one too minor to be detected by someone staring at their smartphone, as Blake Griffin does in the advertisement. AT&T discloses key limitations on the Guarantee in what AT&T would call "tiny white text" or "barely visible fine print" "[c]amouflaged at the bottom of the screen." SAC ¶¶ 53, 54. According to AT&T, such an "advertisement further deceives customers because they will not notice or navigate to [www.att.com/guarantee]," *id.* ¶ 54—the website disclosing the restrictions and exclusions that apply beyond the specific limitations stated in AT&T's "tiny" disclosure text.

201. Another AT&T Guarantee commercial shows a woman at a business conference speaking on the phone with someone providing live updates from a college football game; she is eagerly awaiting play-by-play updates and passes off her excitement as conference-related when she is told that her team scored.[21] The advertisement opens with a voiceover saying that "at AT&T we guarantee our network so you and your team never miss a play" and concludes by explaining that "in the rare event of a network outage you will automatically get a bill credit for a full day of service. That's all part of the AT&T Guarantee."[22] Again, AT&T's disclaimer about the Guarantee is limited to what it would call "tiny" print, SAC ¶ 53, which AT&T alleges is inadequate. The disclaimer states that the Guarantee is "[f]or wireless downtime lasting 60 minutes or more caused by a single incident impacting 10 or more towers" and that customers "[m]ust be connected to impacted tower at onset of outage."[23] Per AT&T's logic, "consumers would still be unlikely to

[21] AT&T Wireless TV Spot, *Guarantee: Conference Projections*, iSpot.tv, https://www.ispot.tv/ad/BFqd/at-and-t-wireless-guarantee-football-projections (last visited Sept. 11, 2026).
[22] *Id.*
[23] The threshold for the number of towers that must be impacted to trigger the "Guarantee" has changed over time.

understand that" the Guarantee does not provide the "benefits" of uninterrupted service, SAC ¶ 144. According to AT&T, consumers "will not notice or navigate to" the further web-based disclosure of the "[r]estrictions and exclusions [that] apply," nor will they "be able to read and comprehend… fleeting, small text," SAC ¶¶ 54, 56. The scene portrayed has nothing to do with the substance of the AT&T Guarantee, and by depicting an AT&T customer seamlessly receiving real-time updates during a critical moment and emphasizing that customers will "never miss a play," the advertisement (applying the standards that AT&T applies to T-Mobile's advertising) misleadingly gives the impression that the Guarantee somehow kicks in to "guarantee" service in real time.

202. Yet another recent commercial shows a series of passengers in a rideshare car.[24] After the driver encourages one passenger to spend time making calls instead of scrolling on her phone, a succession of later passengers are shown engaged in video and phone calls with loved ones. A voiceover and bold, on-screen text says, "When the connection matters, it has to be AT&T. At AT&T we guarantee your network. If there's an outage, we'll make it right."[25] Again, what AT&T would dismiss (when deployed by T-Mobile) as "tiny" text disclosures indicate the narrow circumstances under which the Guarantee actually applies. But according to AT&T, such disclosures would be insufficient to cure the misleading overall impression conveyed by the commercial: that AT&T is guaranteeing to address network outages in real time, and that AT&T is "making it right" by restoring network performance when consumers need it most.

---

[24] AT&T Wireless, "*Time for a Call*" ft. Arturo Castro (2026), YouTube (uploaded by Commercial Archivist, Aug. 2026), https://www.youtube.com/watch?v=BGDyvomOgQU (last visited Sept. 11, 2026).
[25] *Id*.

***AT&T OneConnect "Fast and Simple" Claim***

203. In yet another example of how AT&T seeks to hold T-Mobile to different standards than AT&T would have apply to its own advertising, in March 2026, *after* AT&T had already challenged T-Mobile's "switch in 15 minutes" claim for supposedly promising "unrealistic switching speeds," AT&T began publishing its own, even more aggressive claims about the time it takes consumers to switch to its service. In a public statement touting AT&T's "OneConnect" bundled subscription option, AT&T claims that "[i]n under 5 minutes, new consumers can sign up for AT&T wireless + 1 Gig fiber – simplifying the entire purchase experience."[26] AT&T did not qualify that statement with any limiting or explanatory disclosures, nor did it distinguish the "sign up" process from the activation of and ability to use the AT&T "OneConnect" service; AT&T's footnote disclosure accompanying the "fast and simple" claim leads instead only to fine print about limited regional availability of the service and AT&T's slowing of wireless data speeds if the network is busy. If AT&T is right in its allegations against T-Mobile that "reasonable consumers are likely to understand that 'switching' means using their devices with their new carrier," even though T-Mobile undisputedly states that "[d]evice activation, data & number transfer will take additional time," *id.*, then AT&T's own unqualified representation that consumers can "sign up" for a bundle that includes wireless service in under five minutes is necessarily likely to mislead reasonable consumers.

***Satellite Connectivity***

204. AT&T also has a pattern and practice of running television commercials advertising ***a subscription feature that does not even exist***. AT&T has prominently advertised for years the ability to make calls via satellite connectivity, suggesting that AT&T subscribers in remote

---

[26] *AT&T Launches OneConnect*, AT&T (Mar. 31, 2026), https://about.att.com/story/2026/att-oneconnect.html (last visited Sept. 11, 2026).

locations can already place wireless calls via a satellite network connection. In fact, AT&T's touted technology did not exist at the time those commercials ran—and it still does not exist today.

205. AT&T alleges that T-Mobile made "false and exaggerated network coverage claims" in an advertisement featuring "a rural Kentucky family who say coverage with 'other carriers' is 'hit or miss,' but switching to T-Mobile solved 'a lot' of their coverage problems," SAC ¶ 52, while ignoring its own years-long effort to promote nonexistent satellite connectivity as a meaningful advantage to AT&T customers. AT&T's satellite advertising has never been more than an "exaggerat[ion]" of its "own network capabilities." SAC ¶ 2.

206. AT&T aired a television commercial showing Ben Stiller having an "epic bad golf day."[27] In the ad, Stiller attempts bad golf swings in increasingly remote locations, eventually turning up in the middle of a desert. In an apparent moment of need, Stiller takes out his phone and makes a call to professional golfer Jordan Spieth, which the advertisement conveys is able to go through, despite Stiller's remote location, because his handset connects to a satellite shown orbiting Earth in a dramatic shot from space. His phone specifically displays the words "Making satellite connection…."[28]

[27] AT&T Wireless TV Spot, *Epic Bad Golf Day* Featuring Ben Stiller, Jordan Spieth, iSpot.tv, https://www.ispot.tv/ad/6Dle/at-and-t-wireless-epic-bad-golf-day-featuring-ben-stiller (last visited Sept. 11, 2026).
[28] *Id*.




207. In fact, when it was aired, no one could make a wireless call using any AT&T satellite service, and still today, the technology remains unavailable. The commercial's only disclosure appears for just two seconds in what AT&T would call "small" white text below the satellite—which is shown receiving a signal in AT&T's signature color from the continental United States. The disclosure admits that the satellite is a "demonstration of evolving technology." Under AT&T's view of the efficacy of such disclaimers, it would be unclear to a reasonable consumer that this disclaimer means that AT&T does not offer in any form the satellite calling capability demonstrated by the actors on-screen.




208. In 2024, the National Advertising Division agreed with T-Mobile that AT&T's satellite-connectivity advertising with Ben Stiller conveyed the misleading message that AT&T's Supplemental Coverage from Space ("SCS") was presently available to consumers when, in fact, AT&T did not offer satellite calling to retail wireless customers.[29] The NAD found that there was nothing in the commercial to indicate that the depicted technology was not currently available, including the quick disclosure that was neither prominent nor clear, because the word "evolving" suggested that the technology already existed and was progressing.[30] The NAD recommended that AT&T discontinue or modify the claim. When AT&T appealed that decision, the National Advertising Review Board ("NARB") likewise recommended that AT&T discontinue or modify the claim.[31]

[29] *T-Mobile US, Inc. v. AT&T Servs., Inc.* (AT&T Satellite Calling), NAD Fast-Track SWIFT Case No. 7335 (BBB Nat'l Programs June 12, 2024).
[30] *Id.* at 4.
[31] *T-Mobile US, Inc. v. AT&T Servs., Inc.* (AT&T Satellite Calling), NARB Panel No. 332, SWIFT Appeal of NAD Final Decision No. 7335 (BBB Nat'l Programs July 18, 2024).

209. AT&T alleges that T-Mobile has a pattern and practice of disregarding NAD recommendations to change or abandon advertising claims. But if the examples AT&T cites are sufficient to show that, then AT&T also has such a pattern and practice. As with AT&T's noncompliance with NAD's decision on its Guarantee claims, AT&T continued to advertise its nonexistent satellite connectivity after being warned by NAD. Less than a year later, AT&T aired another commercial making false claims about satellite connectivity. The "Just Called" advertisement depicts a series of individuals placing heartfelt phone calls from dramatic, remote locations, including a horse pasture, the bottom of a canyon, and a boat traveling through a swamp.[32] A voiceover then states that, "with the nation's largest wireless and fiber network, or satellite connectivity, just call, or text, from pretty much anywhere" and "connecting changes everything."[33] Small, white text at the bottom of the screen, "[c]amouflaged" on a field of *white* snow, discloses that coverage and service are not available everywhere, that the "largest" claims are based on third-party and publicly available data, that satellite connectivity is limited to text messaging on select compatible devices, and "limited voice connectivity" via satellite was expected **in late 2026**. *See* SAC ¶ 53.

210. The NARB found that this replacement did not comply with its prior decision, as it communicates substantially the same misleading message that AT&T provides for cellular calls in remote locations via satellite connectivity. The NARB further found that AT&T had not "made a bona fide attempt to bring its advertising in compliance with the NARB decision."[34] Finally,

[32] AT&T Inc. TV Spot, *Just Called*, iSpot.tv, https://www.ispot.tv/ad/Tr00/at-and-t-inc-just-called (last visited Sept. 11, 2026).
[33] *Id.*
[34] *AT&T Servs., Inc.* (AT&T Satellite Calling), NARB Compliance Proceeding No. 7335, NARB No. 332C (BBB Nat'l Programs May 29, 2025), at 3.

AT&T agreed to refrain from using the phrase "satellite connectivity" to imply that such connectivity for calls is currently available.

211. AT&T still does not offer satellite connectivity for voice calling.

**COUNT I**

**(IN THE ALTERNATIVE TO T-MOBILE'S DENIALS AND DEFENSES)**

**False and Misleading Advertising in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**

212. T-Mobile repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs of these Counterclaims as though fully set forth herein. This Count is pleaded in the alternative, pursuant to Rule 8(d); any allegation herein that AT&T's advertising is false, misleading, or material is made solely in the alternative and solely for purposes of this Count and shall not be construed as an admission that any T-Mobile advertising is false, misleading, or unlawful.

213. T-Mobile and AT&T are direct competitors that each offer wireless telecommunications services in interstate commerce to customers throughout the United States.

214. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading savings claims, including prominent headline representations that consumers can "save up to $360 per line" and "get $200 off per line" by switching to AT&T. These attention-grabbing figures are not derived from any straightforward comparison of AT&T's prices to those of competing carriers, but instead depend on promotional reward cards, device subsidies, and multi-line, multi-year financing commitments disclosed only in fine print, and thus convey a far broader and more immediate impression of consumer savings than the material terms of the offers support. *See* SAC ¶¶ 48, 144.

215. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading claims about purportedly exclusive plan features, including falsely claiming that T-Mobile does not offer data prioritization with its Experience Beyond subscription tier, when it in fact comes standard on T-Mobile's Experience Beyond plans.

216. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading claims of comparative superiority, including that AT&T is the "[f]irst to launch their best deals" for new and existing customers, when AT&T offers no substantiation for such claims and comparable promotional offers are routinely available from competing carriers, including T-Mobile.

217. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading claims about the "AT&T Guarantee." AT&T advertises the Guarantee—on comparison tables displayed on its website and throughout its television advertising—as a broad and unqualified benefit, while relegating the Guarantee's multiple restrictions, exclusions, and eligibility requirements to hyperlinked pages and inconspicuous fine print. AT&T's advertising conveys the misleading impression that the Guarantee affords meaningful protection against service disruptions, and even against damage to consumers' devices, when in practice it provides only a limited bill credit made available under restrictive conditions, such as for outages lasting sixty minutes or longer while also excluding numerous categories of outages altogether.

218. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading claims about its "AT&T Turbo" feature. AT&T presents Turbo as an exclusive advantage available to AT&T subscribers but unavailable to customers of competing carriers, while omitting that Turbo is a paid add-on for which AT&T charges most subscribers an additional monthly fee, and that AT&T's own disclosures acknowledge Turbo "doesn't provide extra data"

and "may not be noticeable" during periods of network congestion. In fact, T-Mobile includes comparable priority data access as a standard, default feature of its plans at no additional charge, rendering AT&T's portrayal of Turbo as an exclusive benefit false and misleading.

219. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading claims about its OneConnect bundled subscription offering, including that consumers can sign up in "under 5 minutes," without any disclosure on the actual time it may take to sign up for a multi-product subscription that includes wireless service.

220. AT&T has violated Section 43(a) of the Lanham Act by making false and misleading claims regarding its network and satellite connectivity. AT&T's advertising promotes satellite-based connectivity as a present and available benefit of its network when, as AT&T's own fine-print disclosures concede, that functionality is limited, still evolving, or not yet available to consumers. Both the National Advertising Division and the National Advertising Review Board determined that AT&T's satellite-connectivity advertising conveyed the misleading message that AT&T's Supplemental Coverage from Space was presently available to consumers when it was not, and recommended that AT&T discontinue or modify the claim—guidance with which AT&T agreed to comply but then did not.

221. The foregoing examples are illustrative of AT&T's ongoing pattern and practice of false and misleading advertising, which AT&T disseminates across its website, television commercials, digital advertising, and other promotional materials. AT&T continues to disseminate new advertisements employing the same or similar deceptive tactics, each of which constitutes a further violation of Section 43(a) arising from the same common scheme. T-Mobile reserves the right to present evidence at trial of additional advertisements arising from this pattern and practice. *See* SAC ¶¶ 7, 148.

222. AT&T's false and misleading representations were made in commercial advertising and promotion and were disseminated sufficiently to the relevant purchasing public—current and prospective wireless customers throughout the United States—to constitute "advertising" or "promotion" within the wireless telecommunications industry.

223. AT&T's false and misleading advertising is material to consumers' purchasing decisions, as the representations are intended and likely to influence consumers choosing among competing wireless carriers to view AT&T's services more favorably and those of its competitors, including T-Mobile, less favorably.

224. AT&T's advertising has the tendency and capacity to deceive, and has in fact deceived, a substantial segment of its intended audience—namely, current and prospective wireless customers, including the customers T-Mobile seeks to attract and retain—into believing that AT&T offers benefits, network capabilities, and savings that it does not in fact provide.

225. AT&T caused its false and misleading representations to enter interstate commerce.

226. As a direct and proximate result of AT&T's false and misleading advertising, T-Mobile has suffered and is likely to continue to suffer harm, including lost sales and customers, the diversion of business to AT&T, loss of goodwill, and injury to its reputation, and AT&T has been unjustly enriched.

227. AT&T's false and misleading advertising is deliberate and willful and reflects a considered corporate marketing strategy, rendering this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

228. T-Mobile has no adequate remedy at law and will continue to suffer immediate and irreparable harm unless AT&T is enjoined from its continuing and threatened violations of Section 43(a) of the Lanham Act.

229. T-Mobile is entitled to compensatory damages, disgorgement of AT&T's profits, injunctive relief barring further violations of 15 U.S.C. § 1125(a), enhanced damages, and recovery of its costs and reasonable attorneys' fees under 15 U.S.C. § 1117, together with such other and further relief as the Court deems just and proper.

**COUNT II**

**(IN THE ALTERNATIVE TO T-MOBILE'S DENIALS AND DEFENSES)**

**Unfair Competition**

230. T-Mobile repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs of these Counterclaims as though fully set forth herein. This Count is pleaded in the alternative, pursuant to Rule 8(d); any allegation herein that AT&T's advertising is false, misleading, or material is made solely in the alternative and solely for purposes of this Count, and shall not be construed as an admission that any T-Mobile advertising is false, misleading, or unlawful.

231. As detailed above, AT&T has made false and misleading statements about the costs, features, benefits, and quality of AT&T's and T-Mobile's services in advertising its competing services to consumers, in violation of Section 43(a) of the Lanham Act. *See* SAC ¶¶ 3, 7, 148, 154–155.

232. By making these statements, AT&T has also violated Texas Penal Code § 32.42 because it knew or should have known that its statements were false and misleading, or acted in reckless or criminally negligent disregard of the truth of such statements.

233. AT&T's conduct has interfered with T-Mobile's ability to conduct its business by falsely portraying AT&T's plans, features, and benefits as superior to those of competing carriers, including T-Mobile, and by creating confusion in the marketplace regarding the true costs, features, benefits, and quality of the parties' services. As a result, T-Mobile has had to devote additional

resources to consumer outreach and marketing efforts to counteract AT&T's false and misleading statements.

234. As a direct and proximate result of AT&T's conduct, T-Mobile has suffered, and will continue to suffer, harm, including lost sales and customers, the diversion of business to AT&T, T-Mobile's substantial expenditures on additional consumer outreach and marketing to counteract AT&T's false and misleading statements, and loss of goodwill and injury to its reputation, arising from AT&T's false portrayal of its own services and benefits as superior to those of competing carriers.

235. T-Mobile is entitled to compensatory damages, exemplary damages, injunctive relief barring further violations of 15 U.S.C. § 1125(a) and Texas Penal Code § 32.42, disgorgement of AT&T's profits, recovery of T-Mobile's costs, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff T-Mobile US, Inc. respectfully requests that the Court enter judgment in its favor and against Counterclaim Defendants AT&T Services, Inc. and AT&T Mobility LLC, and award the following relief:

a. A judgment declaring that AT&T has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and has engaged in unfair competition under Texas law;

b. A permanent injunction enjoining AT&T and its officers, agents, servants, employees, successors, and assigns, and all persons acting in concert with them, from disseminating the false and misleading advertising described herein and any advertising employing the same or similar deceptive claims, and from further violating Section 43(a) of the Lanham Act and Texas Penal Code § 32.42;

c. An order requiring AT&T to undertake corrective advertising sufficient to dispel the false and misleading impressions created by its advertising;

d. An award of T-Mobile's actual and compensatory damages in an amount to be proven at trial, and an award of exemplary damages as permitted by law in connection with T-Mobile's unfair competition counterclaim;

e. Disgorgement of AT&T's profits attributable to its false and misleading advertising and unfair competition;

f. An award of enhanced damages and of T-Mobile's reasonable attorneys' fees and full costs pursuant to 15 U.S.C. § 1117, this being an exceptional case;

g. Pre-judgment and post-judgment interest as permitted by law; and

h. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, T-Mobile demands a jury trial on all issues and claims so triable.

Dated: September 11, 2026

Respectfully submitted,

By: /s/ *Hallie B. Levin*
Hallie B. Levin (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Hallie.Levin@wilmerhale.com

Ari Holtzblatt (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6947
Ari.Holtzblatt@wilmerhale.com

Andrés Correa
Jared Eisenberg
LYNN PINKER HURST &
SCHWEGMANN LLP
2100 Ross Avenue, Ste. 2700
Dallas, TX 75201
Telephone: (214) 981-3800
Acorrea@lynnllp.com
Jeisenberg@lynnllp.com

*Counsel for Defendant T-Mobile US, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on September 11, 2026, a true and correct copy of the foregoing was properly served on counsel of record via electronic filing in accordance with the U.S. District Court, Northern District of Texas Procedures for Electronic Filing.

/s/ *Hallie B. Levin*_____
Hallie B. Levin